UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| STATE OF MICHIGAN; CITY OF ROMULUS, | No. 2:26-cv-10968 |
| Plaintiffs, | HON. |
| v. | MAG. |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; and TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement, | |
| Defendants. | |

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. The City of Romulus, Michigan, is a blue-collar town, southeast of Detroit, with a lengthy history of endurance. Romulus endures the impacts of one of the country's largest airports in its borders; it has endured the expansion of that airport, including the

condemnation of property and the displacement of residents from their homes; and it has endured the federal approval of a deep injection site for hazardous waste within its borders.[1]  Despite these impositions beyond its control, Romulus has been on the rise, with a steadily decreasing crime rate and an improving economy—until earlier this year.

2.    In February 2026, the Department of Homeland Security ("DHS"), through its subagency, Immigration and Customs Enforcement ("ICE"), purchased a commercial warehouse, located at 7525 Cogswell Street, Romulus, Michigan 48174 ("Romulus Warehouse"), without notice to any State or City officials.  DHS aims to convert the Romulus Warehouse into an immigration detention center to house 500 detainees.

3.    DHS's plan has thrown the Romulus community into disarray, with multiple protests occurring at or near the Romulus Warehouse, taxing Romulus's public safety (police, fire, and emergency

---

[1] *See* Underground Injection Control Program Hazardous Waste Disposal Injection Restrictions Petition for Exemption—Class I Hazardous Waste Injection Environmental Disposal Systems, Inc., Romulus, MI, 69 Fed. Reg. 15328 (Mar. 25, 2004); *see also* EPA Plans to Reissue Exemption for Hazardous Waste Injection Wells (Sept. 2025), available at https://perma.cc/UGV2-HSLH.

medical services ("EMS")) resources and diverting the City's limited resources to respond to activities stemming from this latest outsider's incursion into Romulus's jurisdiction.

4.      The State of Michigan and the City of Romulus collectively bring this litigation to stop DHS from using the Romulus Warehouse as an immigration detention center.

5.      The Romulus Warehouse is simply not—and never will be— an appropriate place of detention for numerous reasons.  Among others: The Romulus Warehouse is located within a mile of an elementary school and a middle school and abuts residential neighborhoods. (Exhibit 1, Aerial Map.)  The Romulus Warehouse is located on a three-lane, city-owned road that cannot handle traffic for a large-scale immigration detention center.  The Romulus Warehouse is in a floodplain—*and frequently floods*, including last year.  The Romulus Warehouse has only six bathrooms and relies on a 6-inch sewer line connected to a 15-inch city-owned sewage pipe under Cogswell Street— neither of which could possibly handle the sewage load necessary for 500 detainees and staff.

3

6.     DHS also appears to have conducted no search for existing prisons, jails, and detention centers that could provide the increased immigration detention capacity that DHS purports to require.  The State of Michigan owns several empty prison facilities located in communities that may be receptive to ICE's presence, both economically and politically.  Likewise, existing empty prison and jail facilities may exist in Indiana and Ohio that could meet DHS's needs.  Yet, upon information and belief, DHS did not consider any of these—let alone contact their owners.

7.     DHS's expected conversion of the Romulus Warehouse from a commercial warehouse to an immigration detention center and the operation of the Romulus Warehouse as an immigration detention center has harmed and will continue to harm the environmental, economic, public health, and safety interests of the State and City.  DHS appears to have neglected to make any effort to conduct the environmental reviews required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, despite the Romulus Warehouse's location in a floodplain, directly adjacent to a wetland protected by a State-owned conservation easement, and near habitats for protected species.

8.     Further, DHS failed to consult with State and City officials and consider their input before purchasing the Romulus Warehouse, contravening the Intergovernmental Cooperation Act ("ICA"), 31 U.S.C. § 6506(c).

9.     For these reasons, Defendants' actions are contrary to law and arbitrary and capricious.  This Court should vacate and set aside Defendants' decision to construct and operate the Romulus Warehouse as an immigration detention center.  Moreover, this Court should enjoin Defendants from converting the Romulus Warehouse into an immigration detention center and operating it for that purpose.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction under 28 U.S.C. § 1331.

11.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

12.    Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b)(2) and (e)(1).  This is an action against an officer, employee, and/or agency of the United States.  Plaintiff the State of

Michigan is partially located in and Plaintiff the City of Romulus resides in the Eastern District of Michigan, the Romulus Warehouse is located within the Eastern District of Michigan, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within Wayne County and the Eastern District of Michigan.

## PARTIES

### *Plaintiffs*

13.    Plaintiff the State of Michigan is a sovereign state of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

14.    Plaintiff the City of Romulus is a Michigan municipal corporation with its principal offices located at 11111 Wayne Road, Romulus, Michigan 48174.

### *Defendants*

15.    Defendant the United States Department of Homeland Security is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1), and an executive department of the United States government.

16.    Defendant Markwayne Mullin is the Secretary of DHS and the federal official in charge of DHS.   He is sued in his official capacity.

17.    Defendant Immigration and Customs Enforcement, a component of DHS, is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

18.    Defendant Todd M. Lyons is the Senior Official Performing the Duties of the Director of ICE.  He is sued in his official capacity.

## BACKGROUND

19.    Defendants' purchase of the Romulus Warehouse is part and parcel of the Trump administration's efforts to ramp up immigration enforcement throughout the country—and, in many instances, flout the law in the process.

## I.    Immigration Enforcement Surges

20.    ICE's recent immigration enforcement surges in various locations across the country have been a mainstay in the news cycle (and in the courtroom) for many months.

21.    In Chicago, Illinois, for example, ICE immigration enforcement surges sparked widespread protests.  *E.g.*, *Trump v. Illinois*, 607 U.S. __; 146 S. Ct. 432, 433 (2025).  In response, the Trump administration illegally federalized and deployed the National Guard.  *Id.* at 434.  The same occurred in Portland, Oregon, *e.g.*, *Oregon v. Trump*, 802 F. Supp. 3d 1277, 1281–82 (D. Or. 2025), and Los Angeles,

California, *e.g.*, *Newsom v. Trump*, 797 F. Supp. 3d 1092, 1097 (N.D. Ca. 2025).

22.   Next, the Trump administration targeted Minneapolis, Minnesota, where DHS escalated the severity and brutality of its tactics, resulting in the deaths of two American citizens at the hands of ICE and Customs and Border Patrol agents.[2]

23.   Each of these surges have brought a flood of legal challenges to Defendants' activities.  The Eastern District of Michigan alone has addressed more than 120 habeas petitions contesting unlawful immigration detentions and ruled at least 89 detainees were unlawfully denied bond hearings.[3]

---

[2] *See, e.g.*, NYTimes, *New Video Analysis Reveals Flawed and Fatal Decision in Shooting of Pretti* (Jan. 26, 2026), available at https://www.nytimes.com/video/us/100000010668660/new-video-analysis-reveals-flawed-and-fatal-decisions-in-shooting-of-pretti.html; NBCNews, *Trump's DHS immigration enforcement officers have shot 14 people since September. Here's what to know* (March 4, 2026), available at https://www.nbcnews.com/news/us-news/ice-shootings-list-border-patrol-trump-immigration-operations-rcna254202.

[3] Detroit Free Press, *Judges: Hundreds of immigrants jailed illegally in Michigan* (March 18, 2026), available at https://www.freep.com/story/news/local/michigan/2026/03/18/immigrants-jailed-illegally-in-michigan-judges-say/88943497007/.

## II.   ICE's "Detention Reengineering Initiative"

24.   Through these increased immigration enforcement efforts, ICE has brought a staggering number of individuals into DHS custody—reaching the highest level of immigration detention since DHS was created in 2003.[4]

25.   Purportedly to "meet the growing demand for bedspace and streamline the detention and removal process, focusing on non-traditional facilities built specifically to support ICE's needs," ICE developed a "Detention Reengineering Initiative" ("DRI"). (Exhibit 2, ICE DRI, p. 1.)

26.   The DRI outlines a "new detention model" that ICE intends to fully implement by the end of Fiscal Year 2026. (*Id.*)

27.   Under the DRI model, ICE seeks to "strategically increase bed capacity to 92,600 beds" by purchasing and "transforming" existing structures "into processing and detention facilities exclusively for ICE." (*Id.*)

---

[4] *See* CBS News, *ICE's detainee population reaches new record high of 73,000, as crackdown widens* (Jan. 16, 2026), available at https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000/.

28.    This "new model" would apparently replace currently operational "contracted detention facilities[,]" (*id.*) resulting in the closure of dozens of privately owned detention centers and the end of ICE's partnerships with county-run jails.[5]  It also runs contrary to decades of past practice, wherein ICE traditionally avoided expanding detention space through ICE-owned facilities "because of the substantial amount of time needed to design and construct such a facility."[6]

29.    According to the DRI, before purchasing each property, ICE intended to ensure, among other things, that the property had appropriate fire protection water capacity, domestic water supply capacity, wastewater piping and system capacity, and power capacity. (*Id.* at pp. 2–3.)

---

[5] *See* City of Social Circle, *Updated Statement Regarding ICE Detention Facility* (Feb. 18, 2026), https://perma.cc/J3WA-YQ2J; Douglas MacMilan & Aaron Schaffer, *ICE selects untested firms to oversee new warehouse detention centers*, Wash. Post (Mar. 9, 2026).

[6] U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://perma.cc/CCW8-KW82 (stating "officials said that new contracts for ICE-owned service processing centers are not a viable option" because of the time required "coupled with the fact that ICE does not have construction authority").

30.     Additionally, ICE indicated that it had complied or would comply with various federal, state, and local laws, regulations, and standards—including NEPA, relevant federal regulations, environmental regulations, ICE National Detention Standards,[7] and industry best practices—in the purchase and "transformation" of each property.  (*Id.* at pp. 1, 3.)

31.     This appears consistent with past practice: on the rare prior occasions in which DHS attempted to construct or modify a detention center, it has reliably engaged with the NEPA process.[8]

32.     The DRI further indicates that, prior to purchasing each property, "ICE conducted a thorough due diligence process[,]" which included "thorough site inspections[;] analysis of utility services[;] . . . testing and inspection of mechanical and electrical systems[;] . . . review[  of] zoning reports[;] conduct[ing of] site fit testing[;] . . . review[ of] power supply systems, water supply infrastructure, and wastewater

---

[7] ICE, National Detention Standards (revised 2025), available at
https://perma.cc/VP4T-YWSP.

[8] *See* Dep't of Homeland Sec., *DHS Environmental Planning Document Library* (last updated Nov. 14, 2025), available at
https://perma.cc/VR29-NN7L.

exportation based on estimated usage[;] and NEPA surveys." (*Id.* at p. 3.)

33.   Upon information and belief, pursuant to the DRI, ICE purchased numerous warehouses across the country with the intent to convert them into mass detention facilities, including "Regional Processing Centers" and "Large-Scale Detention Facilities." (*Id.* at p. 1.)

## III.   The Romulus Warehouse

34.   Upon information and belief, ICE purchased the Romulus Warehouse as part of its efforts to increase detention capacity under the DRI.

35.   Originally constructed in 2000 for use as an industrial warehouse, the Romulus Warehouse is an approximately 249,090-square-foot building that sits on a 27.15-acre parcel.  The property is zoned for light industrial use.[9]  (*See* Exhibit 3, City Real Estate Summary Sheet; Exhibit 4, Property Transfer Affidavit.)

---

[9] A video showing the interior of the Romulus Warehouse before its purchase by Defendants is available online from the real estate agent: https://perma.cc/FK5B-KNNC.

36.   The property is in close proximity to single-family residential homes to the south.  (Exhibit 1, Aerial Map.)  Two large residential neighborhoods follow further south off Cogswell Street.  (*Id.*)

37.   Two public schools are located very close to the Romulus Warehouse:  Romulus Middle School (~0.75 miles) and Wick Elementary School (~0.85 miles).  (*Id.*)  The local high school, Romulus Senior High School, is less than two miles away.

38.   The property abuts a county-owned drain, referred to as the McClaughrey Drain, to the north.  The property also includes a wet detention pond and an associated pump to move retention water from the detention pond to the drain.

39.   The property borders a 118-acre wetland conservation easement, held by the Michigan Department of Environment, Great Lakes, and Energy (EGLE).  (Exhibit 5, Easement Map.)  The purpose of this easement is to further EGLE's mission under Part 303, Wetlands Protection, of the Michigan Natural Resources and Environmental Protection Act.  Upon information and belief, waterways, the McClaughrey Drain, and floodplains connect the Romulus Warehouse site with this protected area.

40.    The property is also entirely within a federally recognized floodplain, with portions in a 100-year floodplain, 500-year floodplain, and regulated floodway.  (Exhibit 6, Floodplain Notice.)  The property has flooded in the last several years.

41.    Additionally, there is habitat near the Romulus Warehouse for a number of species that are protected or of special concern under Part 365 of Michigan's Natural Resources and Environmental Protection Act, Mich. Comp. Laws § 324.36501, *et seq.*:  the Northern long-eared bat (*Myotis septentrionalis*); the Indiana bat (*Myotis sodalis*); the grasshopper sparrow (*Ammodramus savannarum*); and the Dickcissel (*Spiza americana*).

42.    The Romulus Warehouse is located on Cogswell Street, a three-lane road (two travel lanes and one center turn lane) owned by the City.  The entryways to the Romulus Warehouse do not have associated turning lanes.

43.    The City operates sewage and water services for the community, including the Romulus Warehouse.

44.    The Romulus Warehouse was designed for a standard office setting with low demand use of water and has, upon information and belief, six total bathrooms.

45.    A 6-inch sewage line connects the Romulus Warehouse to the City's 15-inch sewage line under Cogswell Street.

## IV.    Defendants' Purchase of the Romulus Warehouse

46.    Defendants purchased the Romulus Warehouse on or around February 4, 2026, for $34,671,500—an increase in over $12 million from when it was last purchased in 2023.

47.    Before purchasing the Romulus Warehouse, Defendants did not contact the State or City to discuss their plans.

48.    Upon information and belief, before purchasing the Romulus Warehouse, Defendants did not engage with any other impacted local government.

49.    Indeed, the entire purchase was marred with secrecy.

50.    Before purchasing the Romulus Warehouse, Defendants did not contact the Michigan Department of Corrections to determine if there were existing prison facilities that Defendants could purchase or lease for use as an immigration detention facility.

51.     Upon information and belief, Defendants also did not contact local governments that own existing detention facilities or neighboring States, like Ohio or Indiana, to determine if there were existing detention facilities that Defendants could purchase or lease for use as an immigration detention facility.

52.     Upon information and belief, Defendants did not consult with any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved with the decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center.

53.     Upon information and belief, Defendants also did not complete the required environmental assessments under NEPA— including either an Environmental Impact Statement ("EIS") or Environment Assessment ("EA")—related to the purchase, construction, or operation of the Romulus Warehouse as an immigration detention center.

54.     On or around February 20, 2026, DHS published an "Early Notice and Public Review of a Proposed Activity in a 100- to 500-Year Floodplain – Romulus, Michigan" ("Floodplain Notice").  (Exhibit 6,

Floodplain Notice.)  At the time it was posted, as far as Plaintiffs are aware, the Floodplain Notice was the only public document published by Defendants that acknowledged the purchase of the Romulus Warehouse until a Property Transfer Affidavit was filed with the City on or around March 13, 2026—over a month after the purchase.  (Exhibit 4, Property Transfer Affidavit.)

55.    According to the Floodplain Notice, Defendants intend to use the Romulus Warehouse for "short-term, temporary housing for individuals in immigration custody who are awaiting immigration processing and related administrative procedures."  (Exhibit 6, Floodplain Notice, p. 1.)

56.    The Floodplain Notice indicates that Defendants will use approximately 19 acres of the property as a "secure operational area." (*Id.*)

57.    The Floodplain Notice further indicates that Defendants will install "3,800 linear feet of new perimeter security fencing," "one modular security checkpoint structure," "five exterior recreation courts," "exterior lighting and security cameras," "replacement of the existing emergency generator on a new concrete pad," "new telecommunications

cabling," and "sanitary sewer connections or modifications if required by final engineering review." (*Id.*) The Floodplain Notice does not indicate if a "final engineering review" has been completed. However, it notes that "[p]reliminary engineering indicates" the sanitation connection point "may be required to accommodate projected wastewater flows." (*Id.*)

58. The Floodplain Notice does not articulate the type of fencing to be installed or its intended location on the property.

59. The Floodplain Notice also provides no information about interior construction that Defendants intend to complete.

60. The Floodplain Notice suggests that Defendants will comply with permitting requirements for drainage, sewage, and floodplain impact. (*Id.* at p. 2.) However, since the purchase, Defendants have not contacted State and City officials related to permitting, community impact, the strain Defendants' actions will impose, or any support that Defendants can or should offer to the local community to address the

18

burden that the existence of such an immigration detention center will impose.[10]

61.    Upon information and belief, Defendants are currently working to issue a task order through an existing Worldwide Expeditionary Multiple Award Contract (WEXMAC) to retrofit the Romulus Warehouse for use as an immigration detention center.[11]

## V.    Harms to the State and City

62.    The State will suffer significant harm as a result of Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center.

63.    EGLE's interest in its conservation easement will be directly impacted by Defendants' activities at the Romulus Warehouse. Construction is likely to disturb the ground at the Romulus Warehouse

---

[10] While the City's Police Department has informally communicated with ICE employees regarding the proposed use of the Romulus Warehouse and protests, graffiti, and vandalism at the property, none of these conversations have addressed Plaintiffs' significant concerns.

[11] Defendants issued task orders under WEXMAC contracts for construction at similar warehouse facilities in Maryland (https://perma.cc/WAU3-4B8K) and Arizona (https://perma.cc/XNC4-SNKC).  Notably, the Maryland task order provides for a mere sixty-day period of performance for the contractor to complete all construction for the immigration detention center.

site, which may increase sedimentation within the floodplain and to the local waterways and deleteriously impact the immediately adjacent, protected wetlands.  Further, the current sewer lines are insufficient to provide adequate sanitation for 500 detainees and ICE staff, increasing the likelihood of backups and overflows, adversely affecting the nearby waterways, the water table, and wetlands.

64.    The State also has a sovereign interest in protecting its wildlife resources, including species designated for protection under Part 365 of Michigan's Natural Resources and Environmental Protection Act, Mich. Comp. Laws § 324.36501 *et seq*.  Construction and increased activities at the Romulus Warehouse may disturb the habitats of the species that are protected or of special concern.

65.    The City will also suffer significant harm as a result of Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center.

66.    For example, the City has devoted and will be required to continue to devote additional police, fire, and EMS resources to handle not only the disruption of the public peace, safety, and welfare of its residents and local businesses due to Defendants' purchase of and plans

20

for the Romulus Warehouse, but also the medical and emergency response calls to the Romulus Warehouse that will inevitably occur in connection with its operation as an immigration detention center. Devotion of these increased resources is made even more likely given the Romulus Warehouse's proximity to Detroit—a large urban metropolitan area.

67.    The City will experience decreased value of residential homes and commercial properties within its boundaries.

68.    The City also has and will continue to suffer the loss of business investment, opportunity, job creation, and tax base.  Indeed, prior to Defendants' purchase of the Romulus Warehouse, the City's Building Department had recently issued a permit to renovate the Romulus Warehouse's office space.  The contractor was looking to make extensive renovations to accommodate the business needs of a large automobile manufacturer.  This business investment has now been lost as a result of the Defendants' actions.  The City has also heard concerns from existing stakeholders such as Ford Motor Company and Carvana regarding the viability of future investments in the area.

69.    The City does not have adequate road capacity to support the proposed use of the Romulus Warehouse as an immigration detention center, including for ingress and egress.

70.    There are also inadequate setbacks from properties neighboring the Romulus Warehouse with regard to noise, activity, and lighting.

71.    The Romulus Warehouse's location is not consistent with the City's Zoning Ordinance, which does not provide for the proposed use and location of a large-scale detention center similar to a jail, prison, or correctional institution, but rather contemplates light industrial uses such as manufacturing, processing, warehousing, distribution, and research and development.

72.    In addition, the City's sewage and water systems do not have the capacity to service a 500-person immigration detention center operating 24/7 at the Romulus Warehouse.  The Romulus Warehouse was not designed to meet the standards of a prison facility where the peaking factor needs to be increased to the highest demand possible with occupancy anticipated to be 24/7.  Again, the sewage line from the Romulus Warehouse to the main line under Cogswell Street is only 6-

22

inches, which is woefully insufficient to carry the waste of 500 detainees

and staff:



**COUNT I**
**Violation of Administrative Procedure Act § 706(2)(A)**
**Agency Action Contrary to Law (Appropriate Place of**
**Detention, 8 U.S.C. § 1231(g)(1))**

73. Plaintiffs incorporate by reference the prior allegations as if fully restated here.

74. Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA.  5 U.S.C. § 704.

75. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose.  *See City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007) ("Agency action is not in accordance with the law when it is in conflict with the language of the statute relied upon by the agency.") (quotations omitted).

76. Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center was not in accordance with the law.

77.    Under 8 U.S.C. § 1231(g)(1), Defendants must "arrange for appropriate places of detention" for individuals "detained pending removal or a decision on removal."

78.    The Romulus Warehouse is not, and can never be, an appropriate place of detention because:

    a.  The Romulus Warehouse is in close proximity to public schools and residential neighborhoods;

    b.  The Romulus Warehouse is in close proximity to a protected wetland, habitats for protected species, and the public drainage system;

    c.  The Romulus Warehouse is within a floodplain that has a recent history of flooding;

    d.  The Romulus Warehouse is located on Cogswell Street, a three-lane road that lacks the capacity to accommodate a 500-detainee immigration detention center;

    e.  The City has limited sewage and water capacity to support a mass immigration detention center;

    f.  The City has limited public safety (including policing, fire, and EMS) resources to ensure protection for the Romulus

Warehouse, Defendants' employees, and Romulus's residents; and

g. The Romulus Warehouse's location is not consistent with the City's Zoning Ordinance, which does not provide for the proposed use and location of a large-scale detention center similar to a jail, prison, or correctional institution, but rather contemplates light industrial uses such as manufacturing, processing, warehousing, distribution, and research and development.

79. Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

## COUNT II
**Violation of Administrative Procedure Act § 706(2)(A)**
**Arbitrary and Capricious Agency Action (Appropriate Place of Detention, 8 U.S.C. § 1231(g)(1))**

80. Plaintiffs incorporate by reference the prior allegations as if fully restated here.

81.    Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA.  5 U.S.C. § 704.

82.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

83.    An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Id.*; *Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662, 667 (6th Cir. 2013).

84. Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center was arbitrary and capricious because it was not reasonable or reasonably explained.

85. Under 8 U.S.C. § 1231(g)(1), Defendants must "arrange for appropriate places of detention" for individuals "detained pending removal or a decision on removal."

86. But Defendants have not explained how the Romulus Warehouse qualifies as an "appropriate place of detention" under 8 U.S.C. § 1231(g)(1). For instance, Defendants failed to consider or adequately consider, among other things:

> a. Whether other United States Government facilities are available for use;
>
> b. Whether other facilities adapted or suitably located for detention are available for rental;
>
> c. Whether the Romulus Warehouse is a suitable location for an immigration detention center, given its proximity to schools and residential neighborhoods;

d. Whether the operation of an immigration detention center at the Romulus Warehouse will burden the proximate environment and natural resources;

e. Whether the operation of an immigration detention center at the Romulus Warehouse will impose a significant burden upon community resources, including increased resources devoted to policing the area, increased water and sewage usage, and increased local traffic;

f. Whether the Romulus Warehouse can be retrofitted to ensure compliance with ICE's National Detention Standards; and

g. Whether the operation of an immigration detention center at the Romulus Warehouse is or will be consistent with state and local laws, rules, and regulations.

87. In fact, Defendants have failed to meaningfully engage with State and City officials on their purchase of and plans for the Romulus Warehouse.

88.     Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

### COUNT III
### Violation of Administrative Procedure Act § 706(2)(A)
### Agency Action Contrary to Law (Existing Facilities, 8 U.S.C. § 1231(g)(2))

89.     Plaintiffs incorporate by reference the prior allegations as if fully restated here.

90.     Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA.  5 U.S.C. § 704.

91.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose.  *See City of Cleveland*, 508 F.3d at 838.

92. Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center was not in accordance with the law.

93. Under 8 U.S.C. § 1231(g)(2), before "initiating any project for the construction of any new detention facility[,]" Defendants were required to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."

94. By purchasing and moving forward with plans to convert the Romulus Warehouse into an immigration detention center, Defendants have initiated a project for the construction of a new detention facility.

95. Before initiating such project, Defendants failed to consider whether "any existing prison, jail, detention center, or other comparable facility suitable for such use" was available, contrary to 8 U.S.C. § 1231(g)(2). For example, before purchasing the Romulus Warehouse, Defendants did not:

    a. Inquire whether the State was willing to sell or lease any existing facilities suitable for use as an immigration detention center;

b. Inquire whether local governments were willing to sell or lease any existing facilities suitable for use as an immigration detention center;

c. Upon information and belief, inquire whether any nearby States, such as Ohio or Indiana, or local governments therein, were willing to sell or lease any existing facilities suitable for use as an immigration detention center.

96.   In fact, Defendants have failed to meaningfully engage with State and City officials on their purchase of and plans for the Romulus Warehouse.

97.   Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

**COUNT IV**
**Violation of Administrative Procedure Act § 706(2)(A)**
**Arbitrary and Capricious Agency Action (Existing Facilities, 8 U.S.C. § 1231(g)(2))**

32

98. Plaintiffs incorporate by reference the prior allegations as if fully restated here.

99. Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA.  5 U.S.C. § 704.

100. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

101. An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington*, 371 U.S. at 168).  An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.* at 43.

102.  Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center was arbitrary and capricious because Defendants failed to consider or adequately consider "the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2).  For example, before purchasing the Romulus Warehouse, Defendants did not:

    a.  Inquire whether the State was willing to sell or lease any existing facilities suitable for use as an immigration detention center;

    b.  Inquire whether local governments were willing to sell or lease any existing facilities suitable for use as an immigration detention center;

    c.  Upon information and belief, inquire whether any nearby States, such as Ohio or Indiana, or local governments therein, were willing to sell or lease any existing facilities suitable for use as an immigration detention center.

34

103.  In fact, Defendants have failed to meaningfully engage with State and City officials on their purchase of and plans for the Romulus Warehouse.

104.  To the extent Defendants did consider other facilities, they did not articulate a satisfactory explanation as to why those existing facilities were inadequate.

105.  Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

## COUNT V
### Administrative Procedure Act, 5 U.C.S. § 706(2)(A)
### Agency Action Contrary to Law (NEPA 42 U.S.C. § 4321 *et seq.*)

106.  Plaintiffs incorporate by reference the prior allegations as if fully restated here.

107.  Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA.  5 U.S.C. § 704.

108.  The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is not in

accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. *See City of Cleveland*, 508 F.3d at 838.

109. NEPA claims are subject to judicial review under the APA. *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) ("[The Sixth Circuit has] long recognized that federal courts have jurisdiction over NEPA challenges pursuant to the APA.").

110. NEPA establishes a national policy "to promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. In recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment" and "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," Congress declared "that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures" to accomplish NEPA's goals. 42 U.S.C. § 4331(a).

111.   Additionally, in furtherance of NEPA's national policy, the statute contains "'action-forcing' procedures [that] require that agencies take a 'hard look' at environmental consequences." *Sierra Club v. United States Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016) (quotations omitted).

112.   This "hard look" may take a number of forms, depending on the potential environmental impacts of a proposed federal action.

113.   The most thorough and robust type of analysis is the EIS. An EIS is required whenever there is a "proposal[ ]" for a "major Federal action[ ]" that would "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(C).  NEPA defines "proposal" as "a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects."  42 U.S.C. § 4336e(12).  NEPA defines a "major Federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility."  42 U.S.C. § 4336e(10)(A).

114.  An EIS must include discussions of "reasonably foreseeable environmental effects of the proposed agency action"; "reasonably foreseeable adverse environmental effects which cannot be avoided"; "a reasonable range of alternatives[,]" including a "no action alternative"; a discussion of "the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and an accounting of the "irreversible and irretrievable commitments of Federal resources" from the proposed action.  42 U.S.C. § 4332(C)(i)-(v); *see also Sierra Club*, 828 F.3d at 407.

115.  Less robust than an EIS, but still thorough in its analysis, is an EA.  If an agency does not expect a major federal action to have significant impacts on the environment, or if the significance of such effects is unknown, then the agency "*shall* prepare an environmental assessment" instead of an EIS.  42 U.S.C. § 4336(b)(2) (emphasis added).  An EA "shall be a concise *public* document" that either sets forth the basis for the agency's finding of no significant impact or a determination that an EIS is in fact required.  *Id*. (emphasis added).

116.  An agency can dispense with preparing an EIS or EA only if it finds that the proposed agency action fits within a duly adopted

categorical exclusion or if it is excluded from environmental review by another provision of law.  See 42 U.S.C. § 4336(a)(2), (b)(2).  A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [42 U.S.C. §] 4332(2)(C)." 42 U.S.C. § 4336e(1).

117.  An agency must complete the NEPA process by preparing an EIS or EA or properly invoking a categorical exclusion *before* taking final action.  42 U.S.C.§ 4332(C) (requiring that the "detailed statement" be included "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment").

118.  Also as part of the NEPA process, and "[p]*rior* to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved."  42 U.S.C. § 4332(C) (emphasis added).

119.  Upon information and belief, Defendants have not consulted with any federal agency that has jurisdiction by law or special expertise

with respect to any environmental impact involved with the decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center.

120. The decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is also a "major Federal action" for purposes of NEPA that is under Defendants' substantial direction and control. 42 U.S.C. § 4336e(10)(A).

121. Upon information and belief, Defendants have not prepared an EIS, an EA, or properly invoked a categorical exclusion prior to executing the purchase agreement for the Romulus Warehouse.

122. Further, Defendants did not collaborate with Plaintiffs before purchasing the property or at any point in the process of developing their renovation and operation plans for the Romulus Warehouse.

123. Failure to conduct the required environmental review under NEPA deprives the State, local governments, and the public of the procedure to which they are entitled by law.

124. Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

**COUNT VI**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action (NEPA, 42 U.S.C. § 4321, *et seq.*)**

125. Plaintiffs incorporate by reference the prior allegations as if fully restated here.

126. Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA. 5 U.S.C. § 704.

127. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

128. In addition to being contrary to law, Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is arbitrary and capricious. Defendants have not offered "a satisfactory explanation for [their] action"—nor any explanation—"including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43

41

(quoting *Burlington*, 371 U.S. at 168).  Likewise, Defendants have not given any explanation—let alone a reasoned explanation—for their rejection, or even their consideration, of reasonable alternatives.

129.   Defendants also failed to consider important aspects of the problem, including the immediate impact that this decision will have on public health and safety, and the long-term impact of Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center.  *Id.* (requiring consideration of "an important aspect of the problem")

130.   Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

**COUNT VII**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action Contrary to Law (ICA, 31 U.S.C. § 6506(c))**

131.   Plaintiffs incorporate by reference the prior allegations as if fully restated here.

132.   Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is a final agency action subject to judicial review under the APA.  5 U.S.C. § 704.

133. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. *See City of Cleveland*, 508 F.3d at 838.

134. The ICA requires that "State . . . and local viewpoints . . . be considered in planning development programs and projects of the United States Government." 31 U.S.C. § 6506(c). The ICA imposes "an affirmative obligation" on federal agencies to consider local interests and "to develop a reviewable record" to explain any "decision to act in disharmony with local planning objectives." *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 976 (2d Cir. 1976); *see also Richards Adams Russell, Inc. v. U.S. Postal Serv.*, No. 97-cv-76172, 1998 U.S. Dist. LEXIS 9284, at *13-14 (E.D. Mich. May 28, 1998).

135. The "consideration of local viewpoints" required by the ICA must occur "during the planning stages of a project." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244 (1st Cir. 1993) (cleaned up).

136. In violation of these statutory obligations, Defendants decided to purchase, construct, and operate the Romulus Warehouse as an immigration detention center without considering the State's and City's viewpoints during its deliberative process.

137. Defendants "finally determined" that the Romulus Warehouse was "the best available site for the new [detention] facility," as evidenced by its purchase of the Romulus Warehouse expressly for that purpose, all "without [even] informing" the State or City of its plan—let alone soliciting and considering their views, as the ICA requires. *City of Rochester*, 541 F.2d at 972.

138. Defendants' failure to engage in the ICA's required consultation resulted in its deciding to establish an immigration detention center in the Romulus Warehouse without critical information from the government officials most knowledgeable about conditions on the ground in Romulus. For example, City officials were unable to inform Defendants that the City's water and sewage systems lack the capacity to meet the needs of a new immigration detention center. Without this information, Defendants were unable to make a fully informed and "reasoned choice[ ]" among competing national,

state, and local objectives for development in Romulus, frustrating the ICA's central purpose.  31 U.S.C. § 6506(b).

139.  Defendants' violations of the APA have caused and will continue to cause ongoing harm to Plaintiffs for which there is no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and award the following relief:

a) Declare that Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is contrary to law and arbitrary and capricious as the Romulus Warehouse is not, and cannot not become, an "appropriate place of detention" as required by 8 U.S.C. § 1231(g)(1);

b) Declare that Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is contrary to law and arbitrary and capricious as Defendants failed to consider whether "any existing prison, jail, detention center, or other comparable

facility suitable for such use" was available, contrary to 8 U.S.C. § 1231(g)(2);

c) Declare that Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center is contrary to law and arbitrary and capricious in violation of NEPA and the APA;

d) Declare that Defendants' decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center without consulting Plaintiffs is contrary to law in violation of the ICA and the APA;

e) Vacate and set aside Defendants' decision to construct and operate the Romulus Warehouse as an immigration detention center;

f) Enter a preliminary and permanent injunction prohibiting the conversion—including construction, retrofitting, or similar physical changes—of the Romulus Warehouse into an immigration detention center and the operation of the Romulus Warehouse as an immigration detention center;

g) Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

h) Award Plaintiffs reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

i) Award such other relief to Plaintiffs as the Court may deem just and proper.

Respectfully submitted,

DANA NESSEL
Michigan Attorney General

*/s/ Neil Giovanatti*
Neil Giovanatti (P82305)
Benjamin Houston (P76733)
Assistant Attorneys General
Attorneys for Plaintiff State of Michigan
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7622
GiovanattiN@michigan.gov
HoustonB1@michigan.gov

*/s/ David F. Greco*
David F. Greco (P53523)
Attorney for Plaintiff City of Romulus
Greco Law PLLC
143 Cadycentre #164
Northville, MI 48167
(248) 380-1975
David.Greco@Greco-Law.com

Dated:  March 24, 2026

47