UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| STATE OF MICHIGAN; CITY OF ROMULUS, | No. 2:26-cv-10968 |
| Plaintiffs, | HON. JONATHAN J.C. GREY |
| v. | MAG. ELIZABETH A. STAFFORD |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; and TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement, | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Evidentiary Hearing / Oral Argument Requested** |
| Defendants. | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

For the reasons set forth in the accompanying memorandum of law,

Plaintiffs, the State of Michigan and the City of Romulus, move this Court for an

order pursuant to Federal Rule of Civil Procedure 65(a), preliminarily enjoining

Defendants the United States Department of Homeland Security ("DHS"),

Secretary of DHS Markwayne Mullin, the United States Immigration and Customs

Enforcement ("ICE"), and Official Performing the Duties of the Director of ICE

Todd M. Lyons, from (1) taking actions to convert the property located at 7525 Cogswell Street, Romulus, Michigan 48174 (the "Romulus Warehouse") into an immigration detention facility, including any and all efforts to construct, retrofit, demolish, or make physical changes to the Warehouse, during the pendency of this litigation; and (2) detaining individuals at the Romulus Warehouse during the pendency of this litigation.  Plaintiffs further request that this Court order Defendants to file a status report within 48 hours describing all steps Defendants have taken to comply with the Court's order.

In accordance with Local Rule 7.1, Plaintiffs attempted to confer with Defendants before filing this motion but, despite reasonable and timely efforts, Plaintiffs were unable to conduct a conference.  Plaintiffs' counsel contacted civil staff at the U.S. Attorney's Office for the Eastern District of Michigan's, as well as the lead Assistant U.S. Attorney (from the U.S. Department of Justice's main office) representing Defendants in a similar proceeding in the District of Maryland, *Maryland v. Noem*, No. 1:26-cv-733 (D. Md.).  In response, Plaintiffs' counsel was repeatedly informed that the Department of Justice is still working on attorney assignment for this matter.  Accordingly, a conferral was not available.

Plaintiffs request that the Court schedule an evidentiary hearing to preserve their opportunity to contest any evidence or legal argument that Defendants' may

2

present in response to this motion.  If an evidentiary hearing is ultimately not

required, Plaintiffs seek an opportunity to present oral argument.

Respectfully submitted,

*/s/ Neil Giovanatti*
Neil Giovanatti (P82305)
Benjamin Houston (P76733)
Assistant Attorneys General
Attorneys for Plaintiff State of Michigan
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7622
GiovanattiN@michigan.gov
HoustonB1@michigan.gov

*/s/ David F. Greco*
David F. Greco (P53523)
Attorney for Plaintiff City of Romulus
Greco Law PLLC
143 Cadycentre #164
Northville, MI 48167
(248) 380-1975
David.Greco@Greco-Law.com

Dated:  March 31, 2026

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| STATE OF MICHIGAN; CITY OF ROMULUS, | NO. 2:26-cv-10968 |
| PLAINTIFFS, | HON. JONATHAN J.C. GREY |
| V. | MAG. ELIZABETH A. STAFFORD |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; AND TODD M. LYONS, in his official capacity as Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement, | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DEFENDANTS. | |

_____/

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

Table of Contents ............................................................................................... i

Index of Authorities ........................................................................................ iii

Concise Statement of Issues Presented ........................................................ viii

Controlling or Most Appropriate Authority ................................................... ix

Introduction ........................................................................................................1

Statement of Facts .............................................................................................2

    The Romulus Warehouse ............................................................................2

    ICE's "Detention Reengineering Initiative" .............................................4

    Defendants' Purchase of the Romulus Warehouse ...................................6

Argument ............................................................................................................9

I.    Plaintiffs have a strong likelihood of success on the merits. ........................10

    A.    Defendants' decision is a final agency action subject to review under the APA. ...............................................................................10

    B.    Defendants' decision was contrary to law. .......................................12

        1.    Defendants did not comply with NEPA's "hard look" and action-forcing requirements. .....................................................13

        2.    Defendants failed to consult with State and City authorities under the ICA. ........................................................17

        3.    Defendants did not consider whether existing facilities could meet their needs under the INA. ...................................20

    C.    Defendants' decision was arbitrary and capricious ...........................22

II.    Plaintiffs will be irreparably harmed absent injunctive relief. ......................25

III.    The remaining equity factors support a preliminary injunction. .................28

IV.    The Court should waive the security requirement.........................................30

Conclusion and Relief Requested ...........................................................................30

Certificate of Service ..............................................................................................31

# INDEX OF AUTHORITIES

Page

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
    480 U.S. 531 (1987) ........................................................................................26

*Anglers of the Au Sable v. United States Forest Serv.,*
    402 F. Supp. 2d 826 (6th Cir. 2005) ...............................................................26

*Arizona v. Biden,*
    593 F. Supp. 3d 676 (S.D. Ohio), *rev'd and remanded on other grounds,*
    40 F.4th 375 (6th Cir. 2022) ...........................................................................20

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ........................................................................................10

*City of Cleveland v. Ohio,*
    508 F.3d 827 (6th Cir. 2007) ..........................................................................13

*City of Rochester v. U.S. Postal Serv.,*
    541 F.2d 967 (2d Cir. 1976) ..................................................................... 18, 19

*City of Waltham v. U.S. Postal Serv.,*
    11 F.3d 235 (1st Cir. 1993) .............................................................................18

*Coal. to Defend Affirmative Action v. Granholm,*
    473 F.3d 237 (6th Cir. 2006). .........................................................................29

*D.T. v. Sumner Cnty. Schools,*
    942 F.3d 324 (6th Cir. 2019) ..................................................................... 10, 25

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
    591 U.S. 1 (2020) ...........................................................................................23

*EOG Res., Inc. v. Lucky Land Mgmt., LLC,*
    134 F.4th 868 (6th Cir. 2025) ...........................................................................9

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ........................................................................................23

*Maryland v. Noem*,
   No. CV 26-733-BAH, 2026 WL 691507, at *4 (D. Md. Mar. 11, 2026) ............11

*Moltan Co. v. Eagle-Picher Indus.*,
   55 F.3d 1171 (6th Cir. 1995) ...................................................................................30

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................................23

*Nat'l Wildlife Fed'n v. Sec'y of the U.S. DOT*,
   960 F.3d 872 (6th Cir. 2020) ..................................................................................13

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................28

*Ohio v. EPA*,
   603 U.S. 279  (2024) ...............................................................................................23

*Olmsted Citizens for a Better Cmty. v. United States*,
   606 F. Supp. 964 (D. Minn. 1985), *aff'd*, 793 F.2d 201 (8th Cir. 1986) .............19

*Parsons v. United States Dep't of Just.*,
   878 F.3d 162 (6th Cir. 2017).................................................................................12

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ................................................................................................17

*Sierra Club v. Slater*,
   120 F.3d 623 (6th Cir. 1997)....................................................................... 11, 17

*Sierra Club v. Tenn. Valley Auth.*,
   753 F. Supp. 3d 606 (6th Cir. 2024)....................................................................14

*Sierra Club v. United States Forest Serv.*,
   828 F.3d 402 (6th Cir. 2016)..................................................................................16

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
   697 F.3d 387 (6th Cir. 2012)..................................................................................30

*Stenberg v. Cheker Oil Co.*,
   573 F.2d 921 (6th Cir. 1978)..................................................................................10

iv

*Tenn. Scrap Recyclers Ass'n v. Bredesen*,
  556 F.3d 442 (6th Cir. 2009) .................................................................9

*Tennessee v. Dep't of Educ.*,
  104 F.4th 577 (6th Cir. 2024) ...............................................................11

*Texas v. United States*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................20

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ...................................................................... 10, 11

*United States v. King Cnty.*,
  666 F. Supp. 3d 1134 (W.D. Wash. 2023) ..........................................20

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ..................................................................................25

## Statutes

31 U.S.C. § 6506(c) ...................................................................... vii, 1, 18, 19

42 U.S.C. § 4321 ................................................................................... viii, 1

42 U.S.C. § 4332 ...............................................................vii, viii, 13, 16

42 U.S.C. § 4336 ................................................................................ viii, 14

42 U.S.C. § 4336e(1) ...............................................................................14

42 U.S.C. § 4336e(10)(A) ........................................................................15

42 U.S.C. §§ 4332(C) ..............................................................................14

5 U.S.C. § 706 ............................................................................... passim

5 U.S.C. § 706(2)(A) ..................................................................... passim

8 U.S.C. § 1231 ............................................................................. passim

8 U.S.C. § 1231(g)(2) .................................................................... passim

## Rules

6 C.F.R. § 5.5(e)(2) ...................................................................................19

Fed. R. Civ. P. 65(c) .................................................................................30

## Other Authorities

City of Social Circle,
*Updated Statement Regarding ICE Detention Facility* (Feb. 18, 2026) ...............5

Dep't of Homeland Sec.,
*DHS Environmental Planning Document Library* (last updated Nov. 14,
2025) .....................................................................................................6

Dep't of Homeland Sec.,
*Instruction Manual 023-01-001-01, Revision 01, Implementation of the
National Environmental Policy Act (NEPA)* (Nov. 6, 2014) ...............................15

Douglas MacMilan & Aaron Schaffer,
*ICE selects untested firms to oversee new warehouse detention centers*,
Wash. Post (Mar. 9, 2026) ...........................................................................5

Homeland Security Act of 2002 .........................................................................20

ICE,
*National Detention Standards* (revised 2025) .........................................................6

MDOC,
*Closed Facilities* .......................................................................................21

Nick Miroff,
*What Happens Now to Kristi Noem's Warehouse Jails?*, The Atlantic
(Mar. 16, 2026) ........................................................................................29

Ohio Dep't of Rehab. and Corr.,
*Facilities and Institutions* ..........................................................................21

Presidential Memorandum,
*Radical Transparency About Wasteful Spending* (Feb. 18, 2025), ......................1

U.S. Gov't Accountability Off.,
*Immigration Detention: Actions Needed to Improve Planning,*

*Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021) ................................................................................................5

## CONCISE STATEMENT OF ISSUES PRESENTED

1.  Defendants' decision to purchase the Romulus Warehouse without conducting an environmental review is not in compliance with the National Environmental Policy Act's requirements for "major Federal Actions" that will affect the environment, 42 U.S.C. § 4332, and therefore contrary to law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

2.  Defendants failed to consult with State and City under the Intergovernmental Cooperation Act, 31 U.S.C. § 6506(c), which requires that the federal government consider State and local viewpoints when planning Federal projects, and therefore acted contrary to law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

3.  Defendants failed to consider whether alternative detention-type facilities were available and would meet their needs before purchasing the Romulus Warehouse as required by the Immigration and Naturalization Act, 8 U.S.C. § 1231(g)(2), and therefore acted contrary to law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

4.  The failure to comply with the National Environmental Policy Act and the Immigration and Naturalization Act before purchasing the Romulus Warehouse with the intent to convert/retrofit it for use as a mass immigration detention facility was an arbitrary and capricious change in agency policy under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

5.  Injunctive relief is appropriate because Plaintiffs will be irreparably harmed by Defendants' purchase, conversion/retrofitting, and operation of the Romulus Warehouse as a detention center; Plaintiffs are likely to succeed on the merits; the public interest weighs in favor of maintaining the status quo; and Defendants will suffer little to no harm from a preliminary injunction.

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

_Authority_:

- 5 U.S.C. § 706
- 8 U.S.C. § 1231
- 31 U.S.C. § 6506
- 42 U.S.C. § 4321
- 42 U.S.C. § 4332
- 42 U.S.C. § 4336

## INTRODUCTION

It should be safe to assume that the federal government—and particularly an administration allegedly committed to "radical transparency" in its spending of taxpayer dollars[1]—will comply with all laws related to public notice and intergovernmental cooperation before spending millions of dollars from the public fisc.  Unfortunately, that assumption can no longer be made.

In February 2026, Defendant the United States Department of Homeland Security ("DHS"), and its component, Defendant Immigration and Customs Enforcement ("ICE"), purchased a commercial warehouse located at 7525 Cogswell Street, Romulus, Michigan 48174 (the "Romulus Warehouse"), intending to convert it into a mass immigration detention center.  But before doing so, Defendants[2] failed to: engage with Plaintiffs the State of Michigan or the City of Romulus, as required by the Intergovernmental Cooperation Act ("ICA"), 31 U.S.C. § 6506(c); consider the availability of existing alternatives, as required by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(g)(2); or complete the necessary environmental reviews, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.  Through these failures,

---

[1] Presidential Memorandum, *Radical Transparency About Wasteful Spending* (Feb. 18, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/02/radical-transparency-about-wasteful-spending/.

[2] DHS Secretary Markwayne Mullin and ICE Senior Official Performing the Duties of the Director Todd M. Lyons are also named as Defendants.

1

Defendants acted contrary to law and arbitrarily and capriciously, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

Setting aside (for now) Plaintiffs' claims related to the inappropriateness of the Romulus Warehouse as a detention center and the unreasonableness of Defendants' decisions related thereto, through this motion, Plaintiffs seek an order preliminarily enjoining Defendants' actions at the Romulus Warehouse until they complete these bare-minimum prerequisites.  Defendants' failure to complete these necessary steps has harmed—and will continue to irreparably harm—Plaintiffs.

This Court should grant Plaintiffs' motion and enjoin construction to and operation of the Romulus Warehouse as detention center.  After Defendants satisfy the INA, the ICA, and NEPA's prerequisites, it will be further evident that the Romulus Warehouse is—and always will be—a completely inappropriate location for an immigration detention center given its proximity to residential neighborhoods and schools, its location in an active floodplain, and the City's limited public resources to accommodate such use.  Acting rationally, such revelations should cause Defendants to change course; but time will tell.

## STATEMENT OF FACTS

**The Romulus Warehouse**

Originally constructed in 2000 for use as an industrial warehouse, the Romulus Warehouse is an approximately 249,090-square-foot building that sits on

2

a 27.15-acre parcel zoned for light industrial use.  (*See* Real Estate Summary, PageID.57; Property Transfer Aff., PageID.59–60; Ex. 1, McCraight Decl. ¶¶ 6–7.) The Romulus Warehouse is located on Cogswell Street, a three-lane road (two travel lanes and one center turn lane) owned by the City.  (Ex. 2, Scappaticci Decl. ¶ 16.)  The entryways to the Romulus Warehouse do not have associated turning lanes, and only one entering route exists on a major road.  (*Id.* ¶ 17.)

A six-inch sewage line connects the Romulus Warehouse to the City's 15-inch sewage line under Cogswell Street.  (*Id.* ¶ 9.)  The six-inch line was designed for the building's intended low wastewater use, expecting production of 0.26 cubic-feet-per-second ("CFS") of wastewater.  (*Id.* ¶ 10.)  Facilities with high wastewater flow—such as hospitals, schools, and detention centers—see flows as high as 2.30 CFS.  (*Id.* ¶ 11.)  The 15-inch city line under Cogswell Street has a capacity of 3.0 CFS, but also services other buildings and residential neighborhoods along Cogswell Street.  (*Id.*)

The property abuts single-family residential homes to the south, and two large residential neighborhoods follow further south off Cogswell Street.  (Aerial Map, PageID.50; McCraight Decl. ¶ 7.)  Two public schools are located within a mile of the Romulus Warehouse:  Romulus Middle School and Wick Elementary School.  (Aerial Map, PageID.50; McCraight Decl. ¶ 7.)

3

The property borders a 118-acre wetland conservation easement, held by the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"). (Easement Map, PageID.62; Ex. 3, Sanders Decl. ¶ 7.)  Conservation easements—like the easement covering the wetland in Romulus—ensure protection of the States' natural resources, environment, and wildlife habitats.  (Sanders Decl. ¶ 8.)  And easements covering wetlands are particularly important to the State because they protect, in perpetuity, at-risk ecosystems that provide flood mitigation, water quality benefits, and fisheries and critical wildlife habitat for threatened and endangered species.  (*Id.*)  Waterways, a county drain, and floodplains connect the Romulus Warehouse site with this protected area.  (*Id.* ¶¶ 10, 12.)

The property is also entirely within a federally recognized floodplain, with portions in a 100-year floodplain, 500-year floodplain, and regulated floodway. (Floodplain Notice, PageID.64–66; Sanders Decl. ¶ 11.)  The property flooded last year.  (McCraight Decl. ¶ 8; Scappaticci Decl. ¶ 6.)

**ICE's "Detention Reengineering Initiative"**

Purportedly to "meet the growing demand for bedspace and streamline the detention and removal process, focusing on non-traditional facilities built specifically to support ICE's needs," last year, ICE developed a "Detention Reengineering Initiative" ("DRI").  (ICE DRI, PageID.52.)  The DRI outlines a "new detention model," under which ICE seeks to "strategically increase bed

4

capacity to 92,600 beds" by purchasing and "transforming" existing structures "into processing and detention facilities exclusively for ICE."  (*Id.*)  This "new model" would apparently replace currently operational "contracted detention facilities[,]" (*id.*) resulting in the closure of dozens of privately owned detention centers and the end of ICE's partnerships with county-run jails.[3]  It also runs contrary to decades of past practice, wherein ICE traditionally avoided expanding detention space through ICE-owned facilities "because of the substantial amount of time needed to design and construct such a facility."[4]

According to the DRI, before purchasing each property, ICE intended to ensure, among other things, that the property had appropriate fire protection water capacity, domestic water supply capacity, wastewater piping and system capacity, and power capacity.  (ICE DRI, PageID.53–54.)  ICE also claims to have "conducted a thorough due diligence process[,]" including "thorough site inspections[;] analysis of utility services[;] . . . testing and inspection of mechanical and electrical systems[;] . . . review[  of] zoning reports[;] conduct[ing of] site fit

---

[3] *See* City of Social Circle, *Updated Statement Regarding ICE Detention Facility* (Feb. 18, 2026), https://perma.cc/J3WA-YQ2J; Douglas MacMilan & Aaron Schaffer, *ICE selects untested firms to oversee new warehouse detention centers*, Wash. Post (Mar. 9, 2026).

[4] U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13, 2021), https://perma.cc/CCW8-KW82.

testing[;] . . . review[ of] power supply systems, water supply infrastructure, and wastewater exportation based on estimated usage[;] and NEPA surveys." (*Id.* at PageID.54.)  Additionally, ICE indicated that it had complied or would comply with various federal, state, and local laws, regulations, and standards—like NEPA, relevant federal regulations, environmental regulations, ICE National Detention Standards,[5] and industry best practices—in the purchase and "transformation" of each property.  (ICE DRI, PageID.52–54.)  This appears consistent with past practice:  on the rare prior occasions in which DHS attempted to construct or modify a detention center, it has reliably engaged with the NEPA process.[6]

**Defendants' Purchase of the Romulus Warehouse**

Pursuant to the DRI, Defendants purchased the Romulus Warehouse on or around February 4, 2026, for $34,671,500.  (Real Estate Summary, PageID.57.)  The entire purchase was marred with secrecy.

Before purchasing the Romulus Warehouse, Defendants did not contact the State or City to discuss their plans and, as far as Plaintiffs are aware, did not engage with any other impacted local government.  (McCraight Decl. ¶ 9;

---

[5] ICE, *National Detention Standards* (revised 2025), available at https://perma.cc/VP4T-YWSP.

[6] *See* DHS, *DHS Environmental Planning Document Library* (last updated Nov. 14, 2025), available at https://perma.cc/VR29-NN7L.

Scappaticci Decl. ¶ 5; Sanders Decl. ¶ 6; Ex. 4, LeBarre Decl. ¶ 5.)  For example, Defendants did not contact the Michigan Department of Corrections ("MDOC") to determine if there were existing prison facilities that Defendants could purchase or lease.  (LeBarre Decl. ¶ 5.)   Upon information and belief, Defendants also did not contact local governments that own existing detention facilities or neighboring States, like Ohio or Indiana, to determine if there were existing detention facilities that Defendants could purchase or lease.

Additionally, upon information and belief, Defendants did not consult with any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved with the decision to purchase, construct, and operate the Romulus Warehouse as an immigration detention center.  Nor did they complete the required environmental assessments under NEPA—including either an Environmental Impact Statement ("EIS") or Environment Assessment ("EA")—related to the purchase, construction, or operation of the Romulus Warehouse as an immigration detention center.  (*See* Sanders Decl. ¶ 6; Scappaticci Decl. ¶ 5.)

On or around February 20, 2026, DHS published an "Early Notice and Public Review of a Proposed Activity in a 100- to 500-Year Floodplain – Romulus, Michigan" ("Floodplain Notice").  (Floodplain Notice, PageID.64–66.)  According to the Floodplain Notice, Defendants intend to use the Romulus Warehouse for "short-term, temporary housing for individuals in immigration custody who are

7

awaiting immigration processing and related administrative procedures." (*Id.* at PageID.64.)

The Floodplain Notice indicates that Defendants will use approximately 19 acres of the property as a "secure operational area." (*Id.*)  It further indicates that Defendants will install "3,800 linear feet of new perimeter security fencing," "one modular security checkpoint structure," "five exterior recreation courts," "exterior lighting and security cameras," "replacement of the existing emergency generator on a new concrete pad," "new telecommunications cabling," and "sanitary sewer connections or modifications if required by final engineering review." (*Id.*)  The Floodplain Notice does not indicate if a "final engineering review" was completed, but notes that "[p]reliminary engineering indicates" the sanitation connection point "may be required to accommodate projected wastewater flows." (*Id.*)

The Floodplain Notice suggests that Defendants will comply with permitting requirements for drainage, sewage, and floodplain impact.  (*Id.* at PageID.65.) However, since the purchase, Defendants have not contacted State or City officials related to permitting, community impact, the strain Defendants' actions will impose, or any support that Defendants can or should offer to the local community to address the burden that the existence of such an immigration detention center will impose.  (McCraight Decl. ¶ 10; Scappaticci Decl. ¶ 5; Sanders Decl. ¶ 6.)  The

8

Floodplain Notice also provides no information about interior construction that Defendants intend to complete.  (*See* Floodplain Notice, PageID.64–66.)

Upon information and belief, similar to in other states, Defendants are currently working to issue a task order through an existing Worldwide Expeditionary Multiple Award Contract ("WEXMAC") to retrofit the Romulus Warehouse for use as an immigration detention center.[7]

## ARGUMENT

A preliminary injunction is an extraordinary remedy "designed to preserve the" status quo to ensure that the "relative positions of the parties" remain unchanged "until a trial on the merits can be held."  *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).  A "preliminary injunction simply puts the case in a holding pattern" on the recognition that "[c]ases can take months or years to decide, so courts need interim managerial devices to stop defendants from mooting or drastically reshaping the case."  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883–84 (6th Cir. 2025) (quotations omitted).

Four factors determine when a court should grant a preliminary injunction: (1) most important, whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the

---

[7] *See* Maryland (https://perma.cc/WAU3-4B8K) (providing a mere sixty-day period of performance) and Arizona (https://perma.cc/XNC4-SNKC).

merits, (3) the balance of the equities, and (4) the public interest.  *D.T. v. Sumner Cnty. Schools*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)).  The burden of persuasion is on the party seeking injunctive relief.  *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).  Here, Plaintiffs establish all four bases for a preliminary injunction.

## I.      Plaintiffs have a strong likelihood of success on the merits.

Plaintiffs are likely to succeed on the merits of their claims that Defendants acted contrary to law and arbitrarily and capriciously, in violation of the APA, when they decided to purchase, convert/retrofit, and operate the Romulus Warehouse as a mass immigration detention center (a final agency action) without conducting the required NEPA review, consulting with State or City officials under the ICA, or considering existing alternative facilities under the INA.

### A.      Defendants' decision is a final agency action subject to review under the APA.

For agency action to qualify as "final" under the APA, the action must: (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quotations omitted).  Importantly, courts "take a 'pragmatic approach' to finality." *Tennessee*

10

*v. Dep't of Educ.*, 104 F.4th 577, 598 (6th Cir. 2024) (quoting *Hawkes Co.*, 578 U.S. at 599).

Defendants' decision to purchase, convert/retrofit, and operate the Romulus Warehouse as an immigration detention center meets both conditions.  As to the first, there is nothing "tentative or interlocutory" about Defendants' decision:  they paid over $34 million to purchase—and now own—the Romulus Warehouse.  (Real Estate Summary, PageID.57.)  They have also publicly stated their intent to convert/retrofit and operate the Romulus Warehouse as an immigration detention center, including outlining certain planned "improvements."  (*See* Floodplain Notice, PageID.64 (describing proposed fencing, security checkpoints, lighting, etc.).)  And they have done so without engaging in certain prerequisite steps, i.e., a NEPA review, consideration of existing alternatives, and consultation with State and local officials.  *See Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) ("[F]ederal courts have jurisdiction over NEPA challenges pursuant to the APA."); *Maryland v. Noem*, No. CV 26-733-BAH, 2026 WL 691507, at *4 (D. Md. Mar. 11, 2026) (purchasing and converting/retrofitting warehouse into mass detention center without engaging in NEPA review was likely a final agency action).

As to the second, "the challenged agency action . . . ha[s] a sufficiently direct and immediate impact on [Plaintiffs] and a direct effect on [their] day-to-day business." *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 167 (6th Cir. 2017)

11

(quotations omitted).  Defendants' failure to perform the statutorily prescribed steps before deciding to purchase, convert/retrofit, and operate the Romulus Warehouse, has required the State, for example, to work to determine (without any assistance from the federal government) what impact the placement of an immigration detention center will have on its conservation easement, its waterways, and wildlife.  (*See* Sanders Decl. ¶¶ 13–16.)  Likewise, the City (also without any assistance from the federal government) has been required to evaluate whether it has the resources and capacity to sustain such a facility at the Romulus Warehouse.  (McCraight Decl. ¶ 12; Scappaticci Decl. ¶¶ 9–19.)  And the City has already devoted—and expects to continue to devote—resources to address disruption of the public peace, safety, and welfare of its residents and local businesses resulting from Defendants' purchase of and plans for the Romulus Warehouse.  (McCraight Decl. ¶¶ 13, 15–18.)

Because Defendants' decision to purchase, convert/retrofit, and operate the Romulus Warehouse as a mass immigration detention center meets each condition, it represents final agency action subject to review under 5 U.S.C. § 706.

### B.    Defendants' decision was contrary to law.

In purchasing the Romulus Warehouse and engaging in efforts to convert/retrofit and operate it as a mass immigration detention center without

12

satisfying various statutorily prescribed prerequisite steps, Defendants acted contrary to law in violation of the APA.

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. *See City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007) ("Agency action is not in accordance with the law when it is in conflict with the language of the statute relied upon by the agency.") (quotations omitted).

Here, before purchasing the Romulus Warehouse and moving forward with plans to convert/retrofit and operate it as a mass immigration detention center, Defendants failed to satisfy mandatory prerequisites under three statutes: NEPA, the INA, and the ICA. In each of these failures, Defendants acted contrary to law.

### 1. Defendants did not comply with NEPA's "hard look" and action-forcing requirements.

NEPA requires federal agencies to prepare an EIS for "major Federal actions" that will affect the environment. 42 U.S.C. §§ 4332(C), 4336(b)(1), *Nat'l Wildlife Fed'n v. Sec'y of the U.S. DOT*, 960 F.3d 872, 879 (6th Cir. 2020). The EIS and "and the comments and views of the appropriate Federal, *State*, and *local agencies*, which are authorized to develop and enforce environmental standards,

13

shall be made available to the President, the Council on Environmental Quality *and to the public. . . ."* 42 U.S.C. § 4332(C) (emphases added).  In instances when the impact of the proposed major federal action is uncertain, agencies are required to prepare an EA—a less robust, but still thorough, document—which is used to determine the significance of the proposed action.  42 U.S.C. § 4336(b)(2).  EAs must be concise, *public*, and detail the agency's reasoning as to whether further analysis of the environmental impact—in the form of an EIS—is or is not necessary.  *Id.*; *Sierra Club v. Tenn. Valley Auth.*, 753 F. Supp. 3d 606, 613 (M.D. Tenn. 2024).

In some circumstances environmental analysis is not required under NEPA, but these exceptions are limited and enumerated.  42 U.S.C. § 4336(a).  Called categorical exclusions, these are "categor[ies] of actions that a Federal agency has determined normally do[ ] not significantly affect the quality of the human environment within the meaning of [42 U.S.C. §] 4332(2)(C)."  42 U.S.C. § 4336e(1).  None of these exceptions are applicable here.

Defendants' decision to purchase the Romulus Warehouse for more than $34 million, with the stated intent to convert/retrofit it into a detention center for 500 human beings, is a "major Federal action" because it is an action that is subject to

14

"substantial Federal control and responsibility."  42 U.S.C. § 4336e(10)(A).[8]

Defendant DHS is listed as the buyer of the property on a publicly recorded

Property Transfer Affidavit.  (Property Transfer Aff., PageID.59.)  Thus,

Defendants' decision to purchase and their ownership of the Romulus Warehouse

is conclusively under federal control and responsibility.

In addition, Defendants' decision to convert the Romulus Warehouse into a

mass detention center likely will have significant environmental impacts, such that

an EIS is required.  *See Maryland*, 2026 WL 691507, at \*4 (finding that an EIS or

EA was likely required in near-identical circumstances).  Despite the dearth of any

meaningful information about Defendants' plans for the Romulus Warehouse site,

Plaintiffs identified several foreseeably significant impacts to the environment that

will stem from the construction and operation of a 500-person detention center,

thus requiring an EIS in advance of any construction or operation.  For instance,

the site is immediately adjacent to a parcel on which EGLE holds a wetlands

conservation easement.  (Conservation Easement, PageID.62.)  EGLE obtains and

maintains conservation easements as part of its statutory obligation to preserve and

protect the State's environment and natural resources.  (Sanders Decl. ¶¶ 8–9.)

---

[8] *See* DHS, *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)* (Nov. 6, 2014), at V-1, https://www.fema.gov/sites/default/files/2020-07/fema_dhs_instruction-manual_023-01-001-01.pdf.

15

Defendants' unknown—but significant—plans for the Romulus Warehouse site present reasonably foreseeable and substantial impacts to this adjacent wetland, which is connected to the Romulus Warehouse property by a county drain and a floodplain.  (*Id.* ¶¶ 13–15; Scappaticci Decl. ¶ 13.)

In the alternative, even if the environmental impact is merely unknown, Defendants must still prepare an EA because no categorical exclusions apply—or have even been claimed by Defendants.  *See Maryland*, 2026 WL 691507, at *4. In fact, Defendants have utterly failed to publicly review the environmental impacts of their decision to purchase the Romulus Warehouse for use as a future detention center.  There is no indication that Defendants have engaged in taking the "hard look" that NEPA requires *before* a federal agency undertakes a major federal action.  *Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 407 (6th Cir. 2016).

The Floodplain Notice claims that "ICE evaluated whether practicable alternatives existed that would meet operational requirements while minimizing environmental and community impacts" in accordance with NEPA.  (Floodplain Notice, PageID.65.)  However, Defendants have failed to make their analysis public and, even if they were to do so now, the fact that it was conducted in secret—without public input at any stage—would render it fatally flawed under NEPA's "hard look" standard.  42 U.S.C. § 4332(C) (specifying public notice requirements for an EIS); *id*. § 4336(b)(2) (stating that an EA "shall be a concise

16

public document").  "NEPA promotes its sweeping commitment to prevent or eliminate damage to the environment and biosphere by focusing Government *and public attention* on the environmental effects of *proposed* agency action."  *Sierra Club*, 120 F.3d at 630 (emphases added; quotations omitted).  By the time Defendants publicly described their intention to repurpose the Romulus Warehouse, the $34 million purchase of the property was already a *fait accompli*—and the public had no meaningful opportunity to participate in the "hard look" process that NEPA requires of federal agencies.

For these reasons, Plaintiffs are likely to succeed on the merits of their NEPA claims:  Even if Defendants produce a NEPA analysis now, they failed to do so *before* the major federal action—the purchase of the Romulus Warehouse—was consummated, a violation of NEPA's action-forcing procedural requirements. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

### 2. Defendants failed to consult with State and City authorities under the ICA.

In deciding to purchase, convert/retrofit, and operate the Romulus Warehouse as a mass immigration detention center, Defendants also failed to even attempt to gather State and local viewpoints, let alone consider them—a clear violation of the ICA.

Under the ICA, Defendants must consider, "[t]o the extent possible, all . . . State . . . and local viewpoints . . . in planning development programs and projects

of the United States Government." 31 U.S.C. § 6506(c); *see also* Exec. Order No. 12,372, 47 Fed. Reg. 30959 (July 14, 1982) ("Federal agencies shall provide opportunities for consultation by elected officials of those State and local governments . . . that would be directly affected by . . . direct Federal development."). The ICA imposes "an affirmative obligation" on federal agencies to consider local interests and "to develop a reviewable record" to explain any "decision to act in disharmony with local planning objectives." *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 976 (2d Cir. 1976). The "consideration of local viewpoints" must occur "during the planning stages of a project." *City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244 (1st Cir. 1993) (cleaned up).

Here, Defendants failed to engage in any effort whatsoever to comply with the ICA. Defendants did not consult relevant State or local officials before purchasing the Romulus Warehouse and, therefore, necessarily could not have understood or considered their viewpoints. (McCraight Decl. ¶¶ 9–10; Scappaticci Decl. ¶ 5; Sanders Decl. ¶ 6; LeBarre Decl. ¶ 5.) Worse still, after Defendants' purchase of and plans for the Romulus Warehouse were made public, State and City officials repeatedly voiced their objections and concerns. (*See* Ex. 5, AG 2/27/26 Letter; Ex. 6, Romulus City Council Resolution No. 26-044 (Feb. 23,

18

2026).)  Yet, Defendants still have not engaged with the State or the City or demonstrated any attempt to consider their viewpoints.[9]

At best, Defendants' actions display a willful ignorance of State and local concerns and viewpoints; at worst, they demonstrate a blatant disregard.  Either way, Defendants failed to satisfy the ICA's "affirmative obligation" to "develop a reviewable record" that explains why they are acting in "disharmony with local planning objectives."  *Compare City of Rochester*, 541 F.2d at 976 (holding that the U.S. Postal Service failed to comply with the ICA when did not fully consider local viewpoints unanimously opposed to its development plan), *with Olmsted Citizens for a Better Cmty. v. United States*, 606 F. Supp. 964, 980–81 (D. Minn. 1985), *aff'd*, 793 F.2d 201 (8th Cir. 1986) (finding that the federal Bureau of Prisons complied with the ICA when it made "extensive efforts" to consider the input of state and local officials "plans to refurbish [a] former state hospital and use it for the treatment of medical and psychiatric needs of federal inmates").

For these reasons, Defendants violated the ICA, 31 U.S.C. § 6506(c), and consequently acted contrary to law under the APA.  5 U.S.C. § 706(2)(A).

---

[9] Defendants also failed to respond to a Freedom of Information Act request that Michigan Attorney General Dana Nessel submitted on March 4, 2026, seeking further information on an expedited basis.  (Ex. 7, AG FOIA Request.)  Per regulation, Defendants were required to respond to the request for expedited processing within ten days of receipt.  6 C.F.R. § 5.5(e)(2), (4).

**3.      Defendants did not consider whether existing facilities could meet their needs under the INA.**

Defendants' failure to engage with the State, City, and other governments also demonstrates noncompliance with the INA's requirement that Defendants first consider existing detention-type facilities.  8 U.S.C. § 1231(g)(2).[10]

Under the INA, before "initiating any project for the construction of any new detention facility," Defendants must first "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use."  *Id.*[11]  Defendants failed to do so here.

As an initial matter, by purchasing the Romulus Warehouse and moving forward with plans to convert/retrofit it for use as a mass immigration detention center, Defendants have triggered § 1231(g)(2).  That is, a detention facility does not currently exist at the site of the Romulus Warehouse, meaning the planned

---

[10] While § 1231(h) states that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person[,]" courts have read that provision narrowly and held that claims of noncompliance with the INA are subject to review under the APA.  *E.g.*, *Texas v. United States*, 524 F. Supp. 3d 598, 637–39 (S.D. Tex. 2021); *Arizona v. Biden*, 593 F. Supp. 3d 676, 716–17 (S.D. Ohio), *rev'd and remanded on other grounds*, 40 F.4th 375 (6th Cir. 2022).

[11] 8 U.S.C. § 1231(g)(2) purports to impose this requirement upon the Attorney General, but such functions were transferred to DHS and its Secretary through the Homeland Security Act of 2002.  Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002); *see also United States v. King Cnty., Wash.*, 666 F. Supp. 3d 1134, 1140–41 (W.D. Wash. 2023) (recognizing that the responsibility for "arranging for places of detention" rests with the Secretary of DHS).

mass immigration detention center would be "new."[12]  Defendants have also "initiated" a project for construction of such a facility, i.e., "cause[d] or facilitate[d] the beginning of"[13] such project, by purchasing the Romulus Warehouse (Real Estate Summary, PageID.57), and publicly stating their intent to convert/retrofit and operate the Romulus Warehouse as an immigration detention center with numerous planned external (and, undoubtedly, internal) improvements (Floodplain Notice, PageID.64–65; *see also* ICE DRI, PageID.52–54).

But prior to initiating such project, Defendants did not contact MDOC, for example, which owns multiple prison facilities throughout the State that are currently closed, to determine whether MDOC was willing to sell or lease one of those facilities to Defendants.  (LeBarre Decl. ¶¶ 4–5.)[14]  Likewise, the Ohio Department of Rehabilitation and Corrections maintains five closed prisons;[15] however, there is no indication that Defendants ever considered purchasing or leasing those facilities.  Indeed, there is no evidence that Defendants considered

---

[12] *See, e.g., New*, Merriam-Webster, https://www.merriam-webster.com/dictionary/new (last visited March 31, 2026) (defining "new" as "having recently come into existence").

[13] *See, e.g.*, *Initiate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/initiate (last visited March 31, 2026).

[14] *See* MDOC, *Closed Facilities*, available at: https://www.michigan.gov/corrections/prisons/closed-facilities (last visited March 31, 2026).

[15] *See* Ohio Dep't of Rehab. and Corr., *Facilities and Institutions*, available at: https://drc.ohio.gov/about/facilities/facilities (last visited March 31, 2026).

purchasing or leasing *any* existing facility—whether local- or state-owned—before purchasing the Romulus Warehouse.  In fact, the ICE DRI's "new model"—and its express "focus[ ] on non-traditional facilities built specifically to support ICE's needs" (ICE DRI, PageID.52)—provides direct evidence to the contrary.

In short, by neglecting to consider existing detention-type facilities before purchasing the Romulus Warehouse, Defendants violated the INA, 8 U.S.C. § 1231(g)(2), and acted contrary to law under the APA, 5 U.S.C. § 706(2)(A).

### C.    Defendants' decision was arbitrary and capricious.

Defendants' failure to comply with NEPA and the INA before purchasing the Romulus Warehouse was also arbitrary and capricious.  Historically, Defendants routinely complied with both statutes.  But Defendants' secrecy and lack of due diligence in their actions involving the Romulus Warehouse are a radical departure from this prior practice—one without adequate justification.

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

22

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ohio v. EPA*, 603 U.S. 279, 292 (2024).  When changing positions, an agency must "display awareness" of such change and may not "depart from a prior policy *sub silentio*."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The agency "must show that there are good reasons for the new policy," *id.*, and the record must reflect that the agency considered any "serious reliance interests" engendered by the status quo, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotations omitted).

Here, Defendants have dramatically changed course from their past practice of complying with the requirements of NEPA and the INA when engaging in efforts to expand immigration detention capacity.  Defendants have not explained—let alone, adequately explained—their reasons for this change in policy; therefore, they acted arbitrarily and capriciously.

For instance, in the past, Defendants routinely engaged in the NEPA process before initiating activities related to processing and detention centers.[16]  With no explanation, Defendants have decided to ignore NEPA in the context of their activities at the Romulus Warehouse.

---

[16] *See* footnote 6, *supra.*

23

Similarly, by primarily utilizing intergovernmental service agreements to expand detention capacity at state- or local-government-owned facilities,[17] Defendants historically have complied with the INA and its preference for existing detention-type facilities.  8 U.S.C. § 1231(g)(2).  Now, Defendants are focusing on a "new model" of "non-traditional facilities built specifically to support ICE's needs."  (ICE DRI, PageID.52.)  But Defendants' reasoning for implementing this "new model" is severely lacking, does not explain how the "new model" can be reconciled with the INA's existing-facility requirement, and does not address Defendants' departure from their past practice of complying with the same.  Defendants also fail to account for their prior recognition that "ICE-owned service processing centers *are not a viable option* because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority."[18]

Because Defendants failed to reasonably explain why they departed from their past practice of compliance with NEPA and the INA prior to purchasing the Romulus Warehouse, their decision was arbitrary and capricious.

---

[17] *See* footnote 4, *supra*.

[18] *See* footnote 4, *supra* (emphasis added).

24

## II.     Plaintiffs will be irreparably harmed absent injunctive relief.

Irreparable harm is an "indispensable" factor for issuance of a preliminary injunction.  *D.T.*, 942 F.3d at 327.  A moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008).  Here, Plaintiffs have demonstrated that Defendants' actions have already caused irreparable harm, and will likely continue to do so, absent an injunction.

Defendants purchased the Romulus Warehouse and imminently intend to construct and operate a detention center, well before this litigation is expected to conclude.  (Real Estate Summary, PageID.57; Floodplain Notice, PageID.64.)  Once construction begins, there is no turning back:  the State's environmental resources will be impaired, the City's reputation permanently scarred.  There is no "unscrambl[ing] the eggs or put[ting] the genie back in the bottle."  *EOG Res., Inc.*, 134 F.4th at 884.  Without a preliminary injunction, the Court—"and litigants—might be left with remedies in name only, not in substance."  *Id.* (quotations omitted).

The City has already suffered irreparable harm to its public image, lost business and income, and made significant expenditures of public safety resources—all due to the announcement and purchase of the planned detention center within its borders.  (McCraight Decl. ¶¶ 13, 15–16, 20–23.)  For example,

25

the City's Police Department has responded to dozens of protests in response to Defendants' actions and vandalism at the Warehouse, diverting its resources from protecting Romulus's residents.  (*Id.* ¶ 15–16.)

Imminent construction efforts, evidenced by Defendant's Floodplain Notice, will likely cause further harm.  "[I]n the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *Anglers of the Au Sable v. U.S. Forest Serv.*, 402 F. Supp. 2d 826, 837 (E.D. Mich. 2005) (quotations omitted).  As discussed above, there is no indication that Defendants have engaged in meaningful NEPA review; irreparable harm has and will continue to occur.  Moreover, though exact construction efforts are unknown, the State's conservation easement that protects the adjacent wetland is at risk of environmental degradation by the construction, which is inherently irreparable. (Sanders Decl. ¶¶ 9, 13); *see Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.").

Even the limited *known* intended construction risks imminent environmental injury to the State.  The Floodplain Notice indicates Defendants will construct fencing around the Warehouse.  (Floodplain Notice, PageID.64.)  Such fencing could block the floodway, which would cause increased flooding on upstream

26

properties, soil erosion on adjacent properties, and unnatural accumulation of eroded sediment and debris within the wetland.  (Sanders Decl. ¶ 15.)  Because of this, Defendants would be required to obtain a permit before erecting a fence—which Defendants have not applied for to date—and provide a hydraulic model to show the fence would not cause increased flooding on upstream properties.  (*Id.* ¶¶ 6, 15.)  Thus, Defendants' *known* imminent construction runs roughshod over the State's environmental interests, risking irreparable harm to its protected wetland.

The operation of the Romulus Warehouse as an immigration detention center gives risk to likely further harms.  The Romulus Warehouse's sewer capacity is plainly insufficient for 500 detainees, plus Defendants' staff.  (Scappaticci Decl. ¶¶ 10, 13.)  The lack of capacity will lead to sewage backups and overflows, causing problems for both the Romulus Warehouse and the City's downstream system, local groundwater, and the adjacent wetlands.  (*Id.* ¶ 13.)  Overflowing sewage entering the wetland protected by EGLE's conservation easement will negatively impact water quality, oxygen availability, and downstream public uses of the water bodies, and may lead to public health concerns, through the spread of human pathogens.  (Sanders Decl. ¶ 14.)

The City's public safety resources will also be overwhelmed and diverted from providing policing and EMS service to Romulus residents.  (McCraight Decl. ¶¶ 17–18.)   Police service—provided by Romulus's 48-strong police force—will

27

be sidetracked from their current role in reducing the City's crime rate to address protest activity and protection of the Romulus Warehouse and Defendants' staff. (*Id.* ¶¶ 13–17.)  EMS services—also expected to serve the detention center and the numerous calls that arise from typical detention centers—will be stretched thin, leaving community members vulnerable to long ambulance wait times.  (*Id.* ¶ 18.)

Further, Cogswell Street and the ingress and egress for the Romulus Warehouse simply cannot support a large-scale immigration detention center. (Scappaticci Decl. ¶¶ 16–18.)  The opening of the detention center will overburden the roadway, adversely impacting the City and its residents.  (*Id.*)

These harms may have been mitigated in part had Defendants engaged with local officials as required by the ICA and conducted the necessary environmental reviews under NEPA.  But the State and City's interests in Defendants' compliance with federal consultation and environmental reviews have been steamrolled, exposing the State and City to imminent irreparable injury.  *See Maryland*, 2026 WL 691507, at *5–6 (finding irreparable harm in near-identical circumstances).

## III.    The remaining equity factors support a preliminary injunction.

The remaining two preliminary injunction factors, "harm to the opposing party and weighing the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The public interest weighs in favor of an injunction for the same reasons that Defendants' decision to

28

purchase, convert/retrofit, and operate the Romulus Warehouse as an immigration detention center imposes harm on Plaintiffs.  That is, the public has a strong interest in preserving the environment and ensuring appropriate expenditure of limited public resources, including for public safety and infrastructure.  Moreover, the public has an interest in the correct application of federal law.  *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

On the other hand, little to no harm will be imposed upon Defendants in requiring they comply with statutorily mandated prerequisites before engaging in further construction on the property.  Even if Defendants were entirely prohibited from operating a detention center at the Romulus Warehouse, DHS has expressed that such warehouse properties have multiple other possible uses, including as storage, office space, or a training facility.[19]  With two airports staffed by DHS officials located minutes from the Romulus Warehouse, DHS almost certainly could find other appropriate uses for the Romulus Warehouse.

Thus, the third and fourth factors—the balancing of equities and the public interest—weigh against entry of a preliminary injunction.  *Maryland*, 2026 WL 691507, at *5–6 (finding the balance of equities weigh in favor of ordering injunctive relief in near-identical circumstances).

---

[19] *See* Nick Miroff, *What Happens Now to Kristi Noem's Warehouse Jails?*, The Atlantic (Mar. 16, 2026), available at https://archive.ph/BMoHX#selection-991.29-991.305.

29

## IV. The Court should waive the security requirement.

For the same reasons the equities weigh heavily in favor of Plaintiffs, the Court should waive the security required by Federal Rule of Civil Procedure 65(c). District courts "possess[ ] discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995); *see also Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 400 (6th Cir. 2012). As strong public interests support preserving the status quo, the Court should waive the security requirement. *See Moltan Co.*, 55 F.3d at 1176 (finding no bond required when strong public interest is involved).

### CONCLUSION AND RELIEF REQUESTED

For these reasons, Plaintiffs request the Court grant this motion, issue a preliminary injunction against Defendants, and grant such further relief is just and appropriate.

Respectfully submitted,

| | |
|---|---|
| */s/ Neil Giovanatti* | */s/ David F. Greco* |
| Neil Giovanatti (P82305) | David F. Greco (P53523) |
| Benjamin Houston (P76733) | Attorney for Plaintiff City of |
| Assistant Attorneys General | Romulus |
| Attorneys for Plaintiff State of Michigan | Greco Law PLLC |
| Michigan Dep't of Attorney General | 143 Cadycentre #164 |
| 525 W. Ottawa Street | Northville, MI 48167 |
| Lansing, MI 48909 | (248) 380-1975 |
| (517) 335-7622 | David.Greco@Greco-Law.com |
| GiovanattiN@michigan.gov | |
| HoustonB1@michigan.gov | |

 Dated: March 31, 2026

30

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to all counsel of record.  Since counsel for Defendants have not yet appeared as of the filing of this motion, I served the motion and associated brief and exhibits on each of the following individuals or entities via certified mail:

Markwayne Mullin
Secretary of Homeland Security
2707 Martin Luther King Jr. Ave. SE
Washington, D.C. 20528

United States Department of Homeland Security
2707 Martin Luther King Jr. Ave. SE
Washington, D.C. 20528

United States Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

Todd M. Lyons
Senior Official Performing the Duties of the Director
Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

U.S. Attorney for the Eastern District of Michigan
c/o Civil-Process Clerk
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Pamela Bondi
U.S. Attorney General
950 Pennsylvania Avenue NW
Washington DC 20530

31

Further, I will also email an efiled copy of this motion to Zak Toomey,

Kevin Erskine, and Sean C. Duffy, Assistant U.S. Attorneys with the U.S.

Department of Justice.

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Assistant Attorney General

32