**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

STATE OF MICHIGAN, *et al.*,

        *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

Case No. 2:26-cv-10968-JJCG-EAS

HON. JONATHAN J.C. GREY
MAG. ELIZABETH A. STAFFORD

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

BENJAMIN MARK MOSS
*Acting Senior Counsel*
Office of Immigration Litigation

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
U.S. Department of Justice
Environment & Natural Resources Division

KRYSTAL-ROSE PEREZ
*Trial Attorney* (TX 24105931)
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 532-3266
krystal-rose.perez@usdoj.gov

*/s/ David J. Byerley*
DAVID J. BYERLEY
*Senior Litigation Counsel* (DC Bar #1618599)
U.S. Department of Justice: Civil Division
Office of Immigration Litigation
P.O. Box 868, Benjamin Franklin Station
Washington, D.C. 20044
202-532-4523 | David.Byerley@usdoj.gov

JEFFREY ALDERETTE
*Trial Attorney*
Office of Immigration Litigation

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..........................................................................................................i

INTRODUCTION .............................................................................................................1

FACTUAL BACKGROUND..............................................................................................2

    I.     Immigration Detention Space, Generally. ............................................................2

    II.    The Romulus Warehouse Purchase .....................................................................5

STANDARD OF REVIEW .................................................................................................6

ARGUMENT ......................................................................................................................6

    I.     Plaintiff Lacks Standing.......................................................................................6

    II.    Judicial Review of the INA-Based Claims is Unavailable. ..................................9

        A.    The Court Lacks Jurisdiction Over the INA-Based Claims................................9

        B.    Plaintiffs Are Not "Adversely Aggrieved" Under the APA Within the Meaning of § 1231(g). ......................................................................................................15

    III.   Plaintiffs Fail to Show Entitlement to a Preliminary Injunction.......................17

        A.    There is No APA Finality. ...............................................................................17

        B.    The ICA Claims Are Unlikely to Succeed........................................................18

        C.    The NEPA Claims Are Unlikely to Succeed. ...................................................20

        D.    The INA Based Claims Are Unlikely to Succeed..............................................26

        E.    Plaintiffs Have Not Shown Irreparable Harm...................................................30

    IV.   If the Motion is Granted, Plaintiffs Should Be Required to Post Bond. ...........33

CONCLUSION.................................................................................................................33

**TABLE OF AUTHORITIES**

## Cases

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ................................................................................................30

*Arizona v. Biden*,
  593 F. Supp. 3d 676 (S.D. Ohio) ............................................................................16

*Back Country Horseman of Am.*,
  424 F. Supp. 2d .......................................................................................................25

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ...................................................................................................6

*Berry v. U.S. DOL*,
  832 F.3d 627 (6th Cir. 2016) ............................................................................17, 18

*Border Power Plant Working Grp. v. Dep't of Energy*,
  260 F. Supp. 2d 997 (S.D. Cal. 2003) .....................................................................23

*California v. Norton*,
  311 F.3d 1162 (9th Cir. 2002) .................................................................................21

*City of Crossgate v. U.S. Dep't of Veterans Affs.*,
  526 F. Supp. 3d 239 (W.D. Ky. 2021) ...............................................................22, 23

*City of Waltham v. U.S. Postal Serv.*,
  11 F.3d 235 (1st Cir. 1993) ......................................................................................20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................................................................8

*CoreCivic, Inc. v. Gov. of N.J.*,
  145 F.4th 315 (3d Cir. 2025) ..............................................................................10, 17

*Courtney v. Smith*,
  297 F.3d 455 (6th Cir. 2002) ...................................................................................17

*Crounse Corp. v. Interstate Commerce Comm'n*,
  781 F.2d 1176 (6th Cir. 1986) .................................................................................21

*Ctr. for Biological Diversity v. EPA*,
  141 F.4th 153 (D.C. Cir. 2025) .................................................................................9

*Ctr. for Biological Diversity v. Salazar*,
  706 F.3d 1085 (9th Cir. 2013) .................................................................................21

*D.T. v. Sumner Cnty. Schools*,
  942 F.3d 324 (6th Cir. 2019) .......................................................................30, 31, 32

*Earth Island Inst. v. Muldoon*,
  82 F.4th 624 (9th Cir. 2023) ...............................................................................21, 25

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................................7, 8

*Friends of the Earth v. Laidlaw Env't Servs*,
  528 U.S. 167 (2000) ...................................................................................................6

*Friends of the Everglades v. Sec'y, U.S. DHS*,
  No. 25-12873, --- F.4th ----, 2026 WL 1077624 (11th Cir. Apr. 21, 2026) ...............15

*Garland v. Aleman Gonzalez*,
     596 U.S. 543 (2022)..................................................................................................14
*Geo Grp., Inc. v. Newsom*,
     50 F.4th 745 (9th Cir. 2022) ............................................................................3, 10, 29
*Kucana v. Holder*,
     558 U.S. 233 (2010)..................................................................................................10
*Loper Bright Enters. v. Raimondo*,
     603 U.S. 369 (2024)..................................................................................................10
*Lujan v. Def. of Wildlife*,
     504 U.S. 555 (1992)..................................................................................................6, 7
*Maryland v. Mullin*,
     2026 WL 1045503 (D. Md. April 17, 2026)..............................................25, 26, 30, 31
*Monsanto Co. v. Geertson See Farms*,
     561 U.S. 139 (2010)..................................................................................................33
*Taxpayers of Mich. Against Casinos v. Norton*,
     No. 01-cv-0398, 2005 WL 2375171 (D.D.C. Mar. 24, 2005) .....................................23
*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
     933 F.3d 99 (2d Cir. 2019)........................................................................................16
*Robertson v. Methow Valley Citizens Council*,
     490 U.S. 332 (1989)..................................................................................................20
*S. Airways Express, LLC v. U.S. Dep't of Transp.*,
     159 F.4th 50 (D.C. Cir. 2025)...............................................................................13, 19
*Sampson v. Murray*,
     415 U.S. 61 (1974)....................................................................................................32
*Scheid v. Fanny Farmer Candy Shops, Inc.*,
     859 F.2d 434 (6th Cir. 1988) ....................................................................................12
*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
     605 U.S. 168 (2025)......................................................................................20, 21, 26, 27
*Sierra Club v. U.S. Forest Serv.*,
     828 F.3d 402 (6th Cir. 2016) ....................................................................................21
*Starbucks Corp. v. McKinney*,
     602 U.S. 339 (2024)....................................................................................................6
*Summers v. Earth Island Inst.*,
     555 U.S. 488 (2009)..................................................................................................33
*Texas v. United States*,
     524 F. Supp. 3d 598 (S.D. Tex. 2021) ......................................................................16
*Texas v. United States*,
     555 F. Supp. 3d 351 (S.D. Tex. 2021) ......................................................................16
*Texas v. United States*,
     606 F. Supp. 3d 437 (S.D. Tex. 2022) ......................................................................16
*Texas v. United States*,
     515 F. Supp. 3d 627 (S.D. Tex. 2022) ......................................................................16
*TransUnion LLC v. Ramirez*,
     594 U.S. 413 (2021)....................................................................................................6
*U. Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
     933 F.3d 728 (D.C. Cir. 2019)..................................................................................21

*United States v. Chem. Found., Inc.*,
  272 U.S. 1 (1926)..................................................................................7, 23
*Van Dinh v. Reno*,
  197 F.3d 427 (10th Cir. 1999) .............................................................11
*Vang v. Gonzales*,
  237 F. App'x 24 (6th Cir. 2007) ..........................................................16
*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)................................................................................6, 30

## Statutes

5 U.S.C. § 701(a)(1)..................................................................................9
5 U.S.C. § 701(a)(2)............................................................................11, 12
5 U.S.C. § 704...................................................................................15, 17
8 U.S.C. § 1231(g) ............................................................2, 3, 12, 15, 17
8 U.S.C. § 1231(g)(1) ...............................................................................9
8 U.S.C. § 1231(g)(2) .....................................................................9, 10, 13
8 U.S.C. § 1231(h) ..................................................................................15
8 U.S.C. §§ 1221–1231.............................................................................14
8 U.S.C. §§ 1225-1231 ..............................................................................2
15 U.S.C.S. § 80a-46(b)(2) ......................................................................16
31 U.S.C. § 6506(c) ...........................................................................18, 19
42 U.S.C. § 4336(a)(2)............................................................................25
42 U.S.C. § 4336e(1) ...............................................................................21
42 U.S.C. § 4336(b)(1)-(2) .......................................................................21
49 U.S.C. § 41733(c)(1)(D) .....................................................................13
N.J. Stat. Ann. § 30:4-8.15(d).................................................................3, 4
Revised Code of Washington § 70.395.030................................................3

## Rules

Fed. R. Civ. P. 65(c) ...............................................................................33

## Other Authorities

Exec. Order No. 12,372 ............................................................................20
Mich. House Bill 5494..............................................................................4, 29

**INTRODUCTION**

This matter involves a challenge to the Executive Branch's exercise of its core sovereign prerogative: the administration of the nation's immigration system and the secure maintenance of its borders.  Under the Immigration and Nationality Act ("INA"), Congress has vested the Secretary of U.S. Department of Homeland Security ("DHS") with broad, discretionary authority to arrange places for the detention of aliens pending removal. As traditional cooperative models between federal and local authorities have eroded—often due to deliberate state-level obstruction—DHS and U.S. Immigration and Customs Enforcement ("ICE") have sought to ensure operational continuity by acquiring and managing federally owned facilities.

The acquisition of the Romulus Warehouse—a direct manifestation of this statutory responsibility—represents a critical exercise of the Secretary's statutory discretion under the INA to arrange for appropriate detention space in a key logistical corridor.  Plaintiffs now seek "extraordinary remedy" of a preliminary injunction to halt this federal action. Plaintiffs' motion, however, founders on fundamental jurisdictional and substantive grounds.  First, Plaintiffs fail to satisfy the Article III standing, offering only speculative grievances that fall far short of a concrete or certainly impending injury.  Second, Plaintiffs invite this Court to improperly second-guess discretionary agency determinations that Congress has explicitly committed to the Secretary's discretion and, by statute, shielded from judicial interference.  Because the law leaves no room for the judiciary to substitute its judgment for that of the Executive here, and because Plaintiffs demonstrate no likelihood of success on the merits, the motion for preliminary injunctive relief must be denied as a matter of law.

## FACTUAL BACKGROUND

### I.        Immigration Detention Space, Generally.

Under INA, the Secretary of Homeland Security is required to detain broad categories of aliens pending removal and has discretionary authority to detain others. 8 U.S.C. §§ 1225-1231. Given the volume of noncitizens residing illegally in the United States, the Secretary requires ample detention space to comply with his obligations under the INA, which the INA entrusts to the Secretary's discretion to arrange for places of detention he seems "appropriate." 8 U.S.C. § 1231(g).

Traditionally, there were three main methods for ICE to obtain detention space.  First, the historically most-used method is entering into intergovernmental service agreements with state or local entities, in which ICE enters into a contract with a state or local government entity to hold ICE detainees within their facilities.[1] Second, there are "Contract" facilities, for which ICE contracts with the private companies owning the facilities to operate them as ICE detention.[2] Third, ICE can acquire detention space through "riders" on IGSAs entered into by the U.S. Marshals Service, though the ability to use the beds is contingent upon availability.[3]  A fourth method, traditionally less-used, are facilities owned by ICE itself and operated by ICE or by a contractor.[4]

Historically, ICE has relied on contractor-owned, locally-owned, or state-owned facilities to house non-citizens pending the completion of removal proceedings or pending the execution of a removal order. Ingalsbe Decl. ¶ 6. In fact, a majority of ICE's detention facilities are not owned by ICE.[5]  As of January 2021, only 8% of all detainees were housed in facilities owned by ICE

---

[1] U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 11-12 (Jan. 13, 2021), https://perma.cc/CCW8-KW82.
[2] U.S. Gov't Accountability Off., *supra* n.1.
[3] U.S. Gov't Accountability Off., *supra* n.1.
[4] U.S. Gov't Accountability Off., *supra* n.1.
[5] U.S. Gov't Accountability Off., *supra* n.1.

2

itself. [6]  Therefore, the majority of ICE's detention space has depended, to an extreme degree, on the existence of contractors and/or the cooperation of state and local governments.

This dependency rested on the presumption that states and local governments would have the common sense to recognize that an enforced national border and removing criminal, gang member, and terrorist-connected foreigners with no right to be inside the country is a duty owed by the national government to its citizens, especially considering that U.S. citizens are overwhelmingly supportive of such measures.[7] But certain state and local governments—including, but not limited to, Michigan—have instead prioritized putting U.S. citizens at risk to protect criminal aliens from detention for removal purposes.  They do so various ways, all aimed at crippling INA enforcement.

One of the more popular methods includes legislation banning all private detention centers. This includes (*e.g.*) the entire states of California,[8] Oregon,[9] Washington,[10] New Jersey,[11] and much of Maryland.[12]  Another method includes legislating to bar state or local entities from cooperating or contracting in relation to ICE detention.[13]  A third includes banning the sale of any state- or local-owned property to anyone unless usage restrictions are in place to prevent ICE from using that

---

[6] U.S. Gov't Accountability Off., *supra* n.1.

[7] *Majority of Americans Support Deporting Immigrants Who Are in the U.S. Illegally*, IPSOS (January 19, 2025) (https://www.ipsos.com/en-us/majority-americans-support-deporting-immigrants-who-are-us-illegally)

[8] *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022).

[9] *Oregon Department of Justice Sanctuary Promise Guidance*, OREGON DEPT. OF JUSTICE (https://www.doj.state.or.us/oregon-department-of-justice/civil-rights/sanctuary-promise/).

[10] Revised Code of Washington § 70.395.030.

[11] N.J. Stat. Ann. §30:4-8.15(d)

[12] Dennis Valera, *How Howard County Swiftly Banned Privately-Owned ICE Detention Centers*, CBS BALTIMORE (Feb. 6, 2026) (https://www.cbsnews.com/baltimore/news/ice-detention-centers-in-maryland/); Khiree Stewart, *'Deeply personal for me': Baltimore City Council introduces bill to ban private detention centers*, WBALTV (March 9, 2026) (https://www.wbaltv.com/article/baltimore-city-council-bill-ban-private-detention-centers/70687341); Jackie Bensen, *Bill Aims To Block ICE Detention Centers From Coming To Montgomery County*, NBC4 WASHINGTON (March 4, 2026) (https://www.nbcwashington.com/news/local/bill-aims-to-block-ice-detention-centers-from-coming-to-montgomery-county/4070037/).

[13] *E.g., Oregon Department of Justice Sanctuary Promise Guidance*, *supra* n.9.

property.[14]  A fourth is executive action to block sales of vacant state-owned property if it would be used by ICE to enforce the INA.[15]  All are typically motivated by a rabid desire to impede ICE.[16]

The strides taken to impede detention and removal at the state level has called the once-safe reliance on traditional procurement methods into doubt as a long-term solution. Indeed, this is and was the express purpose, intent, and end-goal of these state and local efforts. *See*, *e.g.*, N.J. Stat. Ann. § 30:4-8:15(d); Michigan House Bill 5494 of 2026.[17] In response to state and local efforts obstructionism, DHS reassessed its long-term options. Ingalsbe Decl. ¶ 6; Byers Decl. ¶ 9. ICE decided to "reduc[e] the total number of contracted detention facilities in use while increasing total bed capacity, enhancing custody management, and streamlining removal operations." PageID.52. New ICE-owned facilities would be "built to handle the immediate surge capacity and sustained long-term operations, providing a unified, scalable solution that delivers continuity, safety, compliance, and control - built to scale, and committed to supporting our mission." PageID.52.

---

[14] *See* Michigan House Bill 5494 of 2026 (https://www.legislature.mi.gov/Bills/Bill?ObjectName=2026-HB-5494).

[15] Brad Kutner, *Spanberger Undoes One Of Youngkin's Last Actions. It Involves A Would-Be ICE Facility*, WVTF (Jan. 29, 2026) (https://www.wvtf.org/news/2026-01-29/spanberger-undoes-one-of-youngkins-last-actions-it-involves-a-would-be-ice-facility); James David Dickson and Beth LeBlanc, *Whitmer: 'Michigan Values' Led To Blocked Sale of Shuttered Prison*, THE DETROIT NEWS (Feb. 17, 2019) (https://www.detroitnews.com/story/news/local/michigan/2019/02/17/whitmer-michigan-values-led-blocked-sale-shuttered-prison/2899133002).

[16] Fuad Shalhout, *Here's What Happened at the Romulus Protest and Council Meeting Over ICE Facility*, MLIVE (Feb. 24, 2026) ("Lt. Gov. Garlin Gilchrist addressed demonstrators outside, telling the crowd: 'When they try to warehouse [removable aliens] in Romulus, and in Baldwin and anywhere, what do we say? ICE out!'") (https://www.mlive.com/news/detroit/2026/02/heres-what-happened-at-the-romulus-protest-and-council-meeting-over-ice-facility.html).

[17] Steve Neavling, *Michigan Lawmaker Proposes Ban On State Property Being Used For ICE Detention*, DETROIT METRO TIMES (Jan. 29, 2026) ("'[ICE] detention centers should not exist,' [Rep. Dylan Wegela, D-Garden City] said. 'What we can do in Michigan is make it clear that ICE is not welcome here.'") (https://www.metrotimes.com/news/michigan-news/michigan-lawmaker-proposes-ban-on-state-property-being-used-for-ice-detention/); *see also* Khiree Stewart, *supra* n.12 (explaining Baltimore City Council President was banning private detention facilities *because* "[DHS and ICE] are often utilizing private contractors to do these private detention centers.").

Nonetheless, ICE does continue to ink deals for contract facilities when advantageous. For example, ICE's largest detention facility in the Midwest is the North Lake Detention Facility, which is situated in Baldwin, Michigan.  The contract was signed recently, in March 2025.[18]

## II.   The Romulus Warehouse Purchase

Currently, ICE has no for-certain reliable or dedicated detention capacity in the Detroit metropolitan area and therefore remains dependent on local law enforcement partners in nearby counties to provide space for detainees.  Byers Decl. ¶ 12. The two closest facilities are IGSAs. The Monroe County facility is approximately 40 minutes away, and the St. Clair County facility is approximately one hour away, which provide limited, contingent space. *Id*. ICE typically requests to hold about 100 detainees in Monroe County and 50 detainees in St. Clair County. *Id*. While the North Lake facility offers significant capacity—up to 1810 detainees—its three-hour distance from Detroit presents operational impracticalities for daily use. *Id*.

On February 4, 2026, ICE moved to address this regional deficit by purchasing the Romulus Warehouse.  Ingalsbe Decl. ¶ 17. Consultation letters were sent on or around February 13, 2026, to the Michigan State Historic Preservation Office (MI SHPO) and Tribal Historic Preservation Officials (THPOs).  DeGregorio Decl. ¶ 12. On February 20, 2026, DHS posted a public solicitation for comments. PageID 64. While ICE purchased the Romulus Warehouse with scalability to convert it to detention space for 2,000 detainees, ICE currently does not expect to house more than 500 detainees at the facility.  DeGregorio Decl. ¶ 8.  At present, the project is still in the pre-construction planning phases; current activity is limited to essential security enhancements, such as temporary fencing and surveillance, necessitated by recent incidents of vandalism.  Byers Decl. ¶ 13.

---

[18] *The GEO Group Announces Contract for Company-Owned 1,800-Bed North Lake Facility in Michigan*, THE GEOGROUP (March 20, 2025) (https://investors.geogroup.com/news-releases/news-release-details/geo-group-announces-contract-company-owned-1800-bed-north-lake)

**STANDARD OF REVIEW**

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, plaintiffs must "make a clear showing" that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter*, 555 U.S. at 20, 22).  All four are required. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018).

**ARGUMENT**

**I.   Plaintiff Lacks Standing.**

Plaintiffs must prove their standing, but their Complaint offers little and their briefing does not address it. For this reason alone, the Court lacks jurisdiction over this case and Plaintiffs are unlikely to succeed. And even if Plaintiffs had attempted to meet their burden, the purported injuries alleged in their declarations are too speculative to satisfy Article III standing.

Federal courts may exercise jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). For Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Env't Servs*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[I]mminent" means "certainly impending," not

6

speculative. *Lujan*, 504 U.S. at 564 n.2. "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

There is no evidence that Plaintiffs face *imminent* injury. Plaintiffs' claims the center "could" cause flooding, PageID.130, the sewer capacity is inadequate to accommodate future occupancy, PageID.131, and the facility will increase traffic once operational, PageID.132, are all hypothetical future harms. Plaintiffs' alleged harms are contingent upon DHS failing to follow its own decision, disregarding local regulations with which it has stated it will comply, and the ultimate use of the warehouse as a detention center, the timing of which is "unknown." PageID.130. Not only is the harm speculative, the speculation contravenes the well-trod assumption that government actors are presumed to properly execute their duties. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 15 (1926). None of these speculative assertions supports Article III standing.

Plaintiffs' allegations of reputational harm, lost business and income, and public safety resources, PageID.129, are similarly speculative and do not establish the concrete, particularized, and imminent harm necessary to establish standing. For example, the McCraight declaration claims the City is harmed because it has had to respond to protests and vandalism at the facility and it is worried it will have to do more of that in the future. McCraight Decl. ¶¶ 13-17. But these are alleged harms resulting from the actions of third parties that are not fairly traceable to ICE's actions. *See All. for Hippocratic Med.*, 602 U.S. at 383 (noting no causation where actions of third parties in response to government action are not "sufficiently predictable").[19] Similarly, the McCraight declaration vaguely alludes to lost economic opportunity stemming from speculative future plans

---

[19]It is unclear how enjoining DHS from adding fencing to *prevent* vandalism would result in less— as opposed to more—resources being expended by the city to investigate vandalism.

for the warehouse had ICE not purchased it. However, in a radio appearance just days before his declaration, McCraight acknowledged that the entity who was also interested in the warehouse had not given up on Romulus and was simply trying to find another place in Romulus.[20] In the same interview when asked "is this a 'Not In My Backyard' situation, or is there some other part of the community where a center like this might work better?  Because, you know, in reality, a center would bring jobs and revenue in as well," McCraight was unable to articulate *any basis* for his belief that the operation of a detention center would not bring jobs or taxpayers to Romulus.[21] Such vague and speculative allegations of economic harm fall far from the concrete, particularized, and imminent harm that Article III demands. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). As Mayor McCraight explained in a radio appearance, "it's hard to determine the negative impact holistically on our infrastructure until we know what this is going to be… it's hard to really dictate the negative impact or the complete impact…  until we know exactly what they want to do there."[22]  Speculation and spirited political opposition is not enough, "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

---

[20] All Talk with Kevin Dietz, *Romulus Pushes Back: Mayor McCraight on Lawsuit to Block DHS Detention Center* (March 27, 2026) (at the 3:20 mark) (https://www.wjr.com/2026/03/27/it-boils-down-to-regulations-romulus-mayor-speaks-on-lawsuit-against-ice-detention-center-plans/) ("When the federal government and stepped in and purchased it out from under them, it cancelled this entire deal, but we are trying to find a home for that company in Romulus still, we want to keep those jobs and tax base here.").

[21] All Talk with Kevin Dietz, *supra* n.20 (at the 4:29 mark). McCraight also could not identify any place in Romulus he thought suitable for ICE's use, but made clear in his softball TV interview his opinion that such a place does not exist. *Romulus Mayor Discusses ICE Detention Facility Lawsuit*, FOX 2 DETROIT (March 26, 2026) (beginning at 5:40) (https://www.fox2detroit.com/video/fmc-hiz0wa6ii28bdyh5).

[22] All Talk with Kevin Dietz, *supra* n.20 (beginning at the 8:00 mark). Reports also indicate McCraight has said that the city would not issue permits or a certificate of occupancy for the structure to DHS no matter what, unless ordered to do so. *See* Lauren Gibbons, *Can Michigan Block New ICE Facilities? How Officials Are Fighting Back*, BRIDGE MICHIGAN (March 9, 2026) (https://www.michiganpublic.org/politics-government/2026-03-09/can-michigan-block-new-ice-facilities-how-officials-are-fighting-back).

II. **Judicial Review of the INA-Based Claims is Unavailable.**

The INA entrusts the Secretary of Homeland Security with the duty to "arrange" locations for detention "pending removal or a decision on removal," but leaves to the Secretary's discretion *which* places of detention are "appropriate." 8 U.S.C. § 1231(g)(1) ("The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."). The statute provides some guidance, "before initiating any project for the construction of any new detention facility…, the [Secretary] shall *consider* the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility *suitable* for such use." 8 U.S.C. § 1231(g)(2) (emphasis added). The statute does not require the Secretary to purchase or lease existing prisons, jails, detention centers, or "other comparable facilit[ies]" over acquiring, building, remodeling, repairing, or operating any other facility. *Id.* A weak procedural requirement to "consider" does not subsume a requirement to issue a formal analysis or engage in any drawn-out process. *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 172 (D.C. Cir. 2025).

Judicial review is unavailable under the APA. First, under 5 U.S.C. § 701(a)(1), there is a statute precluding judicial review, and regardless, under § 701(a)(2), decisions about what facilities are "suitable" and "appropriate" under § 1231(g) are left to the Secretary's discretion. Second, Plaintiffs are not "adversely aggrieved" within the meaning of § 1231(g).

A. **The Court Lacks Jurisdiction Over the INA-Based Claims.**

i. **Determining the "Appropriate Places of Detention" is Within the Secretary's Discretion.**

First, review is unavailable because § 1252(a)(2)(B)(ii)—added to the INA in 1996—precludes review of whether, how, and when DHS exercises its discretion to select places of detention under § 1231(g). Section 1252(a)(2)(B)(ii) states:

9

> Notwithstanding any other provision of law (statutory or nonstatutory)…and regardless of whether the judgment, decision, or action is made in removal proceedings, *no court shall have jurisdiction to review—*
>> (ii) *any other decision or action* of the Attorney General or the Secretary of Homeland Security the authority *for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security*, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added). Section 1252(a)(2)(B)(ii) is a "catchall provision" barring review of discretionary decisions "when Congress itself set out the Attorney General's discretionary authority in the statute." *Kucana v. Holder*, 558 U.S. 233, 247 (2010).

In the INA, Congress spoke clearly: "Section 1231(g)(1) gives both responsibility and broad discretion to the Secretary 'to choose the place of detention for deportable aliens.'" *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (*en banc*) (internal marks, citations omitted); *accord CoreCivic, Inc. v. Gov. of N.J.*, 145 F.4th 315, 320 (3d Cir. 2025) ("Federal law gives the federal government discretion to find 'appropriate places of detention for aliens detained pending removal.'"). While Congress has expressed a preference "for purchase or lease of any existing prison, jail, detention center, or other comparable facility" prior to constructing a new one to avoid unneeded expenditures where possible, that preference turns on the Secretary's determination of whether that facility is "suitable." 8 U.S.C. § 1231(g)(2); *CoreCivic*, 145 F.4th at 330 (Ambro, J. dissenting on other grounds) ("Congress has given certain executive agencies… significant discretion in managing civil immigration detention… include[ing] deciding how and where to house immigration detainees."). Thus, because § 1231(g)'s standard for the selection of a facility it is "appropriate" and "suitable," the choice is discretionary. *Id*. at 320 (majority op.); *Id.* at 330 (Ambro, J. dissenting); *Geo Grp*, 50 F.4th at 751; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (noting statutory terms "such as 'appropriate' or 'reasonable'" signal discretion).

10

As the Secretary alone "shall arrange for appropriate places of detention", and the Court cannot entertain Plaintiffs' attempts to veto the Secretary's discretion over which places are "appropriate."  Compl. ¶¶ 73-79.  Section 1252(a)(2)(B)(ii) bars review of the Secretary's exercise of discretion under § 1231(g). *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999).  The choice to retrofit the Romulus Warehouse and to convert it into an "appropriate place of detention" is an exercise of discretion under § 1231(g), and review is unavailable per § 1252(a)(2)(B)(ii).  And even if § 1252(a)(2)(B)(ii) did not exist, the determination of which places of detention are "appropriate" is "agency action is committed to agency discretion by law" which is excluded from the APA's waiver of sovereign immunity. 5 U.S.C. § 701(a)(2). The injunction must be denied, at a minimum.

### ii. Plaintiffs Identify No Transgression of § 1231(g) Authority.

Plaintiffs briefly argue that DHS exceeded § 1231(g)(1) authority in purchasing the Romulus Warehouse because § 1231(g)(2) says, "prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." Mot. at 20-21. Plaintiffs focus on the words "new" and "initiate", but—tellingly— ignore others. Mot. 21. Among those is "construct," which is synonymous with "build,"[23] and which is distinguishable from "remodel[ing]" as described in § 1231(g)(1). If "construction" included "remodeling," § 1231(g)(2) would have said so, as § 1231(g)(1) enumerated "acquire, build, remodel, repair, and operate" while § 1231(g)(2) only mentions "construct[]." *Compare* § 1231(g)(1) *and* (2).  Instead, it is limited to circumstances involving building, so § 1231(g)(2) imposes no "consideration" requirement before remodeling.

---

[23] *Construct*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/construct (last visited April 16, 2026).

11

And even if it did, at most, DHS would have only been required to consider "*the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.*" *Id.* § 1231(g) (emphasis added). "Available" means "present or ready for immediate use."[24]   Tellingly, despite complaining DHS did not make cold calls about MDOC's facilities, Plaintiffs fail to identify *any* MDOC facility that is "availab[le] for purchase or lease" to ICE. *See* Compl.; LeBarre Decl. ¶¶ 1-5. Plaintiffs do not allege any facility is or was available. *Id.*; Compl. ¶ 50. If there were, Plaintiffs would surely have identified it. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 (6th Cir. 1988) ("[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.").

But they stop at implication, and for good reason: Plaintiffs are well aware Gov. Whitmer blocked the last attempt to sell a vacant MDOC facility for use as ICE detention space because doing so would not align with her "values."[25]  So while Plaintiffs attempt to *imply* "availability" by noting MDOC has "at least one" vacant facility (LeBarre Decl. ¶ 5), Plaintiffs exclude any claim their vacant facilities were *actually* "available for purchase or lease" for ICE's use. Under the Whitmer-Gilchrist administration, Michigan has made clear that any vacant facilities it owns are not "available" to DHS.[26]  As such, Michigan owns no "available" facilities that were overlooked, and Plaintiffs' attachments show ICE considered existing structures, as 10 of the 24 planned new acquisitions were "turnkey" facilities, i.e., existing prisons, jails, and the like. PageID.52.

Regardless, § 1231(g) does not require DHS to find *no* "existing prison, jail, detention center, or other comparable facility" exists before deciding to remodel a different structure.  8

---

[24] *Available*, Merriam-Webster, https://www.merriam-webster.com/dictionary/available (last visited April 16, 2026).
[25] Dickson and LeBlanc, *supra* n.15.
[26] Dickson and LeBlanc, *supra* n.15; Shalhout, *supra* n.16.

U.S.C. § 1231(g). As Plaintiffs note, the Romulus Warehouse is ideally located between "two airports staffed by DHS officials located minutes from the Romulus Warehouse[.]" Mot. 29.  In an interview, Mayor McCraight acknowledged he "heard rumors… for years" that ICE had been interested in Romulus "because of [Romulus's] proximity to the airport."[27]  Indeed, this was a component of DHS's decision.  Ingalsbe Decl. ¶¶ 10 and 15. It is not clear why Plaintiffs believe the Secretary cannot consider the "place"—including proximity to major metropolitan areas and airports—in determining "appropriate *places* of detention[.]"

Nonetheless, Plaintiffs make far too much of the loose requirement to "consider the availability," which demands less than door-knocking every local government within a five-state radius to inquire about off-market facilities that are less suitable for DHS's operational needs. *Cf.* Compl. ¶ 95. A requirement to "consider" does not subsume anywhere near that much. *See*, *e.g.*, *S. Airways Express, LLC v. U.S. Dep't of Transp.*, 159 F.4th 50, 60 (D.C. Cir. 2025) (explaining 49 U.S.C. § 41733(c)(1)(D)'s requirement to "consider" whether "the air carrier has included a plan in its proposal to market its services" does not require DOT "to analyze the particulars of any carrier's marketing plan or how it compared with other proposed marketing plans").  But even if the requirement to "consider" required exhaustion, "contact[ing] MDOC… to determine whether MDOC was willing to sell or lease one of those facilities to Defendants" would have been a waste of time. The last attempt for an MDOC facility for ICE's use was sunk because "the Whitmer administration demanded a guarantee the facility would only house single adults, and none

---

[27] All Talk with Kevin Dietz, *supra* n.20 ("DIETZ: When did you first learn about the detention facility plan? MCCRAIGHT: Well, we've heard about rumors [unintelligible] similar for years because of our proximity to the airport, I'm assuming, the airport being right in the middle of our community.").

separated from other family members after they arrived in the United States."[28] Such a condition is obviously a non-starter, and the lawsuit speaks for itself as to where Governor Whitmer stands now.

### iii.     Plaintiffs' Requested Injunction Violates § 1252(f).

Plaintiffs demand an order barring: (1) "taking [any] actions to convert the [Romulus Warehouse] into an immigration detention facility including any and all efforts to construct, retrofit, demolish, or make physical changes to the Warehouse, during the pendency of this litigation", and (2) "detaining individuals at the Romulus Warehouse during the pendency of this litigation." Page.ID 93. In addition to § 1252(a)(2)(B)(ii) bar, § 1252(f) strips jurisdiction over it.

Section 1252(f)(1) provides, "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the [8 U.S.C. §§ 1221–1231]." As such, "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). The Court cannot "prohibit the Government from doing what the statute allows or commands." *Id.* at 552.

As explained above, the Secretary has statutory authority under § 1231(g) to remodel the Romulus Warehouse into an appropriate place of detention.  So while Plaintiffs may disagree with the choice, they cannot enjoin it. *Id.* Plaintiffs' demand to bar DHS from "arrang[ing] for appropriate places of detention for aliens detained pending removal or a decision on removal" or "expend[ing]… amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available)

---

[28] Jonathan Oosting, *Firm: Whitmer Made 'Impossible' Demands For Immigrant Detention Center*, DETROIT NEWS (Mar. 19, 2019).

necessary for detention" as it relates to the Romulus Warehouse restrains the operation of § 1231(g).

Indeed, the very *point* of Plaintiffs' lawsuit: preventing immigration detention *anywhere* in Romulus[29] (and, per Lt. Gov. Gilchrist, Michigan as a whole).[30] The second demand, to bar DHS from "detaining individuals at the Romulus Warehouse during the pendency of this litigation" would likewise enjoin the detention provisions of §§ 1226-1231. As the Eleventh Circuit recently explained, "[a]n injunction that prevents [the Secretary] from detaining aliens in a place of his choosing 'enjoin[s] or restrain[s] the operation[s]' of sections 1231(g) and 1226(a)." *Friends of the Everglades v. Sec'y, U.S. DHS*, No. 25-12873, --- F.4th ----, 2026 WL 1077624, at *7 (11th Cir. Apr. 21, 2026).  Plaintiffs' injunction is no different and runs afoul of § 1252(f)(1).

### B. Plaintiffs Are Not "Adversely Aggrieved" Under the APA Within the Meaning of § 1231(g).

Plaintiffs are not "adversely aggrieved" under 5 U.S.C. § 704 within the meaning of the relevant statute (8 U.S.C. § 1231(g)), as is required under the APA to press a claim. Plaintiffs assume they can enforce "the INA's requirement that [DHS] first consider existing detention-type facilities[.]" Mot. 20. But per § 1231(h), "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h) (cited at Mot. 20, n.10). To try to avoid § 1231(h), Plaintiffs argue "courts have read that provision narrowly and held that claims of noncompliance with the INA are subject to review under the APA." Mot. 20 n.10 (citing

---

[29] FOX 2 DETROIT, *supra* n.21 (beginning at 6:07).

[30] Shalhout, *supra* n.16 ("Lt. Gov. Garlin Gilchrist addressed demonstrators outside, telling the crowd: 'When they try to warehouse [removable aliens] in Romulus, and in Baldwin and anywhere, what do we say? ICE out!'").

*Texas v. United States*, 524 F. Supp. 3d 598, 637–39 (S.D. Tex. 2021);[31] *Arizona v. Biden*, 593 F. Supp. 3d 676, 716–17 (S.D. Ohio), *rev'd on other grounds*, 40 F.4th 375 (6th Cir. 2022)).

But these cases are inapposite. In each, the allegation was that DHS lacked authority under the INA to pause removals for 100 days because § 1231(a)(1)(A) plainly mandated removal within 90 days after a final removal order. *Arizona*, 593 F. Supp. 3d at 715; *See Texas v. United States*, 515 F. Supp. 3d 627, 631 (S.D. Tex. 2021). Those held § 1231(h) would not bar an APA claim against a policy to violate § 1231(a)(1)(A). *Id*. at 717; *Texas*, 515 F. Supp. 3d at 634. But as explained, the Secretary acted within § 1231(g) authority.  In such a case, the Sixth Circuit has held the same language (as it appears § 1158(d)(7)) to bar claims of entitlement or injury from alleged deviance in the statute's processing provisions. *Vang v. Gonzales*, 237 F. App'x 24, 31 (6th Cir. 2007) (finding identical language § 1158(d)(7) made asylum interview timelines unenforceable).

Even if § 1231(h) did not expressly say there is no enforceable right to dictate to the Secretary how he may exercise § 1231(g) discretion, reading § 1231(g) as a whole clarifies that the interest sought to be protected by § 1231(g)(2)'s loose requirement to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use" is that of the public fisc, not the interests of state and local officials. Section 1231(g)(1) and (2) require only that the Secretary give preference to lower-cost options when "available", "suitable", and "appropriate," which is essentially statutory guidance to spend appropriated funds

---

[31] Judge Tipton wrote opinions for multiple cases interpreting § 1231(h) the same way. *See*, *e.g.*, *Texas*, 515 F. Supp. 3d at 634; *Texas v. United States*, 524 F. Supp. 3d 598, 638 (S.D. Tex. 2021); *Texas v. United States*, 555 F. Supp. 3d 351, 387 (S.D. Tex. 2021); *Texas v. United States*, 606 F. Supp. 3d 437, 475 (S.D. Tex. 2022).  Judge Tipton reads "party" in § 1231(h) to be limited to "the alien involved in the immigration removal proceeding detailed in that specific section[.]" *Texas*, 524 F. Supp. 3d at 637.  But were this what Congress intended, the term "*any* party" is a bizarre choice to refer to just *one specific* party. *Cf. Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105-06 (2d Cir. 2019) (interpreting 15 U.S.C.S. § 80a-46(b)(2), "Lansuppe's interpretation… would limit 'any party' to one: the SEC. We consider it highly unlikely that Congress meant to allow a suit only by the SEC when it used a phrase that so unambiguously contemplates… more than one[.]")). Regardless, Plaintiffs do not argue they are not "any party" in this case.

16

wisely. 8 U.S.C. § 1231(g). "Congress's interest in ensuring that government funds are spent efficiently" is a "goal is shared by all taxpayers, and is not a particular interest of the plaintiffs." *Courtney v. Smith*, 297 F.3d 455, 465, 465 (6th Cir. 2002).  Statutory guidance to prefer cheaper options where suitable and appropriate does not create taxpayer standing, even if § 1231(h) could be ignored. The requirement of "consideration" is, at most, a weak procedural one, and it is one that Congress stated is not a "right or benefit that is legally enforceable" by "any party."

But even without § 1231(h), the claim that Michigan is aggrieved because DHS did not consider its vacant facilities is disingenuous, because their vacant facilities *were* considered in 2019, and Gov. Whitmer blocked the deal.[32] Indeed, Gov. Whitmer blocked the sale of Deerfield Correctional Facility after a year of negotiations, just days before finalization.[33] There was no other plan, the decision to block it was purely political, and Michigan eventually paid $1.1 million to tear it down.[34] In addition to Gov. Whitmer, Lt. Gov. Gilchrist made his position clear too: "ICE out!"[35] For this reason, Plaintiffs do not allege contacting MDOC would have been productive.  Section 1231(g) confers "significant" discretion to DHS to set places of detention (*CoreCivic*, 145 F.4th at 330 (Ambro, J. dissenting)), and confers no right to Plaintiffs to insist on wasting DHS time.

**III.    Plaintiffs Fail to Show Entitlement to a Preliminary Injunction.**

### A. There is No APA Finality.

The APA only permits review over "final agency action." 5 U.S.C. § 704. "An agency action must generally meet two conditions to be considered 'final' under the APA." *Berry v. U.S. DOL*,

---

[32] Dickson and LeBlanc, *supra* n.15.
[33] Dickson and LeBlanc, *supra* n.15.
[34] Dickson and LeBlanc, *supra* n.15; Aaron Parseghian, *Vacant Ionia Prison To Be Demolished, Prepped For Redevelopment*, FOX 17 WEST MICHIGAN (https://www.fox17online.com/news/local-news/ionia/vacant-ionia-prison-to-be-demolished-prepped-for-redevelopment).
[35] Shalhout, *supra* n.16.

832 F.3d 627, 633 (6th Cir. 2016). "First, the challenged action must mark the consummation of the agency's decisionmaking process." *Id*. This means that the action is not tentative, interlocutory, or under further consideration. *Id.* "Second, the challenged action must determine rights and obligations of a party or cause legal consequences." *Id.*  This means it has a sufficiently direct, immediate impact on the "aggrieved party" and directly effects its day-to-day business. *Id.*

The plans for the Romulus Warehouse remodeling are still in the planning stages. DeGregorio Decl. ¶¶ 8, 10, 11.  For example, while ICE originally planned to remodel the Romulus Warehouse "to house up to 500 to 1,000 detainees, with scalability to accommodate 2,000", ICE now "does not expect to house more than 500 detainees at the facility." *Id*. ¶ 8.  Moreover, ICE is not finished with its NEPA analysis either, and will conduct further analysis as plans develop. *Id.* ¶ 10.   Where ICE lands on bedspace will impact its construction plans. *Id.* ¶¶ 8, 10, 11. Unsurprisingly, in his interviews, Mayor McCraight was unable to quantify any impacts to Romulus because no plans have been finalized.[36] A contemplated action at "some unknown point in the future" and that is subject to change is not "final agency action" under APA.

### B.  The ICA Claims Are Unlikely to Succeed.

Plaintiffs claim "deciding to purchase, convert/retrofit, and operate the Romulus Warehouse as a mass immigration detention center, Defendants also failed to even attempt to gather State and local viewpoints, let alone consider them—a clear violation of the ICA." Mot. at 17. The cited ICA provision says, "*[t]o the extent possible*, all national, regional, State, and local viewpoints shall be considered in planning *development programs and projects* of the United States Government or assisted by the Government." 31 U.S.C. § 6506(c) (emphasis added).

---

[36] FOX 2 DETROIT, *supra* n.21 (beginning at 8:00); All Talk with Kevin Dietz, *supra* n.20 (at 8:00).

Even assuming that retrofitting of an existing facility for use as an ICE detention center can be considered a "development program[] and project[,]" Plaintiffs are unlikely to succeed in the ICA claims for at least two reasons: (1) DHS did, in fact, solicit input (PageID. 64), and both the Mayor of Romulus and Michigan State Attorney General provided their objections; and (2) nothing in § 6506(c) requires DHS to exhaust or reconcile all input *before* breaking dirt.

First, Plaintiffs attach DHS's solicitation of public comments to their Complaint. Pls' Ex. 6 (PageID 64).  The solicitation says, "[a]ny individual, group, or agency wishing to comment on the project may do so via email at icesustainability@ice.dhs.gov." *Id.*  Michigan Attorney General Nessel utilized that opportunity to submit comments on February 27, 2026. PageID.191.  And according to reports, so did Mayor McCraight, on February 16, 2026.[37] Attaching DHS's solicitation of comments to the Complaint is self-defeating of the ICA claim.

Second, that Plaintiffs have not gotten their way is not evidence of "willful ignorance of State and local concerns and viewpoints" or "a blatant disregard."  The ICA does not require DHS to respond to "concerns and viewpoints," the ICA (at most) requires "consideration," but only "to the extent possible." 31 U.S.C. § 6506(c).  Notably, the ICA does not require DHS to yield to objections or to reconcile its national security mission with local preferences.  Again, a requirement to "consider" is a weak procedural one, it does not require door-knocking to solicit extra views or a formal analysis of the views submitted. *S. Airways*, 159 F.4th at 61.  The ICA also did not require DHS to "consult relevant State or local officials before purchasing the Romulus Warehouse," as the ICA does not specify when during the "planning" stages that viewpoints be considered. *Compare* 31 U.S.C. § 6506(c) *with* Mot. 18. Indeed, a pre-purchase solicitation of comments would

---

[37] Shalhout, *supra* n.16.

19

have only made the warehouse sitting duck for arsonists and vandals. *See* Byers Decl. ¶ 13.  As

Breyer, J. explained while the First Circuit's Chief Judge,

> In our view, neither the Act nor [Exec. Order No. 12,372, 47 Fed. Reg. 30,959 (1982)] requires a federal agency to begin consultations before the agency makes *any* commitment to a particular project or takes *any* steps towards carrying out such a project. Nothing in the Act or Order suggests an intent to integrate federal, state, and local bureaucracies to the extent that any such interpretation would require. Nor does the language of the Act or Order suggest an intent to give state or local officials the right to veto federal projects, where, say, speed is important or practical considerations indicate that a degree of pre-consultation federal bureaucratic activity is desirable. Rather, the relevant statutory language simply requires "consideration" of "local viewpoints" during the "planning" stages of a project.

*City of Waltham v. U.S. Postal Serv.*, 11 F.3d 235, 244 (1st Cir. 1993) (Breyer, C.J.).  That

Plaintiffs have not had their way does not mean they have not had their say.  Moreover, given that

groundbreaking has not occurred yet, it is still possible that specific local concerns—other than a

generalized objection to immigration enforcement or detention generally—might still be

accommodated.  *See id.*  But even if they are not accommodated, that DHS goes one way does not

mean that "local viewpoints" were ignored, it just means they did not outweigh other equities. *Id.*

### C.  The NEPA Claims Are Unlikely to Succeed.

Plaintiffs fail to establish a likelihood of success on their NEPA claim because the Romulus

Warehouse Project is categorically excluded from further NEPA review, which DHS documented

in a Record of Environmental Consideration (REC), *see* Exhibit 1.

NEPA "is a purely procedural statute" that "does not require the agency to weigh

environmental consequences in any particular way."  *Seven Cnty. Infrastructure Coal. v. Eagle*

*Cnty.*, 605 U.S. 168, 173 (2025); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-

51 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply

prescribes the necessary process.").  It "is a procedural cross-check, not a substantive roadblock."

*Id.*  A federal agency satisfies NEPA through (1) an environmental impact statement (EIS) if the

agency determines the action will have significant environmental impacts, (2) an environmental assessment (EA) to assess whether the action will have significant environmental impacts, or (3) a categorical exclusion (CE) for types of actions that an agency has determined do not significantly affect the environment.  *See* 42 U.S.C. §§ 4336(b)(1)-(2).  Actions covered by CEs do not require an EA or EIS unless extraordinary circumstances exist.  42 U.S.C. § 4336e(1).

CEs are "a form of NEPA compliance," that streamline an agency's environmental review while providing several procedural safeguards.  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013); *U. Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) ("[CEs] are not exemptions or waivers of NEPA review; they are simply one type of NEPA review."); *see generally Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 408 (6th Cir. 2016) (affirming agency's invocation of CE).  "[T]he entire point of categorical exclusions is to reduce the administrative burden of approving certain projects." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023).  Thus, "[i]n many instances, a brief statement that a categorical exclusion is being invoked will suffice." *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002).

During a NEPA review, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail" of its written analysis. *Seven Cnty.*, 605 U.S. at 182-83.  "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id*. at 182-83 (emphasizing deference owed to agency in deciding "how far to go in considering indirect environmental effects from the project at hand").  A court is not to "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Crounse Corp. v. Interstate Commerce Comm'n*, 781 F.2d 1176, 1193 (6th Cir. 1986).

21

Here, DHS reasonably exercised discretion in documenting the three CEs that the Romulus Warehouse Project falls under and assessing their potential environmental effects.  DHS conducted a multi-step review that included preparing several documents assessing the property, *see* DeGregorio Decl. ¶ 13.  DHS then decided three different CEs would apply to separate components of the Project.  *See*  Exhibit 1 (REC) at 2-3.  DHS applied the CE for real estate activities, though unnecessary because "the mere acquisition of land" by a federal agency "does not implicate NEPA's requirements," *City of Crossgate v. U.S. Dep't of Veterans Affs.*, 526 F. Supp. 3d 239, 259 (W.D. Ky. 2021).  The Repair & Maintenance Activities CE, which the DHS Instruction Manual refers to as "CATEX D1" (*see* Exhibit 2), applies to the planned minor renovations at the Romulus Warehouse.  *See* Exhibit 1 (REC) at 2-3.  And any new construction, installation, and demolition activities will be consistent with the prerequisites of "CATEX E1" because the Project (a) will be compatible with applicable planning and zoning standards and coastal management programs, (b) is in a developed area and previously-disturbed site, (c) will not substantially increase motor vehicles at the warehouse, (d) will involve construction consistent with existing nearby buildings, and (e) will not exceed existing support infrastructure capacities.   Exhibit 2 (DHS Instruction Manual) at 65; Exhibit 1 (REC) at 1 ("All construction activity will be temporary, localized, and confined to previously disturbed areas. No new building additions, footprint expansions, offsite construction, or capacity related improvements are included in the Project.").

After identifying the CEs that apply to the Project, DHS analyzed several resources to ensure that no extraordinary circumstances exist.  For example, the REC notes that traffic patterns will not be significantly affected because the Romulus Warehouse is "near major transportation corridors, including I-94, I-275, and Route 12."  Exhibit 1 (REC) at 7. To control runoff, the Romulus Warehouse has basins designed for managing stormwater runoff from impervious facility surfaces,

and DHS will maintain the basins by clearing vegetation and inspecting drainage structures to comply with stormwater management requirements and to "promote proper function and operation, while proactively mitigating risks such as flooding, sinkholes, or animal burrows." *Id.* at 6.

Notably, the Project's "planned renovations and operations will comply with all applicable federal, state, and local regulations governing air quality, noise, hazardous materials, wastewater, potable water, and transportation safety." Exhibit 1 (REC) at 5. "All construction activities will adhere to best management practices (BMPs) to prevent spills, contamination, or runoff." *Id.* at 6. "Coordination with the local municipal sewer authority will ensure compliance with all permitting requirements." *Id.* "All required utility approvals, permits, and connection authorizations would be obtained to confirm the system's ability to accommodate anticipated flows." *Id.* at 7. By implementing environmental control and management strategies in accordance with permitting requirements, DHS reasonably determined that no extraordinary circumstances exist. *See City of Oberlin*, 937 F.3d at 610 (compliance with another agency's standards sufficient to show no significant impact under NEPA); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020 (S.D. Cal. 2003) (same).

"What constitutes 'significant' impact is left primarily to [agency] discretion," *Taxpayers of Mich. Against Casinos v. Norton*, No. 01-cv-0398, 2005 WL 2375171, at *5 (D.D.C. Mar. 24, 2005), *aff'd*, 433 F.3d 852 (D.C. Cir. 2006). And here, DHS reasonably determined the Project is categorically excluded, especially considering that the Project "consists of security, operational, and infrastructure improvements located entirely within previously developed and disturbed areas." Exhibit 1 (REC) at 17. Indeed, the Romulus Warehouse is "located within an established industrial space" that has been "extensively disturbed to accommodate utilities, parking, and warehouse size requirements," among other things. *Id.* at 5, 11 ("[P]otential ground disturbing work will be

23

consistent in depth and method of disturbance with past modifications to the site.").  Ground disturbing activities required for facility improvements will be minor such as "surface preparation for a perimeter security fence, exterior recreation court installation, light poles, and associated utility work."  *Id.* at 13.  The Project does *not* propose to increase the facility's design capacity, building footprint, expansion areas, offsite improvements, or new utility corridors.  *Id.* at 17.

By relying on well documented CEs, DHS complied with NEPA.  Nonetheless, Plaintiffs assert that DHS should have prepared an EIS, but they fail to identify any potential significant impact to the environment that would require an EIS.  *See* Pls. Br. 15-16.  Instead, Plaintiffs point out that a wetlands conservation easement is nearby the Romulus Warehouse and conclude without support that wastewater from the warehouse would negatively impact the wetlands.  *Id.* (citing Sanders Decl. ¶¶ 13-15; Scappaticci Decl. ¶ 13).  But this conclusion is based on a highly speculative and unrealistic chain of events.  Indeed, Plaintiffs' argument rests on the incorrect premise that the Romulus Warehouse's wastewater system will never be upgraded.  *See* Sanders Decl. ¶ 14 ("*If* the sewer line backs up…  *If* sewage were to enter these water bodies…") (emphasis added), ¶ 15 ("*if* the fence were to block the floodway, the fence *could* cause increased flooding…") (emphasis added); Scappaticci Decl. ¶ 19 (opining "existing water, sewer, and roadway infrastructure serving the Romulus Warehouse" would need "upgrades" to support the Project).

As the REC recognizes, however, wastewater and potable water systems "may need [to be] upgraded for the increase in occupancy."  Exhibit 1 (REC) at 6-7 ("Project may require upsizing or modification of the existing sanitary sewer lateral and/or point of connection to accommodate projected facility wastewater flows.").  The upgrades would not cause any extraordinary circumstances because they would "occur within existing utility easements, right-of-way, or previously disturbed areas," *id.* at 7.  "Ground disturbance associated with sewer improvements

24

would be temporary, localized, and linear in nature, consisting primarily of trenching for pipe replacement or connection upgrades." *Id.*  And of course any "sewer improvements would be designed and implemented in coordination with the local municipal sewer authority," *id.*  Through that coordination, DHS will confirm capacity, complete detailed engineering designs, and obtain necessary permits. *Id.*  Before operating the facility, DHS will prepare an EA addressing concerns about exceeding existing support infrastructure capacities among other impacts. *See* DeGregorio Decl. ¶ 10 ("ICE will complete the preparation of an EA before ICE issues a final decision and before ICE authorizes construction to retrofit the facility for housing detainees.").

Contrary to Plaintiffs' suggestion, NEPA contains no disclosure requirement for the application of CEs, much less any *public* disclosure requirements.  42 U.S.C. § 4336(a)(2) (NEPA stating that an environmental document is not required if the proposed agency action is categorically excluded, with no mention of any public documentation or notice requirement); *Back Country Horseman of Am.*, 424 F. Supp. 2d at 99 (holding that an "agency had no obligation to formally document its decision" to apply a CE); *Earth Island Inst.*, 82 F. 4th at 636 ("Where agency action falls under a categorical exclusion, it need not comply with the requirements of an environmental impact statement or environmental assessment." (citation omitted)).  Further, DHS did disclose important facts about its plans for the facility in consultation and historic preservation letters sent to Native tribes, various local historical trust organizations, and the County Planning and Zoning Board. *See* Exhibit 1 (REC) at 35-374.  The DHS NEPA instruction manual recommends preparing a REC for the application of CE E2, which DHS prepared, but the instruction manual contains no requirement that the REC be made public.

Finally, the District of Maryland's recent decision in *Maryland v. Mullin*, 2026 WL 1045503 (D. Md. April 17, 2026), has significant flaws that should limit its application here for at least four

25

reasons.  First, the court in that case considered factors irrelevant to NEPA compliance such as the time it took the agency to prepare its NEPA analysis.  *See* 2026 WL 1045503, at \*1 ("what review was done appears to have proceeded at a rocket's pace"), *id.* at \*5 ("just hours before Defendants purchased the Williamsport Warehouse, they completed a Record of Environmental Consideration"), \*23 ("the Court has serious concerns about the timing of Defendants' decision-making"). Second, the court did not consider that merely acquiring real estate does not implicate NEPA obligations.   Third, the court misinterpreted the DHS manual to apply a much broader meaning of the phrase "functional use" in the Repair and Maintenance CE.  *Id.* at \*24-25.  Fourth, the court conflated the project's *construction* specifications, which do not include any capacity-related improvements, with the ultimate *operation* of the facility.  *Id.* at \*26 (suggesting that the REC contained inconsistencies about the planned retrofit); *see also* Exhibit 1 (REC) (describing proposed action as "ICE proposes to acquire and retrofit" without expressly authorizing operation).

In short, DHS made factual determinations about the scope and intensity of impacts, and after analysis applying agency expertise and data collection, concluded that the Project falls within three CEs and involves no extraordinary circumstances. These factual determinations are entitled to substantial deference as the *Seven County* decision recently reaffirmed.  605 U.S. at 183. Plaintiffs have set out to prevent DHS from operating the Romulus Warehouse as a detention facility.  But "[c]itizens may not enlist the federal courts, 'under the guise of judicial review' of agency compliance with NEPA, to delay or block agency projects" as Plaintiffs do here.  *Seven Cnty.*, 605 U.S. at 192.  The Court should deny Plaintiffs' Motion for Preliminary Injunction.

### D.  The INA Based Claims Are Unlikely to Succeed.

Plaintiffs have also not demonstrated a likelihood of success on the merits of their INA-based APA claims.   Plaintiffs have not established the Romulus Warehouse will never be an

26

"appropriate place" of detention once it is retrofitted and remodeled.  As Plaintiffs concede, there are "two airports staffed by DHS officials located minutes from the Romulus Warehouse" (Mot. 29), including "one of the country's largest airports[.]"  Compl. ¶ 1.  Romulus Mayor McCraight conceded the selection of Romulus "makes sense logistically" given its proximity to the airports.[38]

The logistical advantages of this facility are bolstered by the current Slandscape, as explained by ICE: Michigan has 138,966 individuals with final orders of removal, 7,072 of whom have criminal records, and 3,760 of whom have pending criminal charges. Byers Decl. ¶ 12.  Detroit alone has 36,702 individuals who have final orders of removal, of which 2,589 of have criminal records, and 1,363 of whom have criminal charges pending. *Id*. This includes murderers,[39] pedophiles,[40] child pornographers,[41] drug traffickers,[42] and arsonists.[43] As ICE explains, Romulus Warehouse was selected because "ICE has no for-certain reliable or dedicated detention capacity in the Detroit area and therefore relies on local law enforcement partners in nearby counties to provide space for detainees" which poses "logistical challenges [that] degrade ICE's ability to enforce the nation's immigration laws and protect public safety." Byers Decl. ¶ 12.  And, as Plaintiffs note, it is located minutes away from two airports.  Mot. 29.  Further, its proximity to

---

[38] FOX 2 DETROIT, *supra* n.21 (beginning at 5:40).

[39] Myesha Johnson, *Venezuelan Man Wanted For Homicide Found In Lincoln Park*, THE DETROIT NEWS (July 7, 2025) (https://www.detroitnews.com/story/news/local/michigan/2025/07/07/venezuelan-man-wanted-homicide-found-lincoln-park-feds-say/84494680007/)

[40] *Illegal Alien from Guatemala and Prior Convicted Sex Offender Pleads Guilty to Illegally Returning to U.S. and Failing to Register as a Sex Offender*, https://www.justice.gov/usao-edmi/pr/illegal-alien-guatemala-and-prior-convicted-sex-offender-pleads-guilty-illegally

[41] *United States Attorney's Office Charges 46 Illegal Aliens with Various Offenses including Immigration Crimes, Drug Trafficking, Weapons Offenses, and Child Pornography*, https://www.justice.gov/usao-edmi/pr/united-states-attorneys-office-charges-46-illegal-aliens-various-offenses-including

[42] *Supra* n.41.

[43] *ICE Detroit Arrests a Convicted Arsonist and a Convicted Murderer in the Same Day*, U.S. Immigration & Customs Enforcement, https://www.ice.gov/news/releases/ice-detroit-arrests-convicted-arsonist-and-convicted-murderer-same-day

Detroit would ensure that those arrested in Detroit and housed in Romulus would have access to legal and personal visitation, consistent with ICE's goals. PageID. 54. Even Mayor McCraight has said that while he thinks Romulus is "a terrible location [for ICE detention] in [his] opinion," he conceded the choice of the Romulus Warehouse "stands to reason, [given] our proximity to Willow Run Airport, where they're flying them out of… is right down the road, so it makes sense logistically[.]"[44] Opinionated disagreement does not veto § 1231(g) authority.

Further, Plaintiffs do not demonstrate a likelihood of success on the claim that the Romulus Warehouse cannot be an "appropriate place of detention" by bemoaning a policy shift toward ICE-owned centers.  Mot. 24.  This is especially so when Plaintiffs need to rely on a gross mischaracterization of a 2021 GAO report.  Specifically, Plaintiffs claim: "Defendants also fail to account for their prior recognition that 'ICE-owned service processing centers *are not a viable option* because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority'" (Mot. 24). This claim is false. First, Plaintiffs cite a GAO report from a study taken between August 2019-January 2021, not a statement of a DHS or ICE policy.[45]  Second, Plaintiffs clip off half of the sentence to change its meaning: the cherrypicked excerpt was from the GAO's collection of comments that "each detention space acquisition method has tradeoffs", among which was that "officials said that *new contracts* for ICE-owned service processing centers are not a viable option because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that

---

[44] FOX 2 DETROIT, *supra* n.21 (beginning at 5:40)
[45] U.S. Gov't Accountability Off., *supra* n.1.

ICE does not have construction authority."[46] No one said "ICE-owned service processing centers are not a viable option," and Plaintiffs' claim to that effect is deceiving.[47]

Regardless, even if that were DHS's general policy position as of January 2021, whatever logistical preferences existed as late as January 2021 must yield to the current reality: there were a record 11 million border encounters in the four years that followed January 2021, and state governments have aggressively sought to sabotage federal immigration enforcement, including detention pending removal by banning contract facilities, by banning state property sales for DHS or ICE's uses, and by banning private companies from operating detention centers for ICE's use. *See*, *e.g.*, *Geo Grp., Inc*, 50 F.4th at 750.  Michigan, for example, is currently considering a bill to ban anyone "acting on behalf of [Michigan]" from "convey[ing] real property of this state to the United States Immigration and Customs Enforcement" and that no state property can be conveyed to *anyone* unless the conveyance "contain[s] a restriction on use… prohibiting the property from being used as an immigration detention center by the federal government or by a person that is not a governmental entity that contracts with the federal government."[48]  But even without a statutory ban, as noted *supra*, governors—including Gov. Whitmer—have blocked ICE from using vacant state facilities.[49] As facts change, views change, and Plaintiffs cannot state a claim that purchasing property to convert into an ICE-owned facility is arbitrary and capricious simply because it is less easy for Plaintiffs to scuttle or ban. Faced with such external obstruction, the Secretary's decision to pursue a federally-owned facilities is likely the most rational option.

---

[46] U.S. Gov't Accountability Off., *supra* n.1.
[47] U.S. Gov't Accountability Off., *supra* n.1.
[48]*See* Michigan House Bill 5494 of 2026, *supra* n.14.
[49] Dickson and LeBlanc, *supra* n.15.

### E.  Plaintiffs Have Not Shown Irreparable Harm.

The Court should deny Plaintiffs' Motion for Preliminary Injunction because Plaintiffs cannot establish imminent irreparable harm. "To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Schools*, 942 F.3d 324, 327 (6th Cir. 2019) (internal marks, citations omitted); *see also Winter*, 555 U.S. at 20 (holding a plaintiff must show irreparable harm is likely not just possible); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (holding alleged environmental injury not sufficiently likely).

Here, Plaintiffs' alleged harms are neither certain nor immediate. Indeed, Plaintiffs' alleged harm stems from their environmental concerns about construction and operation of the facility. But ICE will not proceed with construction and operation until completing an EA and approving such work.  *See* DeGregorio Decl. ¶¶ 8-11.  As Mr. DeGregorio explains, "ICE is still developing its plan for retrofitting the warehouse" and will prepare an EA to analyze the potential environmental effects before any construction begins.  *Id.* ¶ 10. Alleged harm from actions that will not be taken until completion of this process are neither imminent nor certain. *See D.T.*, 942 F.3d at 327. In fact, Plaintiffs concede that "exact construction efforts are unknown," PageID.130, undermining their own claim of "imminence." PageID.130. Rhetoric alone is insufficient for preliminary injunctive relief. *D.T.*, 942 F.3d at 326 (affirming denial of preliminary injunctive relief where plaintiff did not show their injury was imminent). "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* at 327.

Indeed, the District of Maryland recognized in a similar case that the State's "alleged harm flows from the potential for significant construction at the site" and "the facility's ultimate operation as a detention and processing center."  *Maryland v. Mullin*, No. 26-cv-733, 2026 WL 1045503, at *32 (D. Md. Apr. 17, 2026).  The court noted that "some actions Defendants seek to engage in now

30

do not immediately relate to the imminent environmental harm alleged include installing security cameras and security lighting, laying fiberoptic cable within the warehouse for a building alarm system, repairing the warehouse's existing HVAC system, repairing leaks in the roof and walls, installing communications wiring within the warehouse, and internal drywall demolition and installation." *Id.* The court therefore excluded these activities from its preliminary injunction, allowing DHS to proceed with certain work. *Id.*

Further, even if Plaintiffs could properly rely on harms related to potential retrofitting and operation of the facility, their asserted harms would still be neither imminent or concrete. Plaintiffs first argue that fencing "*could* block the floodway," leading to potential environmental harms. PageID.130 (emphasis added). But Plaintiffs' declarant on this point, Jerrod Sanders, admits "[t]he location of the fence and type of fence are unknown." PageID.162 ¶ 15. And he acknowledges that this potential risk from flooding is purely hypothetical: "*if* the fence were to block the floodway, the fence could cause increased flooding…" *Id.* (emphasis added). Theoretical injuries are insufficient for preliminary injunctive relief. *D.T.*, 942 F.3d at 327.

And as stated in the Floodplain Notice, "ICE will avoid constructing barriers that could impede overland flow or alter floodplain conveyance." PageID.64. Although EGLE is "concerned" about the impact of construction and operation of the Warehouse as a detention center—though Mr. Sanders also admits that "DHS's construction plan and use of the Romulus Warehouse are unknown," PageID.161 ¶ 13—the Floodplain Notice assuages the concern: "ICE will coordinate with EGLE and Wayne County to determine whether floodplain permits are required and will obtain any necessary approvals prior to construction." PageID.65. The alleged harm related to flooding is speculative, not immediate, and insufficient for extraordinary relief.

Plaintiffs next argue that the sewer capacity is insufficient to accommodate projected occupancy levels and will impact water quality. PageID.131. But again, the Floodplain Notice Plaintiffs cite indicates that the government will install "sanitary sewer connections or modifications if required by final engineering review," that preliminary engineering indicates that upgrades may be necessary, and "[a]ny improvements, if needed, would be completed in kind and coordinated with the local municipal sewer authority through standard utility permitting[,]" PageID.64, thereby negating Plaintiffs' concerns about sewer overflows. To repeat, ICE stated that "[a]ny required sewer work… would comply with applicable Wayne County Floodplain management and permitting requirements." *Id*.

Plaintiffs' third argument, that operation of the detention center will "overburden the roadway" is equally speculative. PageID.132. ICE determined the "facility's operations are not anticipated to result in significant changes to traffic patterns or modes of transportation," Exhibit 1 at 7, and operations "will comply with all applicable federal, state, and local regulations governing… transportation safety." *Id*. at 5. In a passing reference, Plaintiffs also allege reputational harm, lost business and income, and expenditure of public safety resources, PageID.129, none of which are "certain" or "immediate." *D.T.*, 942 F.3d at 327. Plaintiffs offer no specific details of how they will suffer reputation or economic harm. And expenditure of public safety resources is categorically not irreparable. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." (citation omitted)).

Finally, Plaintiffs reference alleged procedural harms to try to establish imminent and certain irreparable harm. But deprivation of a procedural right alone does not establish injury much less the irreparable injury Plaintiffs must show absent a concrete interest that is affected by the

32

deprivation of the claimed right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). The Supreme Court clarified there is no "thumb on the scales" favoring injunctions as to NEPA procedural claims. *Monsanto Co. v. Geertson See Farms*, 561 U.S. 139, 157 (2010) (finding no irreparable harm in NEPA case).

Plaintiffs have not shown they will suffer a certain and immediate injury absent a preliminary injunction, and the Court should deny the Motion.

## IV.     If the Motion is Granted, Plaintiffs Should Be Required to Post Bond.

Should this Court grant the motion, Rule 65(c) mandates that the movant provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The Court should require bond if it grants the preliminary injunction, in an amount to be determined at a later date.

## CONCLUSION

Plaintiffs have failed to satisfy the rigorous requirements for jurisdiction, let alone a preliminary injunction.  Therefore, Plaintiffs' motion should be denied.

DATED: April 21, 2026

Respectfully Submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
U.S. Department of Justice
Environment & Natural Resources Division


KRYSTAL-ROSE PEREZ
*Trial Attorney* (TX 24105931)
Natural Resources Section
150 M Street NE
Washington, DC 20002
(202) 532-3266
krystal-rose.perez@usdoj.gov

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

BENJAMIN MARK MOSS
*Acting Senior Counsel*

JEFFREY ALDERETTE
*Trial Attorney*

/s/ David J. Byerley
DAVID J. BYERLEY (D.C. Bar 1618599)
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Washington D.C. 20044
202-532-4523 | david.byerley@usdoj.gov

*Attorneys for Defendants*

34

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

DATED: April 21, 2026

*/s/ David J. Byerley*
DAVID J. BYERLEY (D.C. Bar 1618599)
*Trial Attorney*
