# Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)



**DEPARTMENT OF HOMELAND SECURITY**

**OFFICE OF THE CHIEF READINESS SUPPORT OFFICER**

Jeffery Orner
Chief Readiness Support Officer

11/6/2014
Date

# Issue Date:

# Table of Contents

I.    List of Acronyms.......................................................................................I-1

II.   Definitions .............................................................................................II-1

III.  Introduction............................................................................................III-1

IV.  Managing NEPA Implementation...........................................................IV-1

   A.   Decision-Making and Integration of NEPA with DHS Missions.........IV-1

   B.   Primary Point of Contact within Components ....................................IV-2

   C.   Activities Requiring Notification to SEP ............................................IV-2

   D.   Collaboration ...................................................................................IV-4

   E.   Dispute Resolution ..........................................................................IV-4

   F.   EP&HP Decision Support System (EP&HP DSS) ...........................IV-5

   G.   Public Involvement ..........................................................................IV-6

   H.   Use of Contractors..........................................................................IV-11

   I.    Performance Metrics and Reporting Requirements.........................IV-11

   J.   Review of Other Agency NEPA Documents ....................................IV-11

   K.   Component Supplemental Instructions and Delegation of Authority..............IV-12

   L.   Administrative Record Requirements ...............................................IV-16

V.   Procedures for Implementing NEPA ......................................................V-1

   A.   Overview of NEPA Requirements.....................................................V-1

   B.   Categorical Exclusions and Extraordinary Circumstances ...............V-3

   C.   Environmental Assessments ............................................................V-8

   D.   Environmental Impact Statements....................................................V-13

   E.   Mitigation and Monitoring ................................................................V-18

   F.   Cooperating and Joint Lead Agency Relationships ..........................V-20

   G.   NEPA Analysis and Writing ..............................................................V-21

VI.  Emergency Actions...............................................................................VI-1

   A.   Secure Lives and Protect Property....................................................VI-1

I-2

Instruction Manual # 023-01-001-01

Revision # 01

B. Determine Applicability of NEPA ........................................................................VI-1

C. Notification to SEP........................................................................................VI-1

D. Determine Level of NEPA Evaluation ...........................................................VI-1

VII. Review of Applications from Persons or Organizations Outside of DHS .........VII-1

Appendix A. DHS List of Categorical Exclusions ......................................................A-1

Appendix B. List of Environmental Planning Requirements other than NEPA.........B-1

Appendix C. Record of Environmental Consideration (REC) Template for
Categorically Excluded Actions ................................................................ C-1

Instruction Manual # 023-01-001-01

Revision # 01

## I.   List of Acronyms

| Acronym | Term |
|---------|------|
| CATEX | Categorical Exclusion |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| DEIS | Draft Environmental Impact Statement |
| DHS | Department of Homeland Security |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| EP&HP | Environmental Planning and Historic Preservation |
| EP&HP DSS | EP&HP Decision Support System |
| EPPM | Environmental Planning Program Manager |
| FEIS | Final Environmental Impact Statement |
| FOIA | Freedom of Information Act |
| FONSI | Findings of No Significant Impact |
| FR | Federal Register |
| HQ | Headquarters |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NOA | Notice of Availability |
| NOI | Notice of Intent |
| OCRSO | Office of the Chief Readiness Support Officer |
| OGC | Office of the General Counsel |
| OPA | Office of Public Affairs |
| PEA | Programmatic Environmental Assessment |

I-1

| Acronym | Term |
|---------|------|
| PEIS | Programmatic Environmental Impact Statement |
| REC | Record of Environmental Consideration |
| ROD | Record of Decision |
| SEA | Supplemental Environmental Assessment |
| SEIS | Supplemental Environmental Impact Statement |
| SEP | Sustainability and Environmental Programs |
| U.S. | United States |
| U.S.C. | United States Code |

I-2

## II.  Definitions

All definitions contained in the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act (NEPA) (40 Code of Federal Regulations [CFR] Parts 1500-1508) apply to this Instruction Manual.  Definitions from the CEQ regulations of some of the terms and phrases that are more commonly used in this Instruction Manual are provided below for ease of reference.  Additional terms and phrases not defined in the CEQ regulations are defined below.

***Action***: A plan, project, program, policy, rule, regulation, procedure, or legislative proposal, as discussed at 40 C.F.R. §1508.18, subject to DHS's control and responsibility.  Projects include actions approved by permit or other regulatory decision as well as Federally-assisted activities (e.g., grants).

***Best Management Practices***: Generally accepted and applied measures or practices to lessen the adverse effects of actions on the human environment (e.g., control stormwater flowing through a construction site to reduce impacts to water quality).

***Categorical Exclusion (CATEX)***: As defined in 40 C.F.R. §1508.4, activities that do not need to undergo detailed environmental analysis in an EA or EIS because the activities have been determined to normally not have the potential, individually or cumulatively, to have a significant effect on the human environment.  Agencies can define categories of such activities as a way to reduce unnecessary paperwork and delay.  CATEXs are defined by, and are unique to, each Federal agency; at DHS they may be established for the Department as a whole or for an individual Component.  At DHS, certain CATEXs (see Appendix A, Table 1) are denoted with an asterisk and require preparation of a Record of Environmental Consideration (REC); an asterisk denotes classes of actions that have a higher possibility of involving extraordinary circumstances.

***Component***: As defined in DHS Directive 252-01, Organization of the Department of Homeland Security, any organization which reports directly to the Office of the Secretary of DHS when approved as such by the Secretary.  This is inclusive of both Operational Components and Support (also known as Headquarters) Components.  For purposes of this Instruction, the Office of the Secretary also constitutes a Component.  The list of major Components making up DHS is available on the DHS website at https://www.dhs.gov/department-components.

***Component Supplemental Instructions***: A written policy-type document that describes how a Component implements the requirements of DHS Directive 023-01, and this Instruction Manual within their respective organization.  Criteria for Component Supplemental Instructions are provided in Section IV, Part K.

***Cooperating Agency***: As defined in 40 C.F.R. §1508.5, any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any

environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment.  A state or local agency of similar qualifications or a Tribe may by agreement with the lead agency also become a Cooperating Agency. Participation of Cooperating Agencies is not limited to the preparation of Environmental Impact Statements; it may also be appropriate for Cooperating Agencies to participate in the preparation of Environmental Assessments.

***Council on Environmental Quality (CEQ)***: Title II of NEPA established a council in the Executive Office of the President to oversee implementation of the Act.  The Council is appointed by the President with the advice and consent of the Senate.  The President designates the Chairman.  CEQ's responsibilities include appraising Federal Government programs and activities in light of the policy set forth in Title I of NEPA and formulating and recommending national policies to promote improvement of the quality of the environment.

***Cumulative Impact***: As defined in 40 C.F.R. §1508.7, the impact on the environment which results from the incremental impact of an action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

***Decision-Maker***: See Proponent.

***Department***: The Department of Homeland Security, which, unless otherwise specified includes all components thereof.

***Effects***: As defined in 40 C.F.R. §1508.8, effects of proposed actions includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.  Effects may also include those resulting from actions which may have both beneficial and detrimental effects.  "Effects" and "impacts" as used in the CEQ regulations and this Instruction Manual are synonymous.

***Effects of National Concern***: Effects that because of the high quality or function of the affected resource or because of the wide geographic range of effects (e.g. climate change) could create concern beyond the locale or region of a proposed action, as well as effects that may occur in multiple geographic regions of the U.S. from a program of proposed actions.

***Emergency***: A natural or man-made disaster or other phenomenon of an exceptional, inevitable, and irresistible character demanding immediate action for the protection of human life, public safety, public health, or the environment, and avoidance of significant loss of property if it relates to one of the other factors.  This includes but is not limited to

Instruction Manual # 023-01-001-01

Revision # 01

situations triggering emergency and major disaster declarations by the President under the Stafford Act.  See also 40 C.F.R. §1506.11.

***Emergency Action***: Any action needed to respond to or control the immediate impacts of an emergency.  This definition does not include long-term recovery actions.

***Environmental Assessment (EA)***: As defined in 40 C.F.R. §1508.9, a concise public document for which a Federal agency is responsible that serves to: briefly provide sufficient evidence and analysis for determining whether to prepare an Environmental Impact Statement or a Finding of No Significant Impact, aid an agency's compliance with NEPA when no Environmental Impact Statement is necessary, and facilitate preparation of an Environmental Impact Statement when one is necessary.

***Environmental Impact Evaluation***: The process of determining the level of significance of a potential impact on the human environment.  It includes all of the necessary studies, consultation, and public involvement needed to analyze the potential for environmental impact of a proposed action, assign a value to the level of impact (e.g. minor, moderate, or major), consider mitigation, and determine the level of significance; whether significant or not.  An environmental impact evaluation results in either the application of a Categorical Exclusion or documentation in the form of a final Environmental Assessment and Finding of No Significant Impact or a final Environmental Impact Statement.  An environmental impact evaluation is a necessary and major part of the NEPA process (defined in 40 C.F.R. §1508.21) but normally not fully inclusive of the NEPA process.  "Environmental impact evaluation" and "environmental analysis" as used in this Instruction Manual are synonymous.

***Environmental Impact Statement (EIS)***: As defined in 40 C.F.R. §1508.11, a detailed written statement as required by section 102(2)(C) of NEPA.

***Environmental Planning & Historic Preservation Decision Support System (EP&HP DSS)***: An automated system to standardize and improve the efficiency and effectiveness of NEPA analyses of proposed actions within DHS.  The EP&HP DSS is owned and operated by OCRSO-SEP for Department-wide utilization.

***Environmental Planning Program Manager (EPPM)***: As designated in a Component's approved Supplemental Instructions, the primary point of contact in a Component who is responsible for coordination with SEP on NEPA matters and who has the authority to oversee the implementation of DHS Directive 023-01 and this Instruction Manual in their respective organization.  For Components that do not have an EPPM, Director SEP serves as their EPPM.

***Environmentally Sensitive Area***: An area designated by law, regulation, or executive order that merits special protection or stewardship because of its value as a natural, historic, or cultural resource.  Examples include, but are not limited to: (1) proposed or designated critical habitat for threatened or endangered species; (2) properties listed or eligible for listing on the National Register of Historic Places; and (3) areas having special designation or recognition such as prime or unique agricultural lands, coastal

II-3

Instruction Manual # 023-01-001-01

Revision # 01

zones, designated wilderness or wilderness study areas, wild and scenic rivers, 100 year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, essential fish habitat, etc.

***Extraordinary Circumstances***:  When evaluating whether or not to apply a CATEX to a proposed action, these are circumstances associated with the proposed action that might give rise to significant environmental effects requiring further analysis and documentation in an EA or EIS.

***Finding of No Significant Impact (FONSI)***: As defined in 40 C.F.R. §1508.13, a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (40 C.F.R. §1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

***Human Environment***: As defined in 40 C.F.R. §1508.14, the natural and physical environment and the relationship of people with that environment.

***Impacts***: See effects.

***Indian Tribe or Native American Tribe or Tribe***: Any Indian tribe, band, nation, pueblo, or other organized group or community, including any Alaska native entity, which is Federally-recognized by the Secretary of the Interior through listing by the Bureau of Indian Affairs.

***Jurisdiction by Law***: As defined in 40 C.F.R. §1508.15, an agency's authority to approve, veto, or finance all or part of a proposal.

***Lead Agency***: As defined in 40 C.F.R. §1508.16, the agency or agencies preparing or having taken primary responsibility for preparing an EA or EIS.

***Major Federal Action***: As defined in 40 C.F.R. §1508.18, actions with effects that may be major and which are potentially subject to Federal control and responsibility.  Major reinforces but does not have a meaning independent of significantly (40 C.F.R. §1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.  See 40 C.F.R. §1508.18 for the full definition.

***Mitigation***: An action or series of actions, which may be ongoing and sustained, to reduce the probability of, or lessen the impact of an adverse effect on the quality of the human environment.  The following examples of ways to mitigate impacts to the human environment are provided in 40 C.F.R. §1508.20: (a) avoiding the impact altogether by not taking a certain action or parts of an action; (b) minimizing impacts by limiting the degree or magnitude of the action and its implementation; (c) rectifying the impact by repairing, rehabilitating, or restoring the affected environment; (d) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; (e) compensating for the impact by replacing or providing substitute

II-4

resources or environments.  Mitigation may also include the utilization of best management practices and adaptive management approaches.

***National Environmental Policy Act (NEPA)***: Public Law 91-190, as amended, declares a national policy which encourages productive and enjoyable harmony between humans and the environment.  NEPA requires Federal officials to consider environmental values alongside technical and economic considerations in their decision-making.

***NEPA document***: A DHS REC, EA, SEA, PEA, FONSI, NOA, NOI, EIS, SEIS, PEIS, Legislative EIS, ROD, or any other document prepared pursuant to a requirement of NEPA, the CEQ Regulations, DHS Directive 023-01, or this Instruction Manual. This includes environmental documents as defined in 40 C.F.R. §1508.10.

***NEPA process***: The effort required to systematically address the environmental stewardship and compliance requirements set forth in NEPA during program and project planning, development, and design; and prior to execution of a proposed action for the purpose of protecting, sustaining, or restoring the quality of the human environment. This process consists wholly or in part of scoping, development, and consideration of the proposed action and alternatives, environmental impact evaluation, consideration of mitigation and monitoring its success, consultation, and public involvement.  This includes the NEPA Process as defined in 40 C.F.R. §1508.21.

***Notice of Availability (NOA)***: A formal notice published in the Federal Register announcing the issuance and public availability of a draft or final EIS and ROD.  The EPA published NOA is the official public notification of an EIS.

***Notice of Intent***: As defined in 40 C.F.R. §1508.22, a notice that an environmental impact statement will be prepared and considered.

***Office of the Chief Readiness Support Officer (OCRSO)***: Office that supports the Departmental CRSO, which is organizationally located in the Management Directorate at DHS Headquarters (HQ), as defined in DHS Directive 0100, Organization of the Office of the Under Secretary for Management, and DHS Directive 0004, Administrative Services Line of Business Integration and Management, and any successions to these Directives.

***Office of the General Counsel (OGC)***: Office that supports the General Counsel (defined in DHS Directive 252-01), who is the chief legal officer and the final legal authority within DHS, and has the authority to participate in and decide any legal matter within DHS (except for matters within the scope of the Inspector General's authorities). OGC includes DHS Headquarters attorneys together with the attorneys in all Component legal offices, whether denominated Office of Chief Counsel, Office of Principal Legal Advisor, Office of the Judge Advocate General or otherwise.

***Proponent***: A DHS Federal employee who is the identified program or project manager for a proposed action that is subject to NEPA review.  The Proponent is also the

decision-maker for the proposed action.  The Proponent is responsible for defining the reason why a proposed action is needed, and has the immediate authority to decide a course of action or has the authority to recommend a course of action, from among options, to the next higher organizational level (e.g., district to region, region to headquarters) for approval.  The Proponent also normally has authority to establish the total estimate of resource requirements for the proposed action or, in the execution phase, has the authority to direct the use of resources.  The Proponent does not have to personally perform the environmental impact evaluation or have NEPA expertise, but is responsible for ensuring NEPA compliance before committing DHS to a particular course of action; this includes responsibility (with support from their respective EPPM) for the completion of any appropriate NEPA documentation.

***Record of Decision (ROD)***: The concise public record described in 40 C.F.R. §1505.2 that is prepared to conclude the process of preparing an Environmental Impact Statement.  A ROD (or Notice of its Availability) is published in the Federal Register.  The ROD need not be a unique or separate document, when a formal public record of a decision is otherwise issued, as long as the formal public record meets the requirements of 40 C.F.R. §1505.2.  For example, grant award documents or permits may suffice for a ROD if they meet the requirements of 40 C.F.R. §1505.2.

***Record of Environmental Consideration (REC)***: An internal DHS administrative document that records the application of a DHS CATEX (Appendix A, Table 1) to a specific proposal.  A REC is required for the application of any CATEX identified with an asterisk in Appendix A, Table 1 of this Instruction Manual.  RECs are normally prepared and maintained electronically in the EP&HP DSS.

***Secretary***: The Secretary of the Department of Homeland Security.

***Significantly***: As used in the NEPA process, an evaluation of significance requires consideration of both context and intensity.  Context means that the significance of an action must be analyzed in several contexts such as society as a whole, the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action.  Intensity refers to the severity of impact.  See 40 C.F.R. §1508.27 for the full definition.

***Special expertise***: As defined in 40 C.F.R. §1508.26, an agency's statutory responsibility, mission, or related program experience.

***Sustainability and Environmental Programs (SEP)***: A program management area organizationally located in OCRSO, Management Directorate, DHS Headquarters.  SEP is responsible for oversight of the implementation of NEPA across DHS.

## III.  Introduction

This Department of Homeland Security (DHS) "Instruction Manual on Implementation of the National Environmental Policy Act (NEPA) (Instruction 023-01-001-01)," together with DHS Directive 023-01, "Implementation of the National Environmental Policy Act," (hereafter Instruction Manual and Directive) establish the policy and procedures DHS follows to comply with the National Environmental Policy Act of 1969 (NEPA) (42 United States Code [U.S.C.] 4321 et seq.) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 C.F.R. Parts 1500-1508). This Instruction Manual serves as the DHS implementing procedures for NEPA (as required by 40 C.F.R. Parts 1505.1 and 1507.3) which supplement the CEQ regulations and therefore must be read in conjunction with them.  The Directive and this Instruction Manual are available on the DHS website at www.dhs.gov/nepa.  The NEPA statute and the CEQ regulations are available at https://ceq.doe.gov/index.html.

NEPA is the basic charter and foundation for stewardship of environmental resources in the United States.  To implement the policies set forth in NEPA, Congress prescribed a procedure commonly referred to as the "NEPA process" for Federal agencies to follow.  The NEPA process is a planning and decision-making tool that helps Federal agency decision-makers systematically identify and evaluate the potential environmental impacts of proposed actions prior to making decisions.  The NEPA process encourages public involvement in decisions that would affect the quality of the human environment and includes the identification and evaluation of reasonable alternatives to proposed actions that would avoid or minimize adverse environmental impacts.

Generally, NEPA applies to Federal actions that affect the human environment.  Within DHS,  NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, executed by DHS under the direction of Congress, or proposed by persons or organizations outside of DHS that require approval, funding, a license, or a permit from DHS.

The requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS.  Within Components, proponents of programs, projects, and activities implement the requirements of the Directive and this Instruction Manual in consultation with their respective Environmental Planning Program Manager (EPPM) (for a definition of EPPM, see Section II and Section IV, Part K) and Office of General Counsel (OGC), and the Director of Sustainability and Environmental Programs (SEP) when appropriate.

References to government organizations or regulations in this Instruction Manual include their succeeding organizations and requirements.

Instruction Manual # 023-01-001-01

Revision # 01

## IV. Managing NEPA Implementation

### A.  Decision-Making and Integration of NEPA with DHS Missions

DHS follows the Directive and this Instruction Manual to ensure that decisions are made in accordance with the policies and procedures of NEPA.  DHS integrates the NEPA process with other planning efforts at the earliest possible stage so that environmental factors are considered with sufficient time to have a practical influence on the decision-making process before decisions are made.  Within Components, Proponents ensure that the appropriate NEPA analysis and documentation is completed before a decision is made that irretrievably commits resources or limits the choice of reasonable alternatives to satisfy an objective, fix a problem, address a weakness, or develop a program. DHS also integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment, and follows CEQ guidance on such integration.  These other requirements include, but are not limited to, those listed in Appendix B.  However, compliance with other requirements for the stewardship and protection of the human environment does not relieve DHS from completing the NEPA process and complying with NEPA; conversely, compliance with NEPA does not relieve DHS from complying with these other requirements.

Because of the diversity of DHS, it is not feasible to describe in this Instruction Manual the decision-making process for every DHS program.  Proposals and actions may be initiated at any level of the DHS organization.  Similarly, review and approval authority may be exercised at various levels depending on the nature of the action, source of funding, statutory authority, etc.  In their respective decision-making processes, Components:

(1)  Consider all relevant NEPA documents in evaluating proposals for action;

(2)  Make relevant NEPA documents, comments, and responses part of the record in formal rulemaking or adjudicatory proceedings;

(3)  As a proposal for action is being developed, ensure that relevant NEPA documents, comments, and responses accompany the proposal through the appropriate formal project approval and decision-making processes to ensure that the NEPA analysis is considered in making a decision; and

(4)  As a proposal for action is being developed, ensure that the range of reasonable business and operational alternatives being considered are appropriately analyzed under NEPA and, when evaluating a proposal for action, that only those alternatives discussed in the relevant NEPA documents are considered in the evaluation, unless the environmental documents are appropriately supplemented to examine a newly developed alternative.

IV-1

## B.   Primary Point of Contact within Components

Each Component provides to Director SEP the name of a primary point of contact for coordination of NEPA matters.  For Components that seek a delegation of authority as described in Section IV, Part K, this point of contact is referred to as the EPPM.

## C.   Activities Requiring Notification to SEP

Components notify SEP in writing, unless otherwise specified, of NEPA activities that meet any of criteria listed below.  This notification is made at the earliest possible stage to allow for substantive involvement from SEP and, where applicable, approval by Director SEP.

(1)   NEPA activities for actions that are likely to receive high-level executive branch and/or national attention, including those that are likely to require the attention of either the Deputy Secretary or the Secretary.  This includes situations where a Component intends to communicate with another Federal agency regarding the NEPA activities.  SEP provides written notification to Components on its level of involvement within five (5) working days of notification, or as soon as possible for emergency actions.

(2)   Emergency actions that would have significant environmental effects. Components notify SEP as soon as possible by any practical means, and SEP consults with CEQ as soon as possible to develop alternative arrangements for completing an Environmental Impact Statement (EIS). Also see Section VI.

(3)   Emergency actions where there is the potential for significant environmental effects or where the effects are unknown and there is not sufficient time to prepare an Environmental Assessment (EA). Components notify SEP as soon as possible by any practical means, and SEP coordinates with CEQ as soon as possible regarding an alternative approach to completing an EA.  Also see Section VI.

(4)   NEPA disputes that cannot be resolved at the Component level.  See the dispute resolution process in Section IV, Part E.

(5)   Requests for DHS review and comment on NEPA documents originating from other agencies when the receiving Component has a mission-related interest in the proposal, so that SEP can coordinate the request among Components to determine whether others have a mission-related interest and need to be involved in preparing the comment.  SEP acknowledges receipt and begins coordination with Components within five (5) working

IV-2

days of notification, or as soon as possible for emergency actions.  If more than one Component has a mission-related interest in the proposal, SEP normally prepares a single departmental response with input from the interested Components.  If only one Component has a mission-related interest in the proposal, SEP normally tells the respective Component to respond directly to the requesting agency.  Also see Section IV, Part J.

(6)   Where a Component is the lead or joint-lead, the following are reviewed by SEP prior to public disclosure: all Notices of Intent (NOIs) to prepare an EIS and all associated draft, final, and supplemental EISs (SEISs), all Notices of Availability (NOAs), and all proposed notices for EAs to be published in the Federal Register.  SEP provides written comments to the Component within ten (10) working days of notification for EISs and five (5) working days of notification for NOIs, NOAs, and Federal Register notices for EAs.  Also see Section V, Parts C and D.

(7)   When a Component has information to be posted on the DHS NEPA webpage.  The information is provided to SEP for posting on the DHS NEPA webpage a minimum of seven (7) calendar days in advance of the date the Component seeks to make the information publicly available.  Also see Section IV, Part G (2).

(8)   New or revised Component Supplemental Instructions, including Component requests for a delegation of authority to approve NEPA documents.  SEP reviews and approves new or substantively revised Component Supplemental Instructions following the process described in Section IV, Part K (2).  Components provide SEP with copies of non-substantive changes to existing approved Supplemental Instructions, but no formal approval by SEP is required.

(9)   All NEPA documents that require approval by Director SEP, unless otherwise delegated (see Section IV, Part K (3)).  SEP provides written comments to Components within ten (10) working days of notification for EAs and EISs and five (5) working days of notification for Records of Environmental Consideration (RECs).

(10)  Component proposals for changes to categorical exclusions (CATEXs), including a supporting Administrative Record for a new or substantively revised CATEX.  For substantive revisions to, deletions of, or establishment of new CATEXs, SEP reviews and provides written comments to Components within ten (10) working days or begins coordination with CEQ, as appropriate.  For non-substantive changes to CATEXs, SEP appropriately revises Appendix A, Table 1.  Also see Section V, Part B (3).

IV-3

(11) Existence of circumstances that may substantially impair a Component's ability to fulfill substantive requirements of the Directive and Instruction Manual, and Component Supplemental Instructions, if they exist (e.g., the departure of the Component's EPPM or a significant proportion of staff who perform environmental planning activities).  Also see Section IV, Part K (3).

(12) Existence of a pattern of non-compliance in the Component with substantive requirements of the Directive and Instruction Manual, and Component Supplemental Instructions, if they exist.  Also see Section IV, Part K (3).

## D.  Collaboration

Collaboration among DHS personnel regarding common NEPA issues helps promote effective and efficient environmental planning and NEPA compliance and fosters the growth of environmental planning expertise across DHS.  To that end, SEP is responsible for facilitating collaborative efforts across DHS to promote effective implementation of NEPA.  SEP uses various communication methods, including email distribution lists, committees, and work groups with Component representation.  Through these channels,  issues are surfaced, expertise from across DHS is used to develop solutions, and members are kept apprised of and given the opportunity to provide input into current NEPA initiatives – both those developed by DHS and those originating from outside DHS, such as from regulatory and oversight agencies (e.g., CEQ).  The Environmental Planning and Historic Preservation  Decision Support System (EP&HP DSS) (see Section IV, Part F) is also used for sharing knowledge and best practices across DHS.

Components coordinate among themselves to resolve project-specific issues, with conflicts resolved through the dispute resolution process described in Section IV, Part E.  Components raise common issues to SEP for a determination as to whether a DHS-wide solution is needed.

## E.  Dispute Resolution

During the NEPA process, DHS and another Federal agency or Tribal, State or local government or the public may not agree on significant issues or aspects of the NEPA review process or the proposed action.  In addition, disputes may arise within DHS on aspects of the NEPA process or the proposed action.  When a significant dispute arises, Components keep a record of the positions and interests, as well as the eventual resolution of the dispute.

It is DHS policy to seek resolution of NEPA disputes at the lowest organizational level possible and to follow established organizational lines of authority for elevating and resolving the dispute.  If a NEPA dispute cannot be resolved at the Component level, the Component requests the involvement of Director SEP for resolution.

Instruction Manual # 023-01-001-01

Revision # 01

When the issue(s) of conflict are beyond the authority of Director SEP to resolve, the dispute is elevated to higher levels of DHS for resolution, following established organizational lines of authority.

If an external dispute arises in the context of a memorandum of understanding or similar interagency agreement which includes a dispute resolution provision, the terms of that dispute resolution provision are ordinarily followed.  The CEQ regulations provide a formal Referral Process that may be used for referring interagency disagreements to CEQ regarding proposed actions considered in an EIS that might cause unsatisfactory environmental effects (see 40 C.F.R. §1504).  The CEQ Referral Process is only used after there have been concerted but unsuccessful attempts to resolve the differences between DHS and another Federal agency, including elevation of the dispute to Director SEP.  When the CEQ referral process is used, the Component prepares the referral package according to the requirements in 40 C.F.R. §1504.3 and submits the package to Director SEP, and Director SEP submits the referral to CEQ.  Alternative Dispute Resolution, using the Institute for Environmental Conflict Resolution (see http://www.ecr.gov/) or another mediation service, is another option that may be used for resolving interagency disputes.  Additional information on environmental collaboration and conflict resolution is provided in the CEQ and OMB Memorandum on Environmental Collaboration and Conflict Resolution, 7 September 2012 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html).

## F.   EP&HP Decision Support System (EP&HP DSS)

The EP&HP DSS is an automated system designed to standardize and improve the efficiency and effectiveness of DHS reviews of proposed actions for compliance with NEPA requirements.  The system is available to anyone with access to the DHS network.  Questions on the review screens in the EP&HP DSS help users determine whether a proposed action may impact the quality of the human environment.  This enables users to ensure that the appropriate level of NEPA documentation is prepared.  The EP&HP DSS also enables knowledge sharing across DHS regarding environmental planning activities and requirements, is a repository for DHS NEPA documents, and is used to gather information necessary for meeting internal and external EP&HP reporting requirements, including NEPA reporting requirements.  Reference to the EP&HP DSS in this Instruction Manual includes Version 2.0 and future versions of the system and any successors.

The EP&HP DSS is used for the following:

   (1)   To record the application of any CATEX listed in Appendix A, Table 1 that is denoted with an asterisk;

   (2)   To maintain electronic versions of final NEPA documents, such as: RECs, EAs, EISs, Findings of No Significant Impact (FONSIs), and Records of Decision (RODs), as well as associated documents, including but not

limited to Memoranda of Agreement, Programmatic Agreements, and Biological Assessments; and

(3)   As determined by Components in their Supplemental Instructions.

In instances when the EP&HP DSS is not available (e.g., if the server is down), Components manually prepare a REC, using the template provided in Appendix C. Components may propose modifications to this template in their Supplemental Instructions, provided that the Component-specific template remains compatible with the EP&HP DSS.  Components include in their Supplemental Instructions the REC template to be used to prepare a REC when the EP&HP DSS is not available. When the EP&HP DSS becomes available, Components upload the manually-completed REC (in PDF format) into the system; no additional review conducted in the EP&HP DSS is necessary.

Additional information and requirements on use of the system, such as user roles and workflow, is provided online within the EP&HP DSS.

## G.   Public Involvement

Open communication, consistent with other Federal requirements, is DHS policy. Intergovernmental collaboration and public involvement improve the effectiveness of DHS missions and activities, as well as build trust between DHS and the communities it serves.  In addition, collaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making.  At DHS, public involvement is used in the NEPA process to help define the scope of issues and level of analysis.

During the NEPA process, information and documents are made available to the public in conformance with CEQ regulations at 40 C.F.R. §1506.6.  Public involvement starts early and continues throughout the NEPA process.  Components schedule sufficient time and make diligent efforts to ensure that potentially interested parties are identified and notified and have an opportunity to provide input in a manner that could have a practical influence on proposed DHS actions before decisions are made.  Components make information on NEPA activities available to the public through a variety of notification methods including, but not limited to, the Federal Register, newspaper notices, website postings, and other media as appropriate.  Specifically for a draft or final EIS, a "Notice of Availability" (NOA) is published in the Federal Register (see Section V, Part D (8)).

In general, collaboration and public involvement in NEPA activities include the following three key elements: (1) seeking information from outside parties to help identify relevant issues; (2) presenting the results of an environmental impact evaluation for public review or comment, including a description of how the

identified relevant issues were considered in the evaluation; and (3) providing a public notice of DHS's final decision, including consideration of relevant public comments.

## (1)   Public Involvement Requirements

When DHS is the lead agency for a proposed action, DHS is responsible for the nature and extent of the public involvement effort.  Public involvement efforts are tailored to the nature of the proposed action, the environmental impact issues of concern, and the characteristics of the individuals and communities to be reached.

Special outreach efforts to reach affected minority populations and low-income populations are appropriate to ensure consideration of environmental justice pursuant to Executive Order (EO) 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (http://www.gpo.gov/fdsys/pkg/FR-1994-02-16/html/94-3685.htm), the CEQ guidance for consideration of environmental justice under NEPA dated December 10, 1997, and the DHS Environmental Justice Strategy (http://www.dhs.gov/dhs-environmental-justice-strategy).  Translation of NEPA documents is also appropriate to reach communities of limited-English speakers.

Coordination with affected Tribes and Native Hawaiian organizations is another requirement that can be met in conjunction with NEPA public involvement activities.  Executive Order 13175, Consultation and Coordination with Indian Tribal Governments (http://www.gpo.gov/fdsys/pkg/FR-2000-11-09/pdf/00-29003.pdf), directs all Federal departments to "strengthen the United States government-to-government relationships with Indian tribes and establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications…"

Components consider the following factors to determine the appropriate nature and extent of public involvement efforts for proposed actions:

(a)   The size and type of the proposed action.

(b)   Whether the proposed action is of international, national, regional, or local interest.

(c)   The potential environmental impacts of the proposed action.

(d)   Extent of previous environmental analysis for the proposed action and/or the geographical location where the action would occur.

(e)   Extent of anticipated controversy over the potential environmental effects of the proposed action, based on DHS experience with similar proposed actions.

IV-7

(f)    Urgency of the proposed action.

(g)    National security classification of the proposed action.

(h)    The presence of Tribal, minority, or low-income populations that may be impacted by the proposed action.

(i)    Other laws and requirements to protect the environment that may require public review; for example, a determination of conformity with a state air quality implementation plan may require public review.

## (2)   DHS NEPA webpage

SEP maintains a DHS NEPA webpage at http://www.dhs.gov/nepa, in accordance with DHS Office of Public Affairs (OPA) requirements, as the central location for web posting of DHS NEPA documents.  Components may either provide SEP with electronic files that meet OPA requirements for posting to the DHS NEPA webpage or with links to their respective Component webpages where NEPA documents are posted, if the Component maintains such a webpage.  Where a Component uses websites of other Federal agencies to post its NEPA documents, links to those webpages are either provided to SEP for inclusion on the DHS NEPA webpage or the Component includes the links on its own NEPA webpage.  SEP submits all content for inclusion on the DHS NEPA webpage to OPA for approval.  SEP manages web content  in accordance with the guidelines established by OPA at http://dhsconnect.dhs.gov/org/comp/opa/web/ Pages/default.aspx and the Office of Management and Budget's (OMB) Policies for Federal Agency Public Websites (OMB M-05-04) (http://www.whitehouse.gov/sites/default/files/omb/ memoranda/ fy2005/m05-04.pdf).

Components that wish to develop and maintain their own webpages for posting NEPA content coordinate with their respective OPA, or equivalent. Components provide the web address for their NEPA pages to SEP, and SEP creates a hyperlink from the DHS NEPA webpage to the Component's webpage.

Components that wish to link to NEPA documents posted on websites outside the Federal government domain (.gov), including contractor websites, seek their respective OPA approval.  OPA determines on a case-by-case basis whether or not is it allowable to link to a contractor-maintained website.

All EISs and RODs are either posted directly on or linked from the DHS NEPA webpage.  In addition, all EAs and FONSIs for proposed actions determined to have effects of national concern are either posted directly on or linked from the DHS NEPA webpage.  Use of the DHS NEPA webpage is optional for posting EAs and FONSIs for proposed actions with effects of regional or local concern, as long as another form of public notice is provided.  Where a Component is a

IV-8

joint lead agency, the joint lead agencies determine the appropriate host in the Federal government domain (.gov).  The DHS NEPA webpage is not presently intended to be used for the deliberative exchange of information or comments that may be necessary in the development of NEPA documents; however, uses of the webpage may change as OPA allows.

For content submitted to SEP for posting on the DHS NEPA webpage, the following requirements apply:

(a)   Documents meet OPA web publishing guidance and standards, DHS branding requirements, and Section 508 of the Rehabilitation Act requirements.

(b)   Documents are in .pdf format, inclusive of figures, appendices, and documents or hyperlinks incorporated by reference.

(c)   If applicable, Components include a point of contact, start and end dates of the public comment period, and information on where interested persons may submit comments.

(d)   Components provide content to SEP a minimum of seven (7) calendar days in advance of the date they seek to make the information publicly available.  For NEPA documents related to emergency actions, or in other time-sensitive situations as appropriate, SEP requests that OPA expedite the approval and posting of web content.

## (3)   Federal NEPA Contact

CEQ maintains a list of Federal NEPA contacts on its website at https://ceq.doe.gov/CEQPublic/ViewFedContacts.aspx.  The Department's Federal NEPA contact is the Director SEP or his/her designee.  Persons interested in the Department's NEPA activities may contact SEP by email at SEP-EPHP@hq.dhs.gov.  This contact information is also available on the DHS NEPA webpage at www.dhs.gov/nepa.

## (4)   Information Protected from Public Disclosure

There is no national security or homeland security exemption from complying with NEPA.  However, information used in a NEPA analysis is subject to compliance with other laws, including the Freedom of Information Act (FOIA) (5 U.S.C. sec. 552).  FOIA encourages Government accountability through transparency.  It provides that any person has a right, enforceable in court, to obtain access to Federal agency records, except to the extent that such records (or portions thereof) are protected from public disclosure by a FOIA exemption; these exemptions are designed to strike a "workable balance" between what citizens need to know and the Government's need to protect certain information.  Information on FOIA, including the exemptions, is available

IV-9

Instruction Manual # 023-01-001-01

Revision # 01

at http://www.foia.gov, and the Department's FOIA policy is provided in Directive 0460.1, Freedom of Information Act Compliance.  DHS will not provide information to the public through the NEPA process that DHS otherwise would not publicly disclose under FOIA.  During the NEPA process, DHS will not publically disclose information that may be sensitive for Native Americans or that may reveal the locations of archeological sites, when such information is not otherwise publicly available.

The fact that a proposed action itself or the environmental analysis for a proposed action contains information protected from public disclosure by a FOIA exemption does not relieve DHS of the requirement to assess and document the environmental effects of the proposed action as required by NEPA.  If the existence of a proposed action cannot be made public by reason of any FOIA exception, then the environmental analysis also cannot be made public.  In some circumstances the environmental analysis may not be subject to judicial review; nevertheless, an environmental analysis is required.

If the existence of a proposed action can be made public, but the environmental analysis would have to contain information that cannot be made public, then DHS segregates or redacts any information that is protected from public disclosure into an appendix sent to appropriately cleared reviewers and decision-makers, and allows public review of the rest of the document (see 40 C.F.R. §1507.3(c)).  If segregation or redaction would leave essentially meaningless material, DHS may withhold the entire document from the public. However, DHS may share such protected NEPA documents with appropriately cleared officials in other agencies such as CEQ and EPA.  In doing so, it is important to recognize and prepare for the situation that other agencies may not interpret FOIA in the same way that DHS does and may release material that DHS would not release, except that which is properly classified for the exception in subsection 552(b)(1).

If the existence of a proposed action must be protected from public disclosure or portions of an environmental analysis must be protected from public disclosure, Components consult with their respective EPPM and OGC at the earliest possible time to ensure that NEPA compliance efforts align with the project schedule to the extent practicable.  To identify DHS and other Federal agency personnel, as well as Tribal, State, and local personnel, that have the appropriate clearance for reviewing classified information during a NEPA process for a proposed DHS action, Components consult with their respective Chief Security Officer and OGC, and follow DHS policy that addresses access to classified information, such as Instruction 121-01-001, Administrative Security Program, and Instruction 121-01-007, Personnel Suitability and Security Program.

Instruction Manual # 023-01-001-01

Revision # 01

CEQ's 2009 FOIA Handbook (http://www.whitehouse.gov/sites/default/files/microsites/ceq/foia_handbook_2-27-12.pdf) provides additional guidance on the appropriate treatment of information that is protected from public disclosure.

## H.   Use of Contractors

NEPA decision-making is an inherently governmental function. DHS frequently uses contractors to perform activities during the NEPA process, such as developing documents, conducting analyses, and soliciting and collecting public comments. DHS may also allow its Federal assistance and permit applicants to use contractors to perform NEPA activities.  However, DHS remains fully responsible for NEPA activities performed by contractors, and only a DHS employee can sign or otherwise approve NEPA documents prepared for proposed DHS actions.

In addition, the presence of contractor names and logos in documents prepared for DHS, including NEPA documents, should be minimized or avoided, unless otherwise specified in the terms of a particular contract.  Proprietary information used by contractors in performance of NEPA activities is subject to public disclosure and should be avoided.  If proprietary information must be included in a NEPA document, the proprietary information is not normally presented in the main body of the document, but is segregated in an appendix where its distribution may be more carefully controlled.

## I.   Performance Metrics and Reporting Requirements

Performance metrics are important indicators of compliance with NEPA requirements and of implementation of the Directive and Instruction Manual throughout DHS.  In addition, DHS responds to Congressional and Federal interagency NEPA reporting requirements (e.g., the annual CEQ Cooperating Agencies Report).  SEP issues data calls to Components, when necessary, to obtain the information required by these external reporting requirements and ensures a consolidated response from DHS.  SEP also uses the EP&HP DSS to obtain information on NEPA performance.

In addition, internal NEPA performance metrics, such as those on the DHS Office of the Chief Readiness Support Officer (OCRSO) Scorecard, are established by SEP with participation of Components through committees and work groups. Components complete and submit their NEPA performance information to Director SEP in accordance with established requirements and timeframes.  Responses to such reporting requirements are evaluated by SEP.

## J.   Review of Other Agency NEPA Documents

Components, when requested, review and comment on NEPA documents provided by non-DHS agencies (Federal, Tribal, State, or local) when the proposed action may impact DHS missions, operations, or facilities, or when DHS has subject matter

IV-11

expertise or legal authorities relevant to the proposed action.  When such requests are received, Components provide written notification to SEP prior to issuing any comments to the requesting agency.

Comments are confined to matters within the jurisdiction or expertise of DHS. These include, but are not limited to, homeland security, immigration, other law enforcement missions, and emergency management.  Components normally do not comment on aspects of a NEPA document provided by a non-DHS agency other than what is needed to appropriately reflect DHS authorities or mission interests.

Components notify SEP of requests for comment on NEPA documents from non-DHS agencies that meet the criteria in Section IV, Part C.

Generally, DHS does not provide formal written comments for the public record.  DHS communicates its interests to other Federal agencies using methods determined on a case-by-case basis that are appropriate for the nature and level of DHS interest in another agency's NEPA activity.  If needed, Components follow the dispute resolution process described in Section IV, Part E.

## K.   Component Supplemental Instructions and Delegation of Authority

Unless otherwise delegated, Director SEP approves NEPA documents prepared for proposed DHS actions.  For any Component which does not have approved Supplemental Instructions and a delegation of authority as described below, Director SEP serves as the EPPM for that Component; Director SEP meets the EPPM criteria specified herein.

The most efficient and effective implementation of NEPA occurs when it is integrated early with other aspects of the planning, review, and development of DHS activities.  This can best be achieved at the lowest appropriate level of the organization where these processes occur.  Director SEP may delegate to Components the authority to approve NEPA documents to ensure the most efficient and effective NEPA compliance.  Component requests for a delegation of authority and Supplemental Instructions may be evaluated concurrently or separately by SEP depending on a Component's needs.  However, in order for a Component to receive a delegation of authority, a Supplemental Instruction approved by Director SEP is required.

### (1)   Component Supplemental Instructions

Components have the option of developing Supplemental Instructions for implementing NEPA within their respective organizations to fit their unique missions and needs.  A Supplemental Instruction describes a Component's administrative processes for implementing the Directive and Instruction Manual.  For Components that choose to develop Supplemental Instructions, the required criteria and content are provided below.  Where these criteria are met through other existing policy or requirement documents, the Component may

provide a brief explanation of the relevance of the existing document(s) and provide a reference in its Supplemental Instruction.  A Supplemental Instruction:

(a) Describes the manner in which the Directive and Instruction Manual are to be implemented, including at what organizational level(s) NEPA activities and approvals occur within the Component.

(b) Describes the internal processing requirements for the preparation and approval of NEPA documents within the Component, including the processes for quality assurance.

(c) Describes how the Component creates a record demonstrating that the Federal employee with decision-making authority for the proposed action (normally the Proponent) has considered the potential environmental impacts of the proposed action in the process of making their decision (this may be accomplished by a signature block) in order to fulfill the requirements of NEPA.

(d) Identifies a position in the Component with the authority to oversee the implementation of the Directive and Instruction Manual, to act as the EPPM, and to serve as the primary point of contact for coordination with SEP on NEPA matters.  The EPPM or his/her staff must have an appropriate level of expertise necessary to provide technical assistance for NEPA compliance to the range of programs, offices, and activities in the Component.  Additional criteria for the EPPM are as follows:

   i. Be in an appropriate position in the organization and have the technical authority to speak on NEPA matters on behalf of the Component;

   ii. Be in an appropriate position to oversee the implementation of the Directive and Instruction Manual in the Component; and

   iii. Have visibility on the planning, development, and implementation of actions in the Component that may require NEPA compliance.

(e) Includes procedures for re-delegation of authority within the Component for approving NEPA documents, as appropriate.  Re-delegation procedures include requirements for:

   i. Quality assurance for the work products;

   ii. A process to grant the re-delegation and criteria to achieve the re-delegation;

IV-13

Instruction Manual # 023-01-001-01

Revision # 01

iii. The identification of NEPA activities that call for the attention and approval of higher levels of the Component's organization, including the Component's management level, as well as SEP; and

iv. A process and criteria for suspension or revocation of the re-delegated authority.

(f) Identifies NEPA activities that call for the attention and approval of higher levels of the Component's organization, as well as SEP.

(g) Describes how the EP&HP DSS is used within the Component (e.g., the assignment of roles and reviewers and establishing workflow).

(h) Describes the process for monitoring and assessing compliance with the Directive and Instruction Manual, including reporting of NEPA performance to Director SEP.

(i) Describes the process for seeking resolution of NEPA-related disputes within the Component.  For NEPA disputes that cannot be resolved at the Component level, provide for a process for elevating the dispute to Director SEP.

(j) If applicable, describes processes or requirements for the review of applications from persons or organizations seeking DHS approval of their proposed activities (e.g., Federal assistance, permits, and licenses) for ensuring NEPA compliance.

(k) In addition to the required content specified in (a) through (j) above, Components can include any additional information in their Supplemental Instructions they deem necessary for implementing NEPA within their organizations, including other areas identified in this Instruction Manual.  However, Components propose new or substantively revised CATEXs separately from their Supplemental Instructions.  CATEXs proposals are processed separately by SEP because of the CEQ review and public notification requirements (see Section V, Part B (3)).

**(2) Component Supplemental Instructions Review and Approval Process**

The following is the process for SEP's review and approval of Component Supplemental Instructions:

(a) Components submit to SEP draft Supplemental Instructions that meet the required content and criteria described above and that have been approved by the Component's appropriate approving official.

(b) Upon receipt of a Component's draft Supplemental Instruction, SEP completes its initial review and provides comments back to the Component within 15 working days.  Issues that cannot be resolved

IV-14

between SEP and the Component within 10 working days thereafter are elevated to the respective CRSOs (or equivalent) for resolution.  If necessary, issues are further elevated to higher levels of DHS for resolution, following established organizational lines of authority.

(c)    If SEP determines that a Component's draft Supplemental Instruction contains information requiring CEQ and public review, SEP coordinates these efforts.

(d)    Director SEP notifies Components in writing when Supplemental Instructions have been approved.  This written notification will include a delegation of authority, if a Component is seeking a delegation of authority in conjunction with its Supplemental Instruction.

(e)    Components review their approved Component Supplemental Instructions and revise or update them as necessary, but at a minimum, whenever the Directive and Instruction Manual are revised.

## (3)   Delegation of Authority

Components that wish to obtain a delegation of authority for approving NEPA documents submit a written request, accompanied by their proposed or approved Component Supplemental Instructions, to Director SEP.  In order for a Component to receive such a delegation, a Supplemental Instruction approved by Director SEP is required.

(a)    Components request the level(s) of NEPA documentation (i.e., REC, EA, and/or EIS) for which they are seeking a delegation of authority. Director SEP remains the approval authority for any level(s) of NEPA documentation that are not included in the delegation.

(b)    Approved delegations are in writing from Director SEP to the Component's EPPM.  The EPPM can re-delegate his/her authority in accordance with the procedures established in their respective Component Supplemental Instruction.

(c)    Components may request approval from Director SEP for substantive revisions to their Component Supplemental Instructions without seeking a new delegation of authority.  However, to approve additional levels of NEPA documentation, Components request a new delegation of authority, with appropriately revised Component Supplemental Instructions.

(d)    Director SEP may revoke a Component's delegation of authority upon finding a pattern of non-compliance with substantive requirements of the Directive and Instruction Manual, which may include repeated failure to follow the respective approved Component Supplemental Instruction.

(e)   Director SEP may temporarily suspend a Component's delegation of authority for less significant reasons than those in paragraph (d) above that have an impact on the ability of the Component to effectively implement the substantive requirements of the Directive and Instruction Manual (e.g., the departure of qualified staff from the organization).

(f)   A Component whose delegation of authority has been suspended or revoked must remedy the issue(s) of concern, demonstrate that it meets the requirements of Section IV, Part K, and make a written request to Director SEP to have its delegation of authority reinstated. Issues related to a suspension or revocation of a delegation of authority that cannot be resolved between SEP and a Component are elevated to higher levels of DHS for resolution, following established organizational lines of authority.

A Component may request an interim delegation of authority in situations where it has drafted its Supplemental Instruction but its respective directives approval process is not completed.  Director SEP will grant an interim delegation of authority for up to six months if a Component provides a draft of its Supplemental Instruction that satisfactorily addresses the required criteria and content described above and that has, at a minimum, been entered into the Component's formal clearance process.  Written requests for extensions of this interim delegation of authority will be granted by Director SEP, with evidence that the Component is proceeding in good faith to complete its respective directives approval process.

## L.   Administrative Record Requirements

In complying with NEPA, government decision-makers cannot be arbitrary and capricious in their decisions.  The Administrative Procedure Act (APA) provides the framework for judicial oversight of executive branch decision-making.  The APA provides that a court will "review the whole record or those parts of it cited by a party…"  Therefore, the administrative record is a compilation of all documents and materials that were examined in the NEPA process (even if examined and then not used) by a Federal agency decision-maker at the time their final decision on a proposed action was made; this includes documents and materials that support a contrary decision.  It is important to note that information that is restricted from public disclosure under FOIA, but is examined in the NEPA process, may be appropriately a part of the administrative record.  The completeness of the administrative record is crucial in litigation because the court needs to be able to see, from only those things included in the record, a rational process through which the agency came to its decision as reflected in the ROD.  The court does not have to agree with the agency's decision, but it must find a rational basis in the record for that decision.  If the court is not able to make this finding, the court will normally require that the

Instruction Manual # 023-01-001-01

Revision # 01

project be put on hold and the NEPA process redone, often under a very tight court directed time frame.

An administrative record includes public draft and final NEPA documents (see Section II for definition); communications with and comments from Federal, Tribal, State, and local agencies, Federal assistance applicants, and the public; and DHS responses to those comments. Materials such as data, reports, studies, computer modeling, maps, photographs, etc., considered by agency staff and found relevant to the decision (these can be especially broad with regard to the choice of alternatives and which alternatives were ruled out and which were considered for NEPA analysis) are also part of the record, whether or not they support the decision made in NEPA documents and whether or not they are generally available to the public. Internal memoranda regarding issues related to a NEPA analysis that were prepared prior to the Proponent's decision on a proposed action are also part of the record. Draft documents that merely clean up typographical errors do not need to be retained, but care must be taken to ensure that no documents which are necessary to the judicial review process are destroyed.  Each document is subject to a legal relevance test and, while Components compile a thorough administrative record, Components obtain the advice of OGC regarding whether or not to leave something out of the administrative record.

Once an agency decision has been made, the "deliberative, pre-decisional" basis for keeping certain internal agency documents which are part of the administrative record protected from public release under FOIA disappears and these documents may, and generally do, become publically releasable.  However, if there is another basis on which to prevent their release, they will remain entitled to protection from release, even though they are part of the record (see Section IV, Part G (3)). Components engage OGC in making decisions about what is releasable and what is protected under FOIA.

IV-17

## V.  Procedures for Implementing NEPA

### A.    Overview of NEPA Requirements

The NEPA process helps DHS decision-makers systematically identify and evaluate the potential environmental effects of proposed actions and make informed decisions. Therefore, the NEPA process must be completed before DHS makes a final decision on a proposed action.

NEPA applies to the majority of DHS actions.  If there is any doubt as to the applicability of NEPA, the Component, working with or through its respective EPPM, consults OGC to determine whether NEPA applies to a proposed action.  Examples of situations in which NEPA is not triggered are very few and include cases of statutory exemption, executive branch waiver of compliance when such waiver authority has been granted by Congress and properly exercised, or when the action does not constitute a major Federal action significantly affecting the quality of the human environment as that term has been interpreted in regulations and court decisions.

When NEPA applies to a proposed action, one of three levels of evaluation (CATEX, EA, or EIS) is necessary.  These levels correspond to the increasing potential for proposed actions to have significant environmental effects.  NEPA documents such as EAs and EISs are not merely a summary of an environmental impact evaluation; they are also a way to communicate that information to DHS decision-makers and the public in an easily understandable form.  The EPPM advises the respective Component on the appropriate level of NEPA analysis and documentation for proposed actions.

Evaluation and documentation requirements under NEPA are summarized in Figure 1 and described below:

(1)   Components determine, in consultation with OGC and their respective EPPM, the appropriate analytical approach, including whether NEPA applies.  Where NEPA does not apply, Components document the determination for future reference, ensure appropriate compliance with other requirements for stewardship and protection of the human environment, and proceed with the proposed action.

(2)   If the proposed action is an emergency, Components follow the emergency provisions in Section VI.

(3)   For all other proposed actions to which NEPA applies, Components review the list of DHS CATEXs (Appendix A, Table 1) and follow the CATEX application procedures in Section V, Part B to determine if one may apply.

V-1

(4)   If the proposed action cannot be categorically excluded, Components normally begin the process to prepare an EA, following the EA procedures in Section V, Part C and associated CEQ guidance and requirements for EAs.  However, in some circumstances it is appropriate to begin the process to prepare an EIS instead of an EA, as explained later in this Instruction.  The EA process ends with either a FONSI or NOI to prepare an EIS.  If the EA process is concluded by a FONSI, the action may proceed.

(5)   If the proposed action clearly would have significant environmental impacts which cannot be mitigated to level of insignificance, or the EA process for the proposed action could not be concluded by a FONSI, Components prepare an EIS.  Components follow CEQ requirements and the EIS procedures in Section V, Part D for preparing an EIS.  The EIS process ends with a ROD.  Until the Component issues its ROD, no action on the proposal can be taken that would have an adverse environmental impact or limit the choice of reasonable alternatives (40 C.F.R. §1506.1(a)).  Once a ROD is issued, the action may proceed.

V-2

## Figure 1 - NEPA Flow Chart



V-3

Instruction Manual # 023-01-001-01

Revision # 01

**B.   Categorical Exclusions and Extraordinary Circumstances**

**(1)   DHS Categorical Exclusions**

The CEQ regulations (40 C.F.R. §1508.4) enable Federal agencies to establish categories of actions that, based on experience, do not individually or cumulatively have a significant impact on the quality of the human environment and, therefore, do not require an EA or EIS.  CATEXs enable DHS to avoid unnecessary efforts, paperwork, and delays and concentrate on those proposed actions having real potential for environmental impact.  Components may otherwise decide to prepare an EA for any action at any time to assist in planning and decision-making (see 40 C.F.R. §1501.3 and §1508.9).

DHS CATEXs are specific to DHS as a whole, or to individual Components when so specified.  DHS may not apply a CATEX established by another Federal agency to a proposed DHS action.  However, DHS may justify its application of a DHS CATEX to a proposed DHS action when another Federal agency has applied a similar CATEX of its own to a similar activity.

DHS CATEXs are divided into the following functional groupings of DHS mission activities:

(a)   Administrative and Regulatory Activities.

(b)   Operational Activities.

(c)   Real Estate and Personal Property Management Activities.

(d)   Repair and Maintenance Activities.

(e)   Construction, Installation, and Demolition Activities.

(f)   Hazardous/Radioactive Materials Management and Operations.

(g)   Training and Exercises.

(h)   Federal Assistance Activities.

(i)   Component-Specific Categorical Exclusions.

**(2)   Applying Categorical Exclusions**

DHS's list of CATEXs is provided in Appendix A, Table 1.  When considering application of a CATEX to a proposed action, Components determine if there are any extraordinary circumstances present that may cause significant impacts preventing the application of the CATEX.  For a proposed action to be categorically excluded, it must satisfy all three conditions described below.  If the proposed action does not clearly meet all three conditions, the Component prepares an EA or EIS according to CEQ requirements and following the procedures provided in Section V, Parts C and D, respectively.  Certain categories of proposed actions included in the CATEX list have a greater

potential to involve extraordinary circumstances and require the preparation of a REC to document the NEPA analysis, as described in Section V, Part B (4). A CATEX cannot be used for an action with significant impacts on the quality of the human environment, regardless of whether the impacts are beneficial or adverse. A CATEX may be applied to an entire program of DHS activities, if appropriate. Application of a CATEX to a proposed action presumes review and compliance under other relevant environmental planning and historic preservation laws, regulations, and Executive Orders (e.g., National Historic Preservation Act, Endangered Species Act) has occurred, and that a higher level of NEPA analysis is not warranted as a result of any identified impacts to resources protected under those other requirements.

Components consider the following when determining whether or not a proposed action is covered by a CATEX:

(a) **Clearly fits the category described in the CATEX**. The entire action clearly fits within one or more of the CATEXs in Appendix A, Table 1. Note that certain CATEXs are restricted to use by a single DHS Component. Where a CATEX is restricted for use to a particular DHS Component, no other Component may apply that CATEX to its proposed actions.

(b) **Is not a piece of a larger action**. It is not appropriate to segment a proposed action or connected actions by division into smaller parts in order to avoid a more extensive evaluation of the potential for environmental impacts under NEPA. For purposes of NEPA, actions must be considered in the same review if the actions are connected. Examples include actions that trigger or force other actions; and when one action depends on another (e.g., when one action is an interdependent part of a larger action, or when one action cannot proceed unless another action is taken).

(c) **No extraordinary circumstances exist**. The presence of one or more extraordinary circumstances precludes the application of a CATEX to a proposed action when the circumstance would have significant environmental impacts (i.e., EIS required), or presents the potential for significant environmental impacts (i.e., EA required), or that potential cannot be readily determined (i.e., EA required). A determination of whether an action that is normally excluded requires additional evaluation because of extraordinary circumstances focuses on the action's potential effects and considers the environmental significance of those effects in terms of both context (i.e., local, state, regional, Tribal, national, or international) and intensity. Components consider whether the proposed action involves one or more of the following extraordinary circumstances:

V-5

i. A potentially significant effect on public health or safety.

ii. A potentially significant effect on species or habitats protected by the ESA, Marine Mammal Protection Act, Migratory Bird Treaty Act, Magnuson-Stevens Fishery Conservation and Management Act, or other law protecting a species or habitat.

iii. A potentially significant effect on historic properties (e.g., districts, sites, buildings, structures, or objects) that are listed in or eligible for listing in the National Register of Historic Places, affects traditional cultural properties or sacred sites, or leads to the loss or destruction of a significant scientific, cultural, or historical resource.

iv. A potentially significant effect on an environmentally sensitive area.

v. A potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment. Some examples of other requirements to consider are: a local noise control ordinance; the requirement to conform to an applicable State Implementation Plan for air quality standards; Federal, Tribal, State, or local requirements to control hazardous or toxic substances; and environmental permits.

vi. An effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks. This also includes effects that may result from the use of new technology or unproven technology. Controversy over, including public opposition to, a proposed action absent any demonstrable potential for significant environmental impacts does not itself constitute an extraordinary circumstance.

vii. Extent to which a precedent is established for future actions with significant effects.

viii. Significantly greater scope or size than normally experienced for this particular category of action.

ix. Potential for significant degradation of already existing poor environmental conditions. Also, initiation of a potentially significant environmental degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

x. Whether the action is related to other actions with individually insignificant, but cumulatively significant impacts.

**(3)   Establishment, Revision, and Deletion of Categorical Exclusions**

V-6

Instruction Manual # 023-01-001-01

Revision # 01

Components forward proposals to substantively revise or establish new CATEXs (together with justification) to Director SEP for approval. Proposals to substantively revise or establish new CATEXs require an Administrative Record that meets CEQ standards and are subject to both CEQ review and public comment. SEP reviews such proposals to determine whether the CATEX is appropriate for inclusion in the DHS-wide list or a Component-specific list. SEP revises Appendix A, Table 1 to include approved new or substantially revised CATEXs. In addition, Components notify SEP of non-substantive revisions to or deletions of Component-specific CATEXs so that SEP can amend the table accordingly.

All CATEXs and the list of extraordinary circumstances in this Instruction Manual are reviewed by SEP in consultation with Component EPPMs at least every seven years to ensure they are still appropriate, and to identify any changes that may be needed in light of additional experience gained in applying the CATEXs to proposed DHS actions. A complete review is conducted in conjunction with any major revision to the Directive and Instruction Manual or when seven years have passed since the last major revision.

### (4)   Record of Environmental Consideration

The application of a CATEX to a proposed action means that the proposed action is appropriately included in a category of actions that DHS has determined do not individually or cumulatively have a significant impact on the human environment and therefore neither the preparation of an EA or EIS is required. Certain CATEXs, identified by an asterisk in Appendix A, Table 1, include classes of actions that have a higher possibility of involving extraordinary circumstances that may preclude the use of a CATEX. A REC is required whenever a CATEX denoted by an asterisk is applied in order to document that potential impacts to the human environment have been appropriately considered and the determination that the proposed action is either appropriately categorically excluded or must be analyzed further through an EA or EIS process. In addition, there may be instances where a Component chooses to prepare a REC when it is not otherwise required.

RECs are normally prepared and maintained electronically in the EP&HP DSS. Completion of a REC involves a review and approval process to ensure the appropriate consideration of extraordinary circumstances, the quality of the NEPA analysis, and that the decision-maker has considered the impact of the proposal on the human environment, as required by NEPA, before making a decision. Director SEP signs all RECs as the approver of the NEPA analysis, unless otherwise delegated.

Component Supplemental Instructions may contain additional information on the administrative procedures and requirements to prepare a REC.

V-7

**C.   Environmental Assessments**

**(1)   Purpose**

An EA is a concise public document prepared for proposed actions that have the potential for significant impacts on the quality of the human environment (40 C.F.R. §1508.9).  The EA process concludes with a Component's determination on the environmental impacts of the proposed action.  A finding of no significant impact (FONSI) document is prepared if the Component concludes that the proposed action would not have significant environmental impacts.  Components ensure FONSIs are publically available.  Additional information and guidance can be found in the CEQ regulations and guidance, such as CEQ's Memorandum for Heads of Federal Departments and Agencies: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act, 6 March, 2012 (http://ceq.hss.doe.gov/ceq_regulations/ guidance.html).

If during the preparation of an EA a Component determines that significant impacts would result from implementation of the proposed action, an EIS is required.

**(2)   When to Prepare an EA**

A Component prepares an EA under the following circumstances:

(a)   When a proposed action is not in a category of actions described in an available DHS CATEX and there is not enough information to determine that the proposed action will have significant environmental impacts requiring an EIS.  In this situation, an EA process is used to determine, through environmental impact evaluation and opportunity for public involvement, if the impacts on the quality of the human environment would be significant or not.

(b)   For a proposed action that is included in a category of actions described in a DHS CATEX but extraordinary circumstances present the potential for significant environmental impacts and therefore preclude application of the CATEX, and there is not enough information to determine that the proposed action will have significant environmental impacts requiring an EIS.

(c)   A Component can decide to prepare an EA as a best practice planning tool to inform decision-makers on the environmental impacts of its actions.

(d)   Other situations conforming to the above circumstances, as described in Component Supplemental Instructions.

V-8

**(3)   Actions Normally Requiring an EA or Programmatic EA**

Examples of activities for which a Component normally prepares an EA or a Programmatic EA include but are not limited to the following:

(a)   Proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas.

(b)   Projects impacting wetlands or waters of the U.S. that do not meet the criteria of the U.S. Army Corps of Engineers Nationwide Permit Program.

(c)   New or revised regulations for activities that have the potential to significantly affect environmentally sensitive areas.

(d)   Security measures that involve permanent closure or limitation of access to any area that was previously open to public use (e.g., roads and recreational areas) where there is a potential for significant environmental impacts.

(e)   New law enforcement field operations for which the environmental impacts are unknown, for which or any potential significant environmental impacts could be mitigated to the level that they are no longer significant, or for which the potential for significant environmental controversy is likely.

**(4)   Programmatic EAs**

A Component may prepare a Programmatic EA (PEA) for a broad Federal action, such as a program, plan, or actions of a similar type or at multiple locations, following the criteria above for when to prepare an EA.  A site- or activity-specific EA can be tiered from the PEA or a Supplemental EA (SEA) can be prepared and incorporate by reference the environmental impact evaluation contained in the PEA.  In some cases a PEA is specific enough or contains sufficient information to require no or very little additional evaluation. The application of a DHS CATEX to a proposed action, following the procedures in Section V, Part B (2), can also be based upon the evaluation contained in a PEA.

**(5)   Supplemental EAs**

A Component may prepare an SEA at any time for a proposed action for which:

(a) A NEPA analysis was previously completed;

V-9

(b) A  NEPA analysis is ongoing when there are substantial changes to the proposal that are relevant to environmental concerns; or

(c) If there are new circumstances or information relevant to environmental concerns and bearing on the proposal or its impacts.

An SEA only needs to focus on the issues that triggered the additional environmental impact evaluation, and the original analysis can be incorporated by reference in the SEA.  If a final EA is supplemented after a FONSI has been completed, the Component completes a new FONSI.

Components have discretion regarding the type and level of public involvement in SEAs, using the factors listed in Section IV, Part G (1).

In cases where an action has not yet been implemented within one (1) budget cycle not to exceed three (3) years from the date of the FONSI, the Component considers whether the analysis in the EA remains valid for the current state of the proposed activity and whether a supplement is needed before proceeding with the action.

## (6)   Adoption

Reliance on or adoption of an existing EA improves efficiency in the NEPA process and avoids unnecessary use of time and resources.

Within DHS, any Component may use another Component's EA without a formal adoption process, provided it fully covers the scope of the Component's proposed action and alternatives and the environmental impacts.  When relying on another Component's final EA and FONSI, the Component internally documents such reliance.  When relying on another Component's draft EA or portion thereof, the Component completes its own final EA and FONSI.

A Component may adopt another Federal agency's draft or final EA or portion thereof, provided it fully covers the scope of the Component's proposed action and alternatives and environmental impacts (see 40 C.F.R. §1506.3).  When adopting another Federal agency's draft or final EA or portion thereof, Components consider the factors in Section IV, Part G (1) to determine the appropriate additional public involvement needed.

When participating as a cooperating agency, Components may adopt the EA or portion thereof of a lead agency when, after an independent review of the document, the Component concludes that its comments and suggestions have been satisfied and the analysis includes the appropriate scope and level of environmental impact evaluation for the Component's proposed action and alternatives (see 40 C.F.R § 1506.3 (c)).

When adopting another Federal agency's final EA or portion thereof, the Component issues a FONSI acknowledging the adoption of the work of the

V-10

other Federal agency.  When adopting another Federal agency's draft EA or portion thereof, the Component completes a final EA and FONSI.

## (7)   Public Involvement Process Involving an EA

The CEQ regulations and this Instruction Manual require public involvement in the NEPA process for proposed DHS actions.  Public involvement requirements may be met during scoping at the start of an evaluation and/or by distributing a draft EA and draft FONSI for public review.

Where a diligent effort has been used to seek out and involve the public in the drafting of an EA and no significant impacts (including potential for an impact on the quality of the human environment that is highly controversial) have been identified, a Component can complete an EA and FONSI without circulating a draft document for public review.  A diligent effort includes consideration of the extent of other related public involvement efforts, as well as consideration of the factors in Section IV, Part G (1).  A public notice of the FONSI is made available to interested parties (see 40 C.F.R. §1506.6 for methods of providing public notice).  After the notice of the FONSI, the Component can take immediate action, unless there is another environmental planning requirement that requires a waiting period before an action can proceed.

When an EA has been drafted without opportunity for public involvement or when public input received during EA development indicates the need for further public review of the environmental impact evaluation, Components normally, absent exigent circumstances, make the draft EA available to the public for review and comment for a minimum of 30 calendar days.  If public comments reveal the potential for significant impact to the human environment, the Component determines whether it is appropriate to complete a FONSI, revise or supplement the EA, or prepare an EIS.  If the Component decides a FONSI is appropriate, it modifies the EA to reflect the consideration of any public comments as appropriate, completes the FONSI, and makes the FONSI available to the public.  A synopsis of the public comments received and how the Component addressed those comments, rather than a response to each individual comment, is normally prepared, and may be included as an appendix in the final EA.  After the FONSI is made publicly available, the Component can take immediate action, unless there is another environmental planning requirement that requires a waiting period before an action can proceed.

If a proposed action is unprecedented or one that normally requires an EIS or is closely similar to one that normally requires an EIS (see Section V, Part D (3)), the Component should, whenever practicable, provide an opportunity for public involvement in the drafting of the EA and makes the draft EA and draft FONSI available for public review, as described in 40 C.F.R. §1501.4(e) (2).

For proposed actions with environmental effects of national concern (see Section II for definition), Components publish a public notice in the Federal Register as required by 40 C.F.R. §1506.6, and submit to SEP draft and final EAs and FONSIs, or a hyperlink to the documents posted on a Component webpage, for posting on the DHS NEPA webpage, in accordance with Section IV, Part G (2).

**(8)   Minimum Required Content for an EA**

The minimum required content for an EA is outlined below.

    (a)    Title page;

    (b)    Purpose and need;

    (c)    Description of the proposed action and alternatives, including a description of alternatives considered but rejected;

    (d)    Description of the affected environment and environmental consequences, including conclusions regarding the significance of environmental impacts for the proposed action and alternatives and a consideration of cumulative impacts;

    (e)    Description of proposed mitigation and monitoring, if applicable;

    (f)    List of preparers;

    (g)    List of agencies and persons consulted or contacted; and

    (h)    References, if appropriate.

**(9)   Finding of No Significant Impact**

A Component's final determination on the environmental impacts of a proposed action is required upon the completion of an EA.  An EA process concludes with a FONSI when (1) the evaluation of the impacts of the proposed action on the human environment indicates that the environmental effects would not be significant, or (2) the Component commits to including measures in the proposed action that mitigate impacts to a level of insignificance (see Section V, Part E).  A FONSI is a separate document from an EA, but may be integrated into any other appropriate decision-making document that can be made publicly available, provided it includes the minimum content requirements in Section V, Part C (10).

V-12

**(10) Minimum Required Content for a FONSI**

A FONSI document is either attached to the EA or incorporates the EA by reference and consists of the following:

(a)   The name and a brief description of the proposed action and alternatives.

(b)   A summary of the results of the environmental impact evaluation.

(c)   Identification of any mitigation commitments (including monitoring) that will be implemented as part of the proposed action and reduce otherwise significant impacts.

(d)   A statement that the proposed action will not have a significant impact on the quality of the human environment.

(e)   A statement of the final agency decision. The analysis that resulted in a FONSI must encompass this final decision.

(f)   The date of issuance and a signature block for the staff member from the Component who has decision-making authority regarding the proposed action in order to demonstrate fulfillment of the NEPA requirement to consider the potential for impact to the human environment in the decision-making process.

(g)   In Components that have not received a delegation of authority (See Section IV, Part K), a signature block for Director SEP.

(h)   Normally be no more than five pages in length, and incorporate commitments as attachments if necessary, to avoid creating a lengthier FONSI document.

**D.  Environmental Impact Statements**

**(1)  Purpose**

An EIS is prepared for major Federal actions significantly affecting the quality of the human environment (see 40 C.F.R. §1502).  Preparation of an EIS involves a more formal process to work collaboratively with other Federal, Tribal, State, local, and non-Federal interested parties, and provides a more formal opportunity for the public to understand the potential environmental impacts and to influence a Federal agency's decision.  The environmental impact evaluation documented in an EIS may be more extensive than that in an EA to appropriately reflect an evaluation of significant impacts to the quality of the human environment.  Detailed information on the requirements for an EIS is found in the CEQ regulations and guidance, such as CEQ's Memorandum for Heads of Federal Departments and Agencies: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National

Environmental Policy Act, 6 March, 2012 (http://ceq.hss.doe.gov/ceq_ regulations/guidance.html).  No alternative, in whole or in part, that is the subject of an EIS process will be taken that would limit the choice of reasonable alternatives, involve a conflict in the use of available resources, or have an adverse environmental impact until the ROD has been made publically available.  A ROD (or Notice of its Availability) is published in the Federal Register.

**(2)   When to Prepare an EIS**

A Component prepares an EIS when its proposed action and/or any reasonable alternative(s) would have significant environmental effects.  This includes actions where an EA concluded that there would be significant impacts, and therefore preparation of an EIS was necessary.  However, a Component has the option to prepare an EIS when there is good reason to do so for any activity at any time.

**(3)   Actions Normally Requiring an EIS, Programmatic EIS, or Legislative EIS**

Examples of activities for which a Component normally prepares an EIS, a Programmatic EIS, or a Legislative EIS include but are not limited to the following:

   (a)   Activities where the effects on the human environment are likely to be highly controversial in terms of environmental impacts or involve unique or unknown environmental risks.

   (b)   Construction projects that would have a significant effect on environmentally sensitive areas.

   (c)   Major Federal actions occurring in the U.S. known to cause a significant environmental effect on the global commons, as this term is defined in E.O. 12114, "Environmental Effects Abroad of Major Federal Actions."

   (d)   Change in area, scope, type, and/or tempo of operations that would result in significant environmental effects.

   (e)   When an action is required by statute or treaty to develop an EIS.

**(4)   Programmatic EIS**

A Component may prepare a Programmatic EIS (PEIS) on a broad Federal action, such as a program, plan, or actions of a similar type or at multiple

Instruction Manual # 023-01-001-01

Revision # 01

locations, for which only very general environmental information is known.  A site-specific EIS or EA can be tiered from the PEIS and incorporate by reference the environmental impact evaluation contained in the PEIS.

### (5)   Legislative EIS

A Legislative EIS is prepared and circulated for any non-budgetary legislative proposal initiated by DHS without request for drafting assistance by any member of the legislative branch that would have significant impacts on the natural and human environment (40 C.F.R. §1506.8).

### (6)   Supplemental EIS

A Component may prepare a supplemental EIS (SEIS) if there are substantial changes to the proposal that are relevant to environmental concerns or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposal or its impacts (40 C.F.R. §1502.9(c)(1)). A Component may also supplement a draft EIS (DEIS) or Final EIS (FEIS) at any time to further the evaluation presented in the original EIS.

Components prepare, circulate, and file a supplement to a DEIS or FEIS in the same manner as any other DEIS or FEIS, except that scoping is optional for an SEIS (40 C.F.R. §1502.9(c)(4)).  Public notice methods are chosen that are appropriate for reaching persons who may be interested in or affected by the proposal.  If an FEIS is supplemented after a ROD has been completed, the Component completes a new ROD and publishes it (or a Notice of its Availability) in the Federal Register.

In cases where an action has not yet been implemented within one (1) budget cycle not to exceed three (3) years from the date of the ROD, the Component considers whether the analysis in the EIS remains valid for the current state of the proposed activity and whether a supplement is needed before proceeding with the action.

### (7)   Adoption

Reliance on or adoption of an existing EIS improves efficiency in the NEPA process and avoids unnecessary use of time and resources.

Within DHS, any Component may use another Component's EIS without a formal adoption process, provided it fully covers the scope of the Component's proposed action and alternatives and the environmental impacts.  When relying on another Component's final EIS, the Component completes its own ROD and publishes it (or a Notice of its Availability) in the Federal Register.  When relying on another Component's draft EIS or portion thereof, the Component completes its own final EIS which is filed with EPA, completes its own ROD, and publishes the ROD (or Notice of its Availability) in the Federal Register.

V-15

A Component may adopt another Federal agency's existing draft or final EIS or portion thereof, provided it fully covers the scope of the Component's proposed action and alternatives and environmental impacts (see 40 C.F.R. §1506.3). When adopting another Federal agency's draft or final EIS or portion thereof, Components consider the factors in Section IV, Part G (1) to determine the appropriate additional public involvement needed.

If the actions covered by the other Federal agency's EIS and the Component's proposed action are substantially the same, the Component normally recirculates the document as a final (i.e., files it with the EPA and makes it available to agencies and the public), and includes a statement describing its respective proposed action and acknowledging the adoption of the EIS (see 40 C.F.R. §1506.3 (b)).  The Component completes its own ROD and publishes a NOA in the Federal Register.

When participating as a cooperating agency, a Component may adopt the lead agency's EIS or portion thereof without recirculation when, after its independent review of the document, the Component concludes that its comments have been satisfied and the analysis includes the appropriate scope and level of environmental impact evaluation for the Component's proposed action and alternatives (see 40 C.F.R. §1506.3 (c)).  When adopting the lead Federal agency's final EIS or portion thereof, the Component completes its own ROD acknowledging the adoption of the work of the other Federal agency and publishes a NOA in the Federal Register.  When adopting the lead Federal agency's draft EIS or portion thereof, the Component completes its own final EIS and ROD.

## (8)   Approval and Filing of an EIS

In accordance with a memorandum of agreement (MOA) between CEQ and EPA, EPA is responsible for the receipt and filing of EISs prepared by Federal agencies.  Every week in the Federal Register, EPA publishes NOAs for all EISs filed during the previous week.  DHS follows the steps for preparation and filing of an EIS as prescribed in the CEQ regulations (40 C.F.R. §1506.9 and 1506.10) and additional information provided in CEQ and EPA guidance (see EPA's Amended EIS Filing System Guidance, published in the Federal Register on January 11, 2011).  Components also follow the requirements in Section IV, Part C regarding when to notify SEP and Section IV, Part G (1) regarding public involvement.  The EPA published NOA is the official public notification of an EIS.  Components may publish their own NOA to provide more information to the public, although it is not required.

**(9)   Minimum Required Content for an EIS**

The CEQ regulations at 40 C.F.R. §1502.10 provide an example format for an EIS, and 40 C.F.R. §1508.25 describes the scope, i.e., the range of actions, alternatives, and impacts to be considered in an EIS.  There is no standard DHS format and Components can vary from the CEQ example, with compelling reason.  The appropriate structure for an EIS is one that facilitates communication of the environmental impact evaluation and results in a manner that is concise, efficient, and most easily understood by Proponents and the general public.  For example, sections on Affected Environment and Environmental Consequences are often combined to produce a document that is shorter in length and easier to read and understand.

The level of public involvement in the development of an EIS is determined through consideration of the factors in Section IV, Part G (1).  The length of an EIS varies based on project type, project size, and potential environmental concerns.

The CEQ standard format for an EIS is outlined below.

    (a)   Cover sheet;

    (b)   Summary;

    (c)   Table of Contents;

    (d)   Purpose of and need for the action;

    (e)   Alternatives considered, including proposed action and no-action alternative;

    (f)   Affected environment (baseline conditions) that may be impacted;

    (g)   Environmental and socioeconomic consequences;

    (h)   List of preparers;

    (i)   Distribution list;

    (j)   Index; and

    (k)   Appendices (as appropriate).

A Component's use of errata sheets attached to a DEIS in-lieu of a traditional FEIS is allowed under 40 C.F.R. §1503.4(c)).  Use of an errata sheet is appropriate when comments received on a DEIS are minor, and the Component's responses to those comments are limited to factual corrections or explanations of why the comments do not warrant further response.  When applying this provision, the errata sheets and the information required in an FEIS (described below) are attached to the DEIS and the document is filed with EPA and provided to the public following the CEQ requirements for an FEIS.

V-17

When using errata sheets, they include at minimum the following information:

(a)  A list of the factual corrections made to the DEIS with references to the relevant page numbers in the DEIS;

(b)  A synopsis of the comments received on the DEIS and an explanation of why the comments do not warrant further response in the FEIS, citing the sources, authorities, or reasons that support the Component's position;

(c)  If appropriate, an indication of the specific circumstances that would trigger reappraisal or further response, particularly information that could lead to a re-evaluation or an SEIS;

(d)  Identification of the preferred alternative and a discussion of the reasons why it was selected;

(e)  List of commitments for mitigation measures for the preferred alternative; and

(f)  A copy or summary of comments received on the DEIS and responses, including any coordination activities since the DEIS.

## (10)  Record of Decision

When a Component decides whether or not to take action on a proposal covered by an EIS, a decision document known as a ROD is prepared.  The content requirements for a ROD are found in 40 C.F.R. §1505.2.  A ROD is a separate document from the EIS, and may be integrated into any other appropriate decision-making document that can be made publicly available provided that the content requirements are met.

A ROD is made publicly available by publishing it (or a Notice of its Availability) in the Federal Register (unless there are issues meeting one or more of the exemptions from information disclosure under FOIA), and presents all the factors an agency considered when it reached its decision on whether to, and if so how to, proceed with the proposed action.  The ROD identifies mitigation measures (if any) which were important in supporting DHS decision-making, such as those measures which reduce otherwise significant impacts.

The Component submits the ROD or the hyperlink to the ROD on its own webpage to SEP for posting on the DHS NEPA webpage, in accordance with Section IV, Part G (2).

## E.  Mitigation and Monitoring

Measures that reduce otherwise anticipated adverse impacts of a proposed action on the quality of the human environment are called mitigation measures.  When a Component commits to mitigation measures to reduce or eliminate potential

adverse effects of an action, it is essential that the Component implements the measures and monitors their effectiveness.  Components commit to appropriate, practical, and implementable mitigation measures identified in a FONSI or ROD that they have sufficient legal authority to implement or impose on applicants.  Mitigation measures are practical and implementable, i.e., those that are reasonably expected to achieve their intended purpose.  Implementable mitigation measures require not only that the Component have the appropriate legal authority, but also that it can reasonably foresee the availability of resources for performing the mitigation.  Where the mitigation is being imposed on an applicant for DHS funding or approval to perform their proposed action, Components make the mitigation a condition of DHS approval of the applications from persons or organizations external to DHS (40 C.F.R. §1505.3).

Prior to commencement of or during implementation of an action, if a mitigation measure that a Component committed to cannot be implemented or conditions have changed such that the mitigation measure may no longer be appropriate, the Component determines if other practical mitigation measures can be implemented or are necessary, in coordination with Federal, Tribal, State, or local government agencies as appropriate.  If the conclusion of the NEPA analysis was predicated in whole or in part on the mitigation in question, the Component considers whether the NEPA decision can be sustained without the identified mitigation.  The Component then considers whether the NEPA document needs to be revised to reflect the new circumstances.  If it does, the Component provides appropriate public notice of the revision.  After that, the action may proceed.

Components monitor implemented actions for effectiveness of mitigation, following the guidance in CEQ's Memorandum for Heads of Federal Departments and Agencies: Appropriate Use of Mitigation and Monitoring and Appropriate Use of Mitigated Findings of No Significant Impact, 14 January, 2011 (http://ceq.hss.doe.gov/ceq_ regulations/guidance.html).  Components also respond to inquiries from the public or other agencies regarding the status of mitigation measures and the results of monitoring.  If post-action monitoring finds that mitigation has been ineffective in mitigating the adverse impacts of the action, Components consult promptly with OGC and their respective EPPM to determine the necessary course of action, and follow Section IV, Part C for circumstances requiring notification to SEP.

Adequately documenting and monitoring mitigation advances NEPA's purpose of informed and transparent environmental decision-making.  Failure to implement, document, and/or monitor mitigation may undermine the integrity of the NEPA analysis, and may compromise the adequacy of the NEPA compliance effort.  Therefore, once a Component has committed to mitigation measures, all decisions to modify or suspend those measures are made in consultation with OGC and the Component's respective EPPM.

V-19

**F.   Cooperating and Joint Lead Agency Relationships**

The CEQ regulations (40 C.F.R. §1501.6) emphasize agency cooperation in the NEPA process.  Sometimes, a proposed DHS action may impact or be impacted by the missions and activities of other agencies.  In such situations, it may be necessary to establish a lead and cooperating agency relationship or a joint-lead agency relationship to minimize or avoid duplicative, redundant NEPA compliance efforts.  Establishing this type of relationship may be appropriate when another Federal agency, Tribe, State, or local agency with a comparable NEPA requirement either proposes or is involved in the same action, or is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity (40 C.F.R. §1501.5).  An interagency MOA is normally executed to identify the lead and cooperating agencies and to document their roles and responsibilities, establish timelines and milestones, etc.  However exigencies may dictate another form of documenting the relationship, such as an exchange of written correspondence.  Components follow the CEQ regulations and guidance on cooperating agencies in its Memorandum to Heads of Federal Agencies: Reporting Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, 23 December 2004, and Memorandum for Heads of Federal Agencies: Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, 30 January 2002 (http://ceq.hss.doe.gov/ceq_regulations/ guidance.html).

The benefits of cooperating agency participation in the preparation of NEPA documents include: 1) disclosing relevant information early in the NEPA process; 2) applying available expertise and staff support; 3) avoiding duplication with other Federal, Tribal, State, and local requirements; 4) establishing a mechanism for addressing intergovernmental issues; 5) fostering intra- and intergovernmental trust; and 6) enhancing agencies' ability to adopt environmental documents.

When a Component is a lead agency, it may invite other appropriate Federal agencies with jurisdiction by law (such as regulatory jurisdiction, authority to manage land or water where the Component proposes to locate an action, or related mission authorities, among other things) to be a cooperating agency in the Component's NEPA effort.  In addition, a Component may invite other Federal agencies with special expertise on a particular environmental issue to be a cooperating agency.  A Component may also invite Tribes and non-Federal agencies to be a cooperating or joint lead agency in order to eliminate duplication with Tribal, State, and local requirements that are comparable to NEPA.

A Component may become a cooperating agency in another Federal agency's NEPA effort at the request of that agency when the Component has jurisdiction by law over an aspect of the other federal agency's proposed activity that requires action or approval by the Component.  A Component may also become a cooperating agency in another Federal agency's NEPA effort at the request of that

V-20

agency when the Component has special expertise by virtue of its statutory responsibility, mission, or related program experience that is relevant to the other Federal agency's proposal.  A Component may also request a lead Federal agency to designate it as a cooperating agency.

If another agency requests that a Component be a cooperating agency in its NEPA effort and the Component declines to accept cooperating agency status, the Component responds to the requesting agency and provides a copy of its response to Director SEP and CEQ (40 C.F.R. §1501.6 (c)).  The denial is not subject to oversight by Director SEP and is not subject to review under the Administrative Procedure Act, 5 U.S.C. 701 et seq.  Director SEP reviews the request to determine whether another Component needs to consider cooperating agency status.

Components that prepare EAs and EISs annually report information on cooperating agency status to SEP for consolidated DHS reporting to CEQ.

## G.   NEPA Analysis and Writing

Components emphasize quality analysis and documentation of potential environmental effects for reasonable alternatives that are economically and technically feasible and that meet mission needs, and of strategies to mitigate significant adverse effects.  In order to improve quality, reduce paperwork, and control the length of NEPA documents, Components closely follow the requirements of 40 C.F.R. §1500.4 and the guidance issued by CEQ in its Memorandum for Heads of Federal Departments and Agencies: Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act, 6 March 2012 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html).

The appropriate structure and format for an EA or EIS is one that facilitates written communication of the environmental impact evaluation and results in a manner that is concise, efficient, and most easily understood by the Proponent and the general public.  The depth and scope of analysis and resulting volume of documentation in a NEPA process are to be relevant and proportionate to the complexity of the project and level of anticipated environmental effects.  The depth and scope of the analysis is normally informed by the level of anticipated environmental effects.  The objective in preparing an EA or EIS is to communicate quality analysis to support DHS decisions, not the production of lengthy documents.

The main body of an EA or an EIS is normally a presentation designed for the general public that is written in plain language (40 C.F.R. §1502.8).  It generally summarizes the environmental impact evaluation for the relevant scope of issues and the development of appropriate mitigation strategies, with sufficient detail to meet CEQ requirements.  Related and background information is included in appendices.  The summary required for an EIS (40 C.F.R. §1502.12) and optional for an EA presents the results of the environmental impact evaluation, stressing the

V-21

major conclusions, areas of controversy, and the issues to be resolved, but is not a summary of the document.

The following are normally taken into consideration when approving a NEPA document prepared for proposed DHS actions:  the scope, depth, and pertinence of the analysis relevant to the proposed action, alternatives, and anticipated environmental impacts; the scientific integrity of the analysis; conformance to requirements of CEQ and this Instruction Manual; and the general presentation and readability of the information.

V-22

## VI. Emergency Actions

DHS missions include ensuring resiliency to disasters and effective emergency response.  Examples of emergencies that may require immediate DHS action include responses to hurricanes, earthquakes, pandemics, nuclear strike, imminent threat of terrorist activity, or release or imminent release of oil, hazardous, biological, or radiological substances.  These incidents require DHS action to defend and protect public health and safety and/or to ensure continuity of government operations as soon as possible.

As DHS develops its response to situations involving immediate threats to human health or safety, or immediate threats to valuable natural resources, it considers whether there is sufficient time to follow the procedures established in the CEQ regulations, as further explained in CEQ's  Memorandum for Heads of Federal Departments and Agencies: Emergencies and the National Environmental Policy Act, 12 May, 2010 (http://ceq.hss.doe.gov/ceq_regulations/guidance.html), and this Instruction Manual.

The following four phases apply when performing NEPA activities during an emergency. Components follow these general provisions for emergency actions in consultation with their respective EPPM and OGC, and SEP when appropriate, and in accordance with their Supplemental Instructions if emergency procedures are specified therein.

### A.    Secure Lives and Protect Property

Do not delay immediate actions needed to secure lives and safety of employees and citizens, or to protect property.  The Component considers the probable environmental consequences of proposed DHS actions and minimizes environmental damage to the maximum degree practical, consistent with protecting human life, property, and national security.

### B.    Determine Applicability of NEPA

Components determine, upon the advice and counsel of OGC, if NEPA applies to the emergency action (see Section V, Part A).

### C.    Notification to SEP

Components follow the criteria in Section IV, Part C, for when to notify or seek approval from Director SEP for NEPA activities during an emergency.

### D.    Determine Level of NEPA Evaluation

When NEPA applies to a proposed DHS emergency action, Components determine the appropriate level of NEPA evaluation using the following criteria:

(1)   If the proposed emergency action qualifies for a CATEX and no extraordinary circumstances exist that would preclude the use of the

VI-1

Instruction Manual # 023-01-001-01

Revision # 01

CATEX, follow the procedures in Section V, Part B for completing a CATEX review.

(2) If the proposed emergency action does not qualify for a CATEX, consideration of the potential for environmental effects must be documented in the form of either an EA or EIS.

(a) Consider if the proposed emergency action is covered by an existing final EA and FONSI or EIS and ROD prepared by any DHS Component. If an existing final DHS EA and FONSI or EIS and ROD fully cover both the scope of the proposed activities and the environmental impacts and the environmental impact evaluation remains current, no further evaluation under NEPA is necessary. However, it is appropriate to internally record the use of another DHS Component's NEPA Document.

(b) If paragraph (a) above is not applicable, determine if the proposed emergency action is covered by an existing EA or EIS of another Federal agency. If an existing EA or EIS of another Federal agency fully covers both the scope of the proposed activities and the environmental impacts and the environmental impact evaluation remains current, then the Component may adopt the document. Adopting an existing analysis may require the Component to provide the opportunity for public comment. The Component prepares a separate FONSI or ROD for the proposed emergency when adopting an existing analysis.

(c) If paragraphs (a) and (b) above are not applicable, determine if an existing EA or EIS from another DHS Component or an EA or EIS adopted from another Federal agency can be supplemented to address the proposed emergency action. Supplementing an existing analysis may require the Component to provide the opportunity for public comment. The Component prepares a separate FONSI or ROD for the proposed emergency when supplementing an existing analysis.

(d) If paragraphs (a) through (c) above are not applicable and the expected environmental impacts are not considered to be significant, determine if sufficient time exists before starting the emergency action to complete a new EA.

i. When sufficient time exists, it is most appropriate for the Component to prepare a focused and concise EA, including consideration of the public involvement factors presented in Section IV, Part G (1). The EA may incorporate by reference any existing relevant non-Federal environmental impact evaluation, such as one prepared pursuant to a state agency's environmental planning

Instruction Manual # 023-01-001-01

Revision # 01

requirement.  If the new EA supports a conclusion that the proposed emergency action will not have significant environmental effects, a FONSI is prepared and made available to interested parties.

ii.   If sufficient time does not exist to complete an EA before starting the proposed emergency action, and the expected environmental impacts are not considered to be significant, the Component consults with Director SEP to develop an alternative approach to completing an EA that meets the requirements of the CEQ regulations and this Instruction Manual.  To the maximum extent practicable, such approaches ensure public notification and involvement and focus on minimizing the adverse environmental consequences of the proposed emergency action.  SEP informs CEQ of these alternatives to the preparation of an EA at the earliest opportunity.

(e)   If, at any time during the emergency, including during preparation of an EA, the Component determines that the emergency action appears to be a major Federal action significantly affecting the quality of the human environment, the Component seeks the involvement of SEP. When another EIS is not available to adopt or supplement, or insufficient time is available to adopt or supplement an existing EIS, SEP notifies CEQ regarding the emergency and seeks alternative arrangements to comply with NEPA in accordance with 40 C.F.R. §1506.11.  Alternative arrangements apply only to actions needed to control the immediate impacts of the emergency to prevent further harm to life or improved property.  Other actions remain subject to NEPA analysis.  Factors to address when crafting alternative arrangements include:

i.   Nature and scope of the emergency;

ii.   Actions needed to control the immediate impacts of the emergency;

iii.   The potential adverse effects;

iv.   Aspects of the NEPA process that can be followed and add value to the decision-making process (such as coordination with resource and regulatory agencies and the public);

v.   Duration of the emergency; and

vi.   Potential adverse impact mitigation measures.

Instruction Manual # 023-01-001-01

Revision # 01

## VII. Review of Applications from Persons or Organizations Outside of DHS

Components that process applications for permits, licenses (other than those for use of real property), Federal assistance (e.g., grants), or other forms of DHS funding or approval have a responsibility to integrate NEPA requirements early in the application process.  In this context, an Applicant is a person or organization outside of DHS that seeks funding, or a permit, license, or other form of approval from DHS in order to carry out its desired action.  Components consider the environmental effects of the Applicant's proposed action when deciding whether or not to provide funding, issue a permit or license, or otherwise approve an Applicant's proposal.  Completion of the NEPA process occurs before making a decision to approve an Applicant's proposal.

Unless otherwise specified in law or regulation, Components that administer Federal assistance, permitting, licensing, or similar types of programs incorporate the applicable provisions below into their respective review and approval processes for applications under those programs.  Components that regularly administer such programs describe in their Supplemental Instructions how these provisions are normally addressed. Components that do not regularly administer such programs may nevertheless elect to develop Supplemental Instructions (or to amend existing Supplemental Instructions) if they wish to seek delegation of NEPA authority for such programs.  Where NEPA-related program-specific guidance, policy, etc., already exists, Components include an explanation of the relevant information and reference the document(s) in their Supplemental Instructions.

A.  Coordination between the Component and the Applicant as early as possible so that the Applicant is aware of its responsibilities, if any, to assist the Component in fulfilling the NEPA process.  This includes notification to the Applicant of the kinds of analyses or information that the Component requires the Applicant to provide or prepare, if any, that are deemed necessary and appropriate for an environmental impact evaluation.  The Component establishes an internal process to ensure completion of an independent and objective evaluation of any such information provided by the Applicant.  This may include notifying the Applicant of its role, if any, in supporting coordination and consultation efforts, scoping, and other public involvement activities, and its role, if any, in activities necessary to eliminate duplication with Tribal, State, local, or other Federal requirements.

B.  Consideration of whether the Applicant's proposed action is a connected action (see 40 C.F.R. §1508.25) or, if the applicant is a non-Federal entity, is a piece of a larger action whereby the Component's involvement would federalize the entire action.

C.  The process to identify and evaluate options to resolve potentially significant environmental impacts, including the Applicant's role in coordination and

VII-1

consultation activities, if any.  This includes development of measures to mitigate adverse impacts, if necessary.

D.   Notification to the Applicant of how the costs of NEPA activities (e.g., preparation of an EA; mitigation measures) are to be paid for.

E.   Notification to the Applicant of its responsibilities regarding emergency actions, if relevant.

F.   Notification to the Component if the Applicant changes the scope of the proposed action.  Scope changes require an evaluation by DHS to determine if the previous NEPA analysis is still relevant or if additional analysis is necessary.

G.   Ensuring that required NEPA documents are completed prior to the Component's decision on the application or, in the case of certain Federal assistance programs, prior to the Component's approval for the applicant to draw funds to execute its proposed action.

H.   Notification to the Applicant when the Component may deny an application if the proposed action's impacts, cost of the environmental impact evaluation, or costs of mitigation measures substantially outweigh the proposed action's costs or monetary and non-monetary benefits.

I.   Ensuring mitigation committed to as part of the NEPA process, including appropriate monitoring of the implementation and success of the mitigation, is incorporated as conditions in the appropriate formal approval document that is issued to the Applicant by the Component.

J.   Notification to the Applicant when the Component may deny an application, revoke an approval (e.g., de-obligate or recoup grant funding), or take other enforcement action if the Applicant does not comply with NEPA requirements or conditions of NEPA approval, or implements the proposed action prior to completion of the NEPA process.

K.   Identification of decision points for when the NEPA analysis and approval occurs in the Component's overall application review and approval/award process.

L.   Making contact information publically available for the DHS office and/or staff responsible for administering the Federal assistance, permitting, licensing, or similar type of program.

M.   When actions are planned by non-Federal entities before DHS gets involved but DHS involvement is reasonably foreseeable, the following provisions also apply:

1) Ensure information and staff are available to advise potential applicants;

2) Consult early with Tribes, State and local agencies, and the public; and

VII-2

Instruction Manual # 023-01-001-01

Revision # 01

3) Commence the NEPA process at the earliest possible time.

When a new Federal assistance, permitting, licensing, or similar type of program is created in DHS, the relevant Component, including the relevant individual program office(s), consults with its respective EPPM and OGC to determine the applicability of NEPA requirements under that new program.  In some cases, the responsibility to administer the program may be transferred from one DHS Component to another DHS Component or from DHS to another Federal agency.  In such situations, the parties may execute an agreement to ensure that NEPA requirements are met.

VII-3

# Appendix A.  DHS List of Categorical Exclusions

**Table 1 - List of DHS Categorical Exclusions**

**Note regarding the following table:** CATEX A8, CATEXs C6 through C10, and all the CATEXs in Sections M and N are new CATEXs. All others are existing CATEXs that DHS is retaining.

The CATEXs in Sections A through G and the CATEXs in Section N are available for use across the entire Department. The CATEXs in Sections H through M are available for use by only the Component specified in the section heading.

**\*** Denotes classes of actions that have a higher possibility of involving extraordinary circumstances. A REC will be prepared to document consideration of extraordinary circumstances whenever a CATEX that is identified by an asterisk is used.

## ADMINISTRATIVE AND REGULATORY ACTIVITIES

**A1** Personnel, fiscal, management, and administrative activities, such as recruiting, processing, paying, recordkeeping, resource management, budgeting, personnel actions, and travel.

**A2** Reductions, realignments, or relocation of personnel that do not result in exceeding the infrastructure capacity or changing the use of space.  An example of a substantial change in use of the supporting infrastructure would be an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate such an increase.

**A3** Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:

  (a) Those of a strictly administrative or procedural nature;

  (b) Those that implement, without substantive change, statutory or regulatory requirements;

  (c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

  (d) Those that interpret or amend an existing regulation without changing its environmental effect;

A-1

(e) Technical guidance on safety and security matters; or

(f)  Guidance for the preparation of security plans.

**A4** Information gathering, data analysis and processing, information dissemination, review, interpretation, and development of documents.  If any of these activities result in proposals for further action, those proposals must be covered by an appropriate CATEX.  Examples include but are not limited to:

(a) Document mailings, publication and distribution, training and information programs, historical and cultural demonstrations, and public affairs actions.

(b) Studies, reports, proposals, analyses, literature reviews; computer modeling; and non-intrusive intelligence gathering activities.

**A5** Awarding of contracts for technical support services, ongoing management and operation of government facilities, and professional services that do not involve unresolved conflicts concerning alternative uses of available resources.

**A6** Procurement of non-hazardous goods and services, and storage, recycling, and disposal of non-hazardous materials and wastes, that complies with applicable requirements and is in support of routine administrative, operational, or maintenance activities.  Storage activities must occur on previously disturbed land or in existing facilities.  Examples include but are not limited to:

(a) Office supplies,

(b) Equipment,

(c) Mobile assets,

(d) Utility services,

(e) Chemicals and low level radio nuclides for laboratory use,

(f)  Deployable emergency response supplies and equipment, and

(g) Waste disposal and contracts for waste disposal in established permitted landfills and facilities.

**A7** The commitment of resources, personnel, and funding to conduct audits, surveys, and data collection of a minimally intrusive nature.  If any of these commitments result in proposals for further action, those proposals must be covered by an appropriate CATEX.  Examples include, but are not limited to:

A-2

(a) Activities designed to support the improvement or upgrade management of natural resources, such as surveys for threatened and endangered species, wildlife and wildlife habitat, historic properties, and archeological sites; wetland delineations; timber stand examination; minimal water, air, waste, material and soil sampling; audits, photography, and interpretation.

(b) Minimally-intrusive geological, geophysical, and geo-technical activities, including mapping and engineering surveys.

(c) Conducting Facility Audits, Environmental Site Assessments and Environmental Baseline Surveys, and

(d) Vulnerability, risk, and structural integrity assessments of infrastructure.

**A8 [new]** Review of and comment on documents that did not originate in DHS.

**OPERATIONAL ACTIVITIES**

**B1** Research, development, testing, and evaluation activities, or laboratory operations conducted within existing enclosed facilities consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, and local requirements to protect the environment when it will result in no, or *de minimus* change in the use of the facility.  If the operation will substantially increase the extent of potential environmental impacts or is controversial, an EA (and possibly an EIS) is required.

**B2** Transportation of personnel, detainees, equipment, and evidentiary materials in wheeled vehicles over existing roads or jeep trails established by Federal, Tribal, State, or local governments, including access to permanent and temporary observation posts.

**B3** Proposed activities and operations to be conducted in an existing structure that would be compatible with and similar in scope to its ongoing functional uses and would be consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, or local requirements to protect the environment.

**B4** Provision of on-site technical assistance to non-DHS organizations to prepare plans, studies, or evaluations.  Examples include, but are not limited to:

(a) General technical assistance to assist with development and enhancement of Weapons of Mass Destruction (WMD) response

A-3

Instruction Manual # 023-01-001-01

Revision # 01

plans, exercise scenario development and evaluation, facilitation of working groups, etc.

(b) State strategy technical assistance to assist States in completing needs and threat assessments and in developing their domestic preparedness strategy.

**B5** Support for or participation in community projects that do not involve significant physical alteration of the environment.  Examples include, but are not limited to:

(a) Earth Day activities,

(b) Adopting schools,

(c) Cleanup of rivers and parkways, and

(d) Repair and alteration of housing.

**B6** Approval of recreational or public activities or events at a location typically used for that type and scope (size and intensity) of activity that would not involve significant physical alteration of the environment.  Examples include, but are not limited to:

(a) Picnics,

(b) Encampments, and

(c) Interpretive programs for historic and cultural resources, such as programs in conjunction with State and Tribal Historic Preservation Officers, or with local historic preservation or re-enactment groups.

**B7** Initial assignment or realignment of mobile assets, including vehicles, vessels and aircraft, to existing operational facilities that have the capacity to accommodate such assets or where supporting infrastructure changes will be minor in nature to perform as new homeports or for repair and overhaul.

**\*B8** Acquisition, installation, maintenance, operation, or evaluation of security equipment to screen for or detect dangerous or illegal individuals or materials at existing facilities and the eventual removal and disposal of that equipment in compliance with applicable requirements to protect the environment. Examples of the equipment include, but are not limited to:

(a) Low-level x-ray devices,

(b) Cameras and biometric devices,

(c) Passive inspection devices,

(d) Detection or security systems for explosive, biological, or chemical

A-4

substances, and

(e) Access controls, screening devices, and traffic management systems.

**\*B9** Acquisition, installation, operation, or evaluation of physical security devices, or controls to enhance the physical security of existing critical assets and the eventual removal and disposal of that equipment in compliance with applicable requirements to protect the environment.  Examples include, but are not limited to:

(a) Motion detection systems,

(b) Use of temporary barriers, fences, and jersey walls on or adjacent to existing facilities or on land that has already been disturbed or built upon,

(c) Impact resistant doors and gates,

(d) X-ray units,

(e) Remote video surveillance systems,

(f)  Diver/swimmer detection systems, except sonar,

(g) Blast/shock impact-resistant systems for land based and waterfront facilities,

(h) Column and surface wraps, and

(i)   Breakage/shatter-resistant glass.

**B10** Identifications, inspections, surveys, or sampling, testing, seizures, quarantines, removals, sanitization, and monitoring of imported products that cause little or no physical alteration of the environment.  This CATEX would primarily encompass a variety of daily activities performed at the borders and ports of entry by various elements of the Customs and Border Protection and Transportation Security Administration.

**B11** Routine monitoring and surveillance activities that support law enforcement or homeland security and defense operations, such as patrols, investigations, and intelligence gathering, but not including any construction activities (construction activities are addressed in Subsection E of these CATEX).  This CATEX would primarily encompass a variety of daily activities performed by the Components of U.S. Coast Guard, Immigration and Customs Enforcement, Customs and Border Protection, Transportation Security Administration, and the U.S. Secret Service.

**REAL ESTATE ACTIVITIES**

A-5

**C1** Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property.

**C2** Lease extensions, renewals, or succeeding leases where there is no change in the facility's use and all environmental operating permits have been acquired and are current.

**C3** Reassignment of real property, including related personal property within the Department (e.g., from one Departmental element to another) that does not result in a change in the functional use of the property.

**C4** Transfer of administrative control over real property, including related personal property, between another Federal agency and the Department that does not result in a change in the functional use of the property.

**C5** Determination that real property is excess to the needs of the Department and, in the case of acquired real property, the subsequent reporting of such determination to the General Services Administration or, in the case of lands withdrawn or otherwise reserved from the public domain, the subsequent filing of a notice of intent to relinquish with the Bureau of Land Management, Department of Interior.

***C6** Congressionally-mandated conveyance of DHS controlled real property to a non-Federal entity.

***C7 [new]** The initial lease of, or grant of an easement interest in, DHS-controlled real property to a non-Federal entity or the amendment, renewal, or termination of such lease or easement interest where the proposed type and intensity of real property use is similar to existing uses.

***C8 [new]** The grant of a license to a non-Federal entity to perform specified acts upon DHS-controlled real property or the amendment, renewal, or termination of such license where the proposed  type and intensity of real property use is similar to existing uses.

**C9 [new]** Allowing another Federal agency to use DHS-controlled real property under a permit, use agreement, or similar arrangement or the amendment, renewal, or termination of such permit or agreement where the proposed type and intensity of real property use is similar to existing uses.

**C10 [new]** Real property inspections to ensure compliance with deed or

A-6

| |
|---|
| easement restrictions. |

**REPAIR AND MAINTENANCE ACTIVITIES**

**D1** Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (e.g. realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an EA or EIS for the installation).

**D2** Routine upgrade, repair, maintenance, or replacement of equipment and vehicles, such as aircraft, vessels, or airfield equipment that does not result in a change in the functional use of the property.

**D3** Repair and maintenance of Department-managed buildings, roads, airfields, grounds, equipment, and other facilities which do not result in a change in functional use or an impact on a historically significant element or setting (e.g. replacing a roof, painting a building, resurfacing a road or runway, pest control activities, restoration of trails and firebreaks, culvert maintenance, grounds maintenance, existing security systems, and maintenance of waterfront facilities that does not require individual regulatory permits).

**\*D4** Reconstruction and/or repair by replacement of existing utilities or surveillance systems in an existing right-of-way or easement, upon agreement with the owner of the relevant property interest.

**\*D5** Maintenance dredging activities within waterways, floodplains, and wetlands where no new depths are required, applicable permits are secured, and associated debris disposal is done at an approved disposal site.  This CATEX encompasses activities required for the maintenance of waterfront facilities managed primarily within the U.S. Coast Guard and Customs and Border Protection.

**D6** Maintenance of aquatic and riparian habitat in streams and ponds, using native materials or best natural resource management practices.  Examples include, but are not limited to:

    (a) Installing or repairing gabions with stone from a nearby source,

    (b) Adding brush for fish habitat,

    (c) Stabilizing stream banks through bioengineering techniques, and

A-7

(d) Removing and controlling exotic vegetation, not including the use of herbicides or non-native biological controls.

This CATEX would primarily involve property management activities at larger properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

**CONSTRUCTION, INSTALLATION, AND DEMOLITION ACTIVITIES**

**E1** Construction, installation, operation, maintenance, and removal of utility and communication systems (such as mobile antennas, data processing cable, and similar electronic equipment) that use existing rights-of-way, easements, utility distribution systems, and/or facilities.  This is limited to activities with towers where the resulting total height does not exceed 200 feet and where the FCC would not require an EA or EIS for the acquisition, installation, operation or maintenance.

**\*E2** New construction upon or improvement of land where all of the following conditions are met:

(a) The structure and proposed use are compatible with applicable Federal, Tribal, State, and local planning and zoning standards and consistent with Federally-approved State coastal management programs,

(b) The site is in a developed area and/or a previously-disturbed site,

(c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area,

(d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings, and,

(e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.).

**\*E3** Acquisition, installation, operation, and maintenance of equipment, devices, and/or controls necessary to mitigate effects of the Department's missions on health and the environment, including the execution of appropriate real estate agreements. Examples include but are not limited to:

(a) Pollution prevention and pollution control equipment required to meet applicable Federal, Tribal, State, or local requirements,

(b) Noise abatement measures, including construction of noise barriers, installation of noise control materials, or planting native trees and/or

A-8

| |
|---|
| native vegetation for use as a noise abatement measure, and,<br><br>(c) Devices to protect human or animal life, such as raptor electrocution prevention devices, fencing to restrict wildlife movement on to airfields, fencing and grating to prevent accidental entry to hazardous or restricted areas, and rescue beacons to protect human life. |
| **\*E4** Removal or demolition, along with subsequent disposal of debris to permitted or authorized off-site locations, of non-historic buildings, structures, other improvements, and/or equipment in compliance with applicable environmental and safety requirements. |
| **E5** Natural resource management activities on Department-managed property to aid in the maintenance or restoration of native flora and fauna, including site preparation, landscaping, and control of non-indigenous species.  This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center. |
| **E6** Reconstruction of roads on Departmental facilities, where runoff, erosion, and sedimentation issues are mitigated through implementation of best management practices. This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center. |
| **E7** Construction of physical fitness and training trails for non-motorized use on Department facilities in areas that are not environmentally sensitive, where run-off, erosion, and sedimentation are mitigated through implementation of best management practices.  This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center. |
| **\*E8** Construction of aquatic and riparian habitat in streams and ponds on Department-managed land, using native materials or best natural resource management practices.  Examples include, but are not limited to:<br><br>(a) Installing or repairing gabions with stone from a nearby source,<br><br>(b) Adding brush for fish habitat,<br><br>(c) Stabilizing stream banks through bioengineering techniques, and,<br><br>(d) Removing and controlling exotic vegetation, not including the use of herbicides or non-native biological controls. |

A-9

This CATEX would encompass property management activities primarily at properties within the U.S. Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Center.

## HAZARDOUS/RADIOACTIVE MATERIALS MANAGEMENT AND OPERATIONS

**F1** Routine procurement, transportation, distribution, use, and storage of hazardous materials that comply with all applicable requirements, such as Occupational Safety and Health Act (OSHA) and National Fire Protection Association (NFPA).

**F2** Reuse, recycling, and disposal of solid, medical, radiological, and hazardous waste generated incidental to Department activities that comply with applicable requirements such as Resource Conservation and Recovery Act (RCRA), Occupational Safety and Health Act (OSHA), and State hazardous waste management practices.  Examples include but are not limited to:

(a) Appropriate treatment and disposal of medical waste conducted in accordance with all Federal, Tribal, State, and local laws and regulations,

(b) Temporary storage and disposal solid waste, conducted in accordance with all Federal, Tribal, State, and local laws and regulations,

(c) Disposal of radiological waste through manufacturer return and recycling programs, and

(d) Hazardous waste minimization activities.

**F3** Use (that may include the processes of installation, maintenance, non-destructive testing, and calibration), transport, and storage of hand-held, mobile or stationary instruments, containing sealed radiological and radioactive materials, to screen for or detect dangerous or illegal individuals or materials in compliance with commercial manufacturers' specifications, as well as applicable Federal requirements to protect the human environment. Examples of such instruments include but are not limited to:

(a) Gauging devices, tracers, and other analytical instruments,

(b) Instruments used in industrial radiography,

(c) Systems used in medical and veterinary practices; and

(d) Nuclear Regulatory Commission (NRC) approved, sealed, small source radiation devices for scanning vehicles and packages where

A-10

radiation exposure to employees or the public does not exceed 0.1 rem per year and where systems are maintained within the NRC license parameters at existing facilities.

**TRAINING AND EXERCISES**

**G1** Training of homeland security personnel, including international, Tribal, State, and local agency representatives using existing facilities where the training occurs in accordance with applicable permits and other requirements for the protection of the environment.  This exclusion does not apply to training that involves the use of live chemical, biological, or radiological agents except when conducted at a location designed and constructed to contain the materials used for that training.  Examples include but are not limited to:

  (a) Administrative or classroom training,

  (b) Tactical training, including but not limited to training in explosives and incendiary devices, arson investigation and firefighting, and emergency preparedness and response,

  (c) Vehicle and small boat operation training,

  (d) Small arms and less-than-lethal weapons training,

  (e) Security specialties and terrorist response training,

  (f)  Crowd control training, including gas range training,

  (g) Enforcement response, self-defense, and interdiction techniques training, and

  (h) Techniques for use in fingerprinting and drug analysis.

**G2**  Projects, grants, cooperative agreements, contracts, or activities to design, develop, and conduct national, State, local, or international exercises to test the readiness of the nation to prevent or respond to a terrorist attack or a natural or manmade disaster and where conducted in accordance with existing facility or land use designations.  This exclusion does not apply to exercises that involve the use of chemical, biological, radiological, nuclear, or explosive agents/devices (other than small devices such as practice grenades/flash bang devices used to simulate an attack during exercise play).

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE TRANSPORTATION SECURITY ADMINISTRATION (TSA)**

**H1** Approval or disapproval of security plans required under legislative or

A-11

Instruction Manual # 023-01-001-01

Revision # 01

| |
|---|
| regulatory mandates unless such plans would have a significant effect on the environment. |
| **H2** Issuance or revocation of certificates or other approvals, including but not limited to:<br><br>    (a) Airmen certificates,<br><br>    (b) Security procedures at general aviation airports, and<br><br>    (c) Airport security plans. |
| **[Section I of this table has been deleted; CATEX I1 is now K3]** |
| **UNIQUE CATEGORICAL EXCLUSIONS FOR THE FEDERAL LAW ENFORCEMENT TRAINING CENTER (FLETC)** |
| **\*J1** Prescribed burning, wildlife habitat improvement thinning, and brush removal for southern yellow pine at the FLETC facility in Glynco, Georgia. No more than 200 acres will be treated in any single year. These activities may include up to 0.5 mile of low-standard, temporary road construction to support these operations. |
| **J2** Harvest of live trees on Federal Law Enforcement Training Center facilities not to exceed 70 acres, requiring no more than ½ mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples include but are not limited to:<br><br>    (a) Removal of individual trees for saw logs, specialty products, or fuel wood, and<br><br>    (b) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor. |
| **J3** Salvage of dead and/or dying trees on Federal Law Enforcement Training Center facilities not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include but are not limited to:<br><br>    (a) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees,<br><br>    (b) Harvest of fire damaged trees, and |

(c) Harvest of insect or disease damaged trees.

**UNIQUE CATEGORICAL EXCLUSIONS FOR CUSTOMS AND BORDER PROTECTION (CBP)**

**K1** Road dragging of existing roads and trails established by Federal, Tribal, State, or local governments to maintain a clearly delineated right-of-way, to provide evidence of foot traffic and that will not expand the width, length, or footprint of the road or trail.

**K2** Repair and maintenance of existing border fences that do not involve expansion in width or length of the project, and will not encroach on adjacent habitat.

**\*K3 [formerly I1]**  A portable or relocatable facility or structure used to collect traveler data at or adjacent to an existing port of entry where the placement or use of the facility does not significantly disturb land, air, or water resources and does not individually or cumulatively have a significant environmental effect.  The building footprint of the facility must be less than 5,000 square feet and the facility or structure must not foreclose future land use alternatives.

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE U.S. COAST GUARD (USCG)**

**\*L1** Personnel and other administrative actions associated with consolidations, reorganizations, or reductions in force resulting from identified inefficiencies, reduced personnel or funding levels, skill imbalances, or other similar causes.

**L2** Routine procurement activities and actions for goods and services, including office supplies, equipment, mobile assets, and utility services for routine administration, operation, and maintenance.

**L3** Routine personnel, fiscal, and administrative activities, actions, procedures, and policies which clearly do not have any environmental impacts, such as military and civilian personnel recruiting, processing, paying, and record keeping.

**L4** Review of documents, such as studies, reports, and analyses, prepared for legislative proposals that did not originate in DHS and that relate to matters that are not the primary responsibility of the USCG.

**L5** Preparation of guidance documents that implement, without substantive

A-13

| |
|---|
| change, the applicable Commandant Instruction or other Federal agency regulations, procedures, manuals, and other guidance documents. |
| **L6** Approval of recreational activities or events (such as a Coast Guard Unit picnic) at a location developed or created for that type of activity. |
| **\*L7** The initial lease of, or grant of, an easement interest in, Coast Guard-controlled real property to a non-Federal party or the amendment, renewal, or termination of such lease or easement interest where the reasonably foreseeable real property use will not change significantly and is similar to existing uses. |
| **\*L8** The grant of a license to a non-Federal party to perform specified acts upon Coast Guard-controlled real property or the amendment, renewal, or termination of such license where the proposed real property use is similar to existing uses. |
| **\*L9** Allowing another Federal agency to use Coast Guard-controlled real property under a permit, use agreement, or similar arrangement or the amendment, renewal, or termination of such permit or agreement where the real property use is similar to existing uses. |
| **\*L10** The lease of a Coast Guard controlled historic lighthouse property to a non-Federal party as outlined in the Programmatic Memorandum of Agreement between the Coast Guard, Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers. |
| **\*L11** Acquisition of real property (including fee simple estates, leaseholds, and easements) improved or unimproved, and related personal property from a non-Federal party by purchase, lease, donation, or exchange where the proposed real property use is similar to existing uses for the foreseeable future (acquisition through condemnation not covered). |
| **\*L12** Acquisition of real property and related personal property through transfer of administrative control from another DHS component or another Federal agency to the Coast Guard where title to the property remains with the United States including transfers made pursuant to the defense Base Closure and Realignment Act of 1990, Pub. L. 101-510, as amended, (10 U.S.C. 2687 note) and where the proposed Coast Guard real property uses is similar to existing uses. |
| **\*L13** Coast Guard use of real property under the administrative control of another DHS component or another Federal agency through a permit, use |

A-14

| |
|---|
| agreement, or similar arrangement where the proposed real property use is similar to existing uses. |
| **\*L14** Coast Guard new construction upon, or improvement of, land where all of the following conditions are met : <br><br> (a) The structure and proposed use are substantially in compliance with prevailing local planning and zoning standards. <br><br> (b) The site is on heavily developed property and/or located on a previously disturbed site in a developed area. <br><br> (c) The proposed use will not substantially increase the number of motor vehicles at the facility. <br><br> (d) The site and scale of construction are consistent with those of existing, adjacent, or nearby buildings. |
| **L15** Real property inspections for compliance with deed or easement restrictions. |
| **\*L16** Transfer of administrative control over real property from the Coast Guard to another DHS component or another Federal agency (title to the property remains with the United States) that results in no immediate change in use of the property. |
| **\*L17** Determination by the Coast Guard that real property is excess to its needs, pursuant to the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 et seq.), and the subsequent reporting of such determination to the Administrator of the General Services Administration or the subsequent filing of a notice of intent to relinquish lands withdrawn or reserved from the public domain with the Bureau of Land Management, Department of Interior, in accordance with 43 CFR part 2370. |
| **\*L18** Congressionally mandated conveyance of Coast Guard controlled real property to another Federal agency or non-Federal entity. |
| **L19** Relocation of Coast Guard personnel into existing Federally owned or leased space where use does not change substantially and any attendant modifications to the facility would be minor. |
| **\*L20** Decisions to temporarily or permanently decommission, disestablish, or close Coast Guard shore facilities including any follow-on connected protection and maintenance needed to maintain the property until it is no longer under Coast Guard control. |

A-15

**\*L21** Demolition of buildings, structures, or fixtures and disposal of subsequent building, structure, or fixture waste materials.

**\*L22** Determination by the Coast Guard that Coast Guard controlled personal property, including vessels and aircraft, is "excess property", as that term is defined in the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 472(e)), and any subsequent transfer of such property to another Federal agency's administrative control or conveyance of the United States' title in such property to a non-Federal entity.

**L23** Decisions to decommission equipment or temporarily discontinue use of facilities or equipment. This does not preclude the need to review decommissioning under section 106 of the National Historic Preservation Act. (REC required for vessels and aircraft.)

**\*L24** Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in functional use of the real property (e.g. realigning interior spaces of an existing building, extending an existing roadway in a developed area a short distance, installing a small antenna on an already existing antenna tower, adding a small storage shed to an existing building, etc.).

**\*L25** Installation of devices to protect human or animal life, such as raptor electrocution prevention devices, fencing to restrict wildlife movement on to airfields, and fencing and grating to prevent accidental entry to hazardous areas.

**\*L26** Maintenance dredging and debris disposal where no new depths are required, applicable permits are secured, and disposal will be at an existing approved disposal site.

**L27** Routine repair, renovation, and maintenance actions on aircraft and vessels.

**L28** Routine repair and maintenance of buildings, roads, airfields, grounds, equipment, and other facilities which do not result in a change in functional use, or an impact on a historically significant element or setting.

**L29** Routine repair and maintenance to waterfront facilities, including mooring piles, fixed floating piers, existing piers, and unburied power cables.

**\*L30** Minor renovations and additions to waterfront facilities, including mooring piles, fixed floating piers, existing piers, and unburied power cables,

A-16

| |
|---|
| which do not require special, site-specific regulatory permits. |
| **L31** Routine grounds maintenance and activities at units and facilities. Examples include localized pest management actions and actions to maintain improved grounds (such as landscaping, lawn care and minor erosion control measures) that are conducted in accordance with applicable Federal, state, and local directives. |
| **\*L32** Defense preparedness training and exercises conducted on Coast Guard controlled property that do not involve undeveloped property or increased noise levels over adjacent property and that involve a limited number of personnel, such as exercises involving primarily electronic simulation or command post personnel. |
| **L33** Defense preparedness training and exercises conducted on other than USCG property, where the lead agency or department is not USCG or DHS and the lead agency or department has completed its NEPA analysis and documentation requirements. |
| **L34** Simulated exercises, including tactical and logistical exercises that involve small numbers of personnel. |
| **L35** Training of an administrative or classroom nature. |
| **\*L36** Realignment or initial homeporting of mobile assets, including vessels and aircraft, to existing operational facilities that have the capacity to accommodate such assets or where supporting infrastructure changes will be minor in nature to perform as new homeports or for repair and overhaul. Note. If the realignment or homeporting would result in more than a one for one replacement of assets at an existing facility, then the checklist required for this CE must specifically address whether such an increase in assets could trigger the potential for significant impacts to protected species or habitats before use of the CE can be approved. |
| **L37** Operations to carry out maritime safety, maritime law enforcement, search and rescue, domestic ice breaking, and oil or hazardous substance removal programs. |
| **L38** Actions performed as a part of USCG operations and the Aids to Navigation Program to carry out statutory authority in the area of establishment of floating and minor fixed aids to navigation, except electronic sound signals. |
| **L39** USCG participation in disaster relief efforts under the guidance or |

A-17

leadership of another Federal agency that has taken responsibility for NEPA compliance.

**L40** Routine movement of personnel and equipment, and the routine movement, handling, and distribution of non-hazardous and hazardous materials and wastes in accordance with applicable regulations.

**\*L41** Contracts for activities conducted at established laboratories and facilities, to include contractor-operated laboratories and facilities, on USCG-owned property where all airborne emissions, waterborne effluents, external radiation levels, outdoor noise, and solid and bulk waste disposal practices are in compliance with existing applicable Federal, state, and local laws and regulations.

**L42** Environmental site characterization studies and environmental monitoring including: Siting, constructing, operating, and dismantling or closing of characterization and monitoring devices. Such activities include but are not limited to the following:

(a) Conducting geological, geophysical, geochemical, and engineering surveys and mapping, including the establishment of survey marks.

(b) Installing and operating field instruments, such as stream-gauging stations or flow-measuring devices, telemetry systems, geochemical monitoring tools, and geophysical exploration tools.

(c) Drilling wells for sampling or monitoring of groundwater, well logging, and installation of water-level recording devices in wells.

(d) Conducting aquifer response testing.

(e) Installing and operating ambient air monitoring equipment.

(f) Sampling and characterizing water, soil, rock, or contaminants.

(g) Sampling and characterizing water effluents, air emissions, or solid waste streams.

(h) Sampling flora or fauna.

(i) Conducting archeological, historic, and cultural resource identification and evaluation studies in compliance with 36 CFR part 800 and 43 CFR part 7.

(j) Gathering data and information and conducting studies that involve no physical change to the environment. Examples include topographic surveys, bird counts, wetland mapping, and other inventories.

**L43** Natural and cultural resource management and research activities that

A-18

Instruction Manual # 023-01-001-01

Revision # 01

are in accordance with inter-agency agreements and which are designed to improve or upgrade the USCG's ability to manage those resources.

**L44** Planning and technical studies which do not contain recommendations for authorization or funding for future construction, but may recommend further study. This includes engineering efforts or environmental studies undertaken to define the elements of a proposal or alternatives sufficiently so that the environmental effects may be assessed and does not exclude consideration of environmental matters in the studies.

**L45** Modification or replacement of an existing bridge on essentially the same alignment or location. Excluded are bridges proving access to undeveloped barrier islands and beaches.

**L46** Construction of pipeline bridges for transporting potable water.

**L47** Construction of pedestrian, bicycle, or equestrian bridges and stream gauging cableways used to transport people.

**L48** Temporary replacement of a bridge immediately after a natural disaster or a catastrophic failure for reasons of public safety, health, or welfare.

**L49** Promulgation of operating regulations or procedures for drawbridges.

**L50** Identification of advance approval waterways under 33 CFR 115.70.

**L51** Any Bridge Program action which is classified as a CE by another Federal agency acting as lead agency for such an action.

**L52** Regulations concerning vessel operation safety standards (e.g., regulations requiring: certain boaters to use approved equipment which is required to be installed such as an ignition cut-off switch, or carried on board, such as personal flotation devices (PFDS), and/or stricter blood alcohol concentration (BAC) standards for recreational boaters, etc.), equipment approval, and/or equipment carriage requirements (e.g. personal flotation devices (PFDs) and visual distress signals (VDS's)).

**\*L53** Congressionally mandated regulations designed to improve or protect the environment (e.g., regulations implementing the requirements of the Oil Pollution Act of 1990, such as those requiring vessels to have the capability to transmit and receive on radio channels that would allow them to receive critical safety and navigation warnings in U.S. waters, regulations to increase civil penalties against persons responsible for the discharge of oil or

A-19

| |
|---|
| hazardous substances into U.S. waters, etc.). |
| **L54** Regulations which are editorial or procedural, such as those updating addresses or establishing application procedures. |
| **L55** Regulations concerning internal agency functions or organization or personnel administration, such as funding, establishing Captain of the Port boundaries, or delegating authority. |
| **L56** Regulations concerning the training, qualifying, licensing, and disciplining of maritime personnel. |
| **L57** Regulations concerning manning, documentation, admeasurement, inspection, and equipping of vessels. |
| **L58** Regulations concerning equipment approval and carriage requirements. |
| **L59** Regulations establishing, disestablishing, or changing the size of Special Anchorage Areas or anchorage grounds. (REC not required for actions that disestablish or reduce the size of the Area or grounds). |
| **L60** Regulations establishing, disestablishing, or changing Regulated Navigation Areas and security or safety zones. (REC not required for actions that disestablish or reduce the size of the area or zone. For temporary areas and zones that are established to deal with emergency situations and that are less than one week in duration, a REC is not required. For temporary areas and zones that are established to deal with emergency situations and that are one week or longer in duration, a REC will be prepared and submitted after issuance or publication.) |
| **L61** Special local regulations issued in conjunction with a regatta or marine parade; provided that, if a permit is required, the environmental analysis conducted for the permit included an analysis of the impact of the regulations. (REC not required.) |
| **L62** Regulations in aid of navigation, such as those concerning rules of the road, International Regulations for the Prevention of Collisions at Sea (COLREGS), bridge-to-bridge communications, vessel traffic services, and marking of navigation systems. |
| **\*L63** Approvals of regatta and marine parade event permits for the following events:<br><br>    (a) Events that are not located in, proximate to, or above an area |

A-20

designated environmentally sensitive by an environmental agency of the Federal, state, or local government.  For example, environmentally sensitive areas may include such areas as critical habitats or migration routes for endangered or threatened species or important fish or shellfish nursery areas.

(b) Events that are located in, proximate to, or above an area designated as environmentally sensitive by an environmental agency of the Federal, state, or local government and for which the USCG determines, based on consultation with the Governmental agency, that the event will not significantly affect the environmentally sensitive area.

**\*L64** Disposal of real property (including facilities) by the USCG where the reasonably foreseeable use will not change significantly or where the reasonably foreseeable use is similar to existing surrounding properties (e.g. commercial store in a commercial strip, warehouse in an urban complex, office building in downtown area, row house or vacant lot in an urban area).

**UNIQUE CATEGORICAL EXCLUSIONS FOR THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA)**

*Note: All categories of actions in Section M below are new CATEXs. These CATEXs will be available for use only by FEMA.*

**M1** The following activities in support of FEMA's administration of the National Flood Insurance Program (NFIP):

(a)  Review of information, provision of technical assistance, and classification for individual communities under the Community Rating System (CRS);

(b)  Approvals and issuance of Letters of Map Change, including Agency comments;

(c)  \*Creation of new flood zones, except establishing new flood zones for areas protected by structural flood control structures or systems or dams;

(d)  Revisions to Standard Flood Insurance Policy and Group Flood Insurance Policy;

(e)  Actions associated with inspections and monitoring, and enforcement of Federal, State, Tribal, or local floodplain management codes, standards, or regulations, except for the suspension of communities from the NFIP;

(f)  \*Development and adoption of CRS activities; and

(g)   Revisions to flood insurance rates and premium schedules.

A-21

**M2** Transportation and prepositioning of assets in preparation for national emergencies and disasters.

**M3** Urban Search and Rescue (USR) activities, including deployment of USR teams.

**M4** Emergency Communications (Stafford Act §418)

**M5** Emergency Public Transportation (Stafford Act §419)

**M6** Lease of pre-existing structures and facilities for disaster operations (e.g. Joint Field Offices, Area Field Offices, Disaster Recovery Centers) located out of floodplains, historic properties, or contaminated sites.

***M7** Lease of pre-existing structures and facilities for disaster operations (e.g., Joint Field Offices, Area Field Offices, Disaster Recovery Centers) located within floodplains, historic properties, or contaminated sites.

***M8** Development of temporary shelter or housing for first responders and Federal disaster personnel involving less than 10 acres of ground disturbance in previously developed or disturbed areas and that follow best management practices for pollution control.

***M9** Storage of assets immediately after a disaster, including development of temporary staging areas involving less than 10 acres of ground disturbance in previously developed or disturbed areas and that follow best management practices for pollution control.

**M10** Activation of response and recovery frameworks and operations (e.g. National Response Framework, National Disaster Recovery Framework, National Response Coordination Center, Regional Response Coordination Center, Emergency Response Teams, Incident Management Assistance Teams, Emergency Support Functions, Recovery Support Functions).

**M11** Information and data gathering and reporting in support of emergency and disaster response and recovery activities, including ground and aerial reconnaissance and structure inspection.

**M12** Development of plans by FEMA for the purpose of preparing for disasters, recovering from disasters, and identifying opportunities for mitigating the effects of future disasters; and the issuance of national frameworks, doctrines, guidance, standard operating procedures, and handbooks for the coordination of Federal, State, local, and private disaster

A-22

response, recovery, and hazard mitigation. This CATEX is not applicable to subsequent decisions on specific situations or projects that are reasonably foreseeable in order to implement the plan.

**\*M13** Construction or installation of structures, facilities, or equipment for the purpose of ensuring the continuity of operations during incidents such as emergencies, disasters, flooding, and power outages involving less than one acre of ground disturbance. Examples include the installation of generators, installation of storage tanks of up to 10,000 gallons, installation of pumps, construction of structures to house emergency equipment, and utility line installation. This CATEX covers associated ground disturbing activities, such as trenching, excavation, and vegetation removal of less than once acre, as well as modification of existing structures.

**FEDERAL ASSISTANCE ACTIVITIES**

*Note: All categories of actions in Section N below are new CATEXs. These CATEXs will be available for use by any DHS Component providing Federal assistance, e.g., grants.*

**N1 Administrative Actions Associated with Grants Management**. Actions related to grant administration performed at any stage during the grants lifecycle, such as the development and issuance of grant guidance; announcements of availability of funds; project reviews for program eligibility; provision of technical assistance; conducting inspections, financial audits, and monitoring activities; development of information technology systems for grants management; grant close-out activities; and actions taken in situations where a grantee or subgrantee is in non-conformance with grant program requirements, such as disallowances, recoupment of funds, and debarment.

**\*N2 Federal Assistance for Facility Repair**. Federal assistance for the repair of structures and facilities in a manner that conforms to pre-existing design, function, location, and land use.  This CATEX does not apply to work within or affecting the following: streams; stream banks; seaward of the limit of moderate wave action (LiMWA) (a line mapped to delineate the inland extent of wave heights of 1.5 feet); or the V zone (areas expected to be affected by wave impact of 3 feet or more in height, in a 100-year flood event) if the LiMWA has not been identified. This CATEX covers the temporary staging and use of equipment and vehicles to carry out the proposed repair actions as long as best management practices are put in place to control noise, water, and air pollution.

**\*N3 Federal Assistance for Property Acquisition and Demolition**. Federal assistance for the acquisition of properties and the associated

A-23

demolition and removal when the acquisition is from a willing seller, the assistance is solely for the purposes of financial compensation for the acquisition, and the land is deed restricted to open space, recreational, wildlife habitat, or wetland uses in perpetuity. This CATEX covers actions associated with the determination of program eligibility.  This CATEX does not cover Federal assistance actions that involve acquisition for the purpose of construction or development at a site in the acquired property. The use of eminent domain is explicitly excluded from the CATEX.

**\*N4 Federal Assistance for Actions Involving Stream Work and Modification and Floodways**. Federal assistance for repair and restoration actions, hazard mitigation actions other than flood control, or the new construction of facilities that are functionally dependent or facilitate open space use, when the actions are within or affect regulatory floodways, streams, and stream banks and  that

(a) Involve ground disturbance of less than ½ acre,

(b) Involve stream bank work or alteration of less than 300 linear feet,

(c) Do not involve hardening or armoring of the stream banks unless the project uses stream or stream bank bioengineering techniques and improve fish passage or habitat,

(d) Do not result in adverse flood risk effects to downstream communities,

(e) Do not result in any increase of flood levels within the community during the occurrence of the base flood discharge if the action takes place within the regulatory floodway, and

(f) Where the effect of the proposed project when combined with other existing or reasonably foreseeable development will not increase water surface elevation of the base flood more than one foot at any point within the community if it the action takes place in a floodplain with no regulatory floodway.

**\*N5 Federal Assistance for Actions in Coastal Areas Subject to Moderate Wave Action or V Zones**.  Federal assistance for repair, hazard mitigation, new construction, or restoration actions of less than one-half acre within the following areas: areas seaward of the limit of moderate wave action (LiMWA) (a line mapped to delineate the inland extent of wave heights of 1.5 feet) during the base flood (an area that has at least a one-percent chance of being flooded in any given year); or areas within the V zone (a coastal area where there is a velocity hazard due to wave action) if the LiMWA has not been established. The actions must meet the following criteria:

A-24

(a) They are consistent with the State or Tribe enforceable policies of approved coastal management programs,

(b) They are not within or affect a Coastal Barrier Resource System unit,

(c) They do not result in man-made alterations of sand dunes,

(d) They do not result in the permanent removal of vegetation (including mangrove stands, wetlands, and dune vegetation),

(e) Applicable Federal requirements and local codes and standards are followed, and

(f) They involve substantial improvement or new construction of structures, the structure is elevated in open works (e.g. piles and columns) as opposed to fill in a manner that the bottom lowest horizontal structural member is at or above the base flood level, the foundation is anchored to resist flotation, collapse, and lateral movement due to the effects of wind and water loads, and the siting of the project conforms to applicable State, Tribe, or local setback requirements.

Examples of activities covered by this CATEX include but are not limited to: the repair and elevation of structures; repair and new construction of jetties and groins; the repair, hazard mitigation, and new construction of functionally dependent facilities such as piers, marinas, boat ramps, bathrooms, and port facility structures; and beach restoration projects except projects that result in the man-made alteration of dunes and wetlands such as beach nourishment projects.

**\*N6 Federal Assistance for Relocation/Realignment of Structures and Facilities**. Federal assistance for the relocation of structures and facilities, including the realignment of linear facilities that are part of a bigger system, when they do not involve ground disturbance of more than one acre. This category does not apply to the following: actions that involve hardening or armoring of stream banks, unless they use stream or stream bank bioengineering techniques; realignment actions affecting a regulatory floodway if they result in any increase in flood levels during the base flood discharge; or actions occurring seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified).

**\*N7 Federal Assistance for Structure and Facility Upgrades**. Federal assistance for the reconstruction, elevation, retrofitting, upgrading to current codes and standards, and improvements of pre-existing facilities in existing developed areas with substantially completed infrastructure, when the immediate project area has already been disturbed, and when those actions

A-25

do not alter basic functions, do not exceed capacity of other system components, or modify intended land use. This category does not include actions within or affecting streams or stream banks or actions seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified).

**\*N8 Federal Assistance for New Construction Activities of Less Than One Acre in Undisturbed or Undeveloped Areas**. Federal assistance for new construction and associated site preparation activities in undisturbed or undeveloped areas when the activities comprise less than one acre and follow best management practices to control noise, water, and air pollution. This category does not apply to new construction in undisturbed or undeveloped floodplains, wetlands, or seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified). This CATEX covers the range of activities typically necessary for new construction, including field work (e.g. borings, site inspection) and temporary staging and use of construction equipment and vehicles.

**\*N9 Federal Assistance for Flood Hazard Reduction Actions**. Federal assistance for drainage, berm, water crossing, and detention, retention, or sediment pond projects which have the primary purpose of addressing flood hazards and:

   (a) Do not affect more than 25 acres,

   (b) Do not result in adverse flood risk effects to downstream communities,

   (c) Do not result in any increase of flood levels within the community during the occurrence of the base flood discharge if the action takes place within the regulatory floodway, and

   (d) Where the effect of the proposed project when combined with other existing or reasonably foreseeable development will not increase water surface elevation of the base flood more than one foot at any point within the community if it the action takes place in a floodplain with no regulatory floodway.

This CATEX covers minor flood control actions as identified in Sections 1366 and 1361 of the National Flood Insurance Act (NFIA).  Actions that are not covered in Sections 1366 and 1361 of the NFIA, such as dikes, levees, seawalls, groins, and jetties, are excluded from this CATEX.

**\*N10 Federal Assistance for Communication Towers of Less than 400 Feet**. Federal assistance for the construction of communication towers when all of the following are met:

A-26

(a) The total height is less than 400 feet above ground level,

(b) The tower construction project has been reviewed by the Federal Communications Commission (FCC) and has been documented as meeting FCC environmental planning and historic preservation procedures,

(c) The project is located farther than 660 feet from a Bald Eagle's nest or 0.6 mile from a Golden Eagle nest,

(d) The tower is not located on ridgelines or in coastal zones, bird staging areas, colonial nesting sites, 100- or 500-year floodplains, or wetlands, and

(e) The lighting scheme meets all applicable US Fish and Wildlife Service guidelines for reducing potential impacts to night-migrating birds.

This CATEX covers associated activities such as installation of fuel storage tanks, equipment buildings, security fencing and lighting, and access roads, and land disturbance activities typically associated with construction such as clearing, fill, and grading.

**\*N11 Federal Assistance for Wildfire Hazard Mitigation Actions**. Federal assistance for wildfire hazard mitigation actions involving the creation of defensible space or hazardous fuel reduction for up to 100 feet of at-risk structures which includes the selective removal of vegetation less than 12 inches in diameter through thinning, pruning, limbing, sawing, or brush cutting; removal of downed, dead, or dry vegetation material as part of the overall action.

The actions must be limited to less than 100 acres of vegetation removal either individually or when combined with other reasonably foreseeable private or public actions and follow appropriate best management practices.

**\*N12** Federal assistance for planting of indigenous vegetation.

**N13** Provision of the Following Forms of Federal Assistance Under the Stafford Act:

(a) Unemployment Assistance (§410);

(b) Individuals and Households Programs (§408), except for grants that will be used for restoring, repairing or building private bridges, or purchasing mobile homes or other readily fabricated dwellings;

(c) Food Coupons and Distribution (§412);

(d) Food Commodities (§413);

A-27

Instruction Manual # 023-01-001-01

Revision # 01

(e) Legal Services (§415);

(f)  Crisis Counseling Assistance and Training (§416);

(g) Community Disaster Loans (§417);

(h) Emergency Communications (§418);

(i)  Emergency Public Transportation (§419);

(j)  Fire Management Assistance (§420)

---

**N14** Federal assistance for Urban Search and Rescue (USR) activities, including deployment of USR teams.

---

**\*N15 Federal Assistance for Disaster Temporary Individual Housing in Private and Commercial Sites**. Federally funded action or federal assistance for the development, installation and/or removal of individual housing units in pre-existing private or commercial sites that are not located on contaminated sites for individual temporary housing units.

---

**\*N16 Federal Assistance for Disaster Temporary Group Housing of Less than Five (5) Acres**. Federal assistance for the placement of disaster temporary group housing, including associated temporary facilities and the tie-in or installation of necessary utilities to service the housing units (such as electricity, potable water, and wastewater infrastructure), that involves less than five (5) acres of ground disturbance on sites that are zoned for housing and that follow best management practices for pollution control.  This CATEX also covers the conversion of such temporary housing to permanent housing when these criteria are met.

---

**N17 Federal Assistance for Development of Plans in Support of Response, Recovery, and Hazard Mitigation Activities**. Federal assistance for the development of plans for the purpose of preparing for disasters, recovering from disasters, and identifying opportunities for mitigating the effects of future disasters. This includes but is not limited to State, Tribal, and local hazard mitigation plans, debris management plans, long-term recovery plans, and disaster housing plans. This CATEX is not applicable to plans associated with specific projects that are reasonably foreseeable to occur and that are not otherwise covered by another CATEX.

---

**\*N18 Federal Assistance for Construction or Installation of Structures, Facilities, or Equipment to Ensure Continuity of Operations**. Federal assistance for the construction or installation of measures for the purpose of ensuring the continuity of operations during incidents such as emergencies, disasters, flooding, and power outages involving less than one acre of

A-28

ground disturbance. Examples include the installation of generators, installation of storage tanks of up to 10,000 gallons, installation of pumps, construction of structures to house emergency equipment, and utility line installation. This CATEX covers associated ground disturbing activities, such as trenching, excavation, and vegetation removal of less than once acre, as well as modification of existing structures.

**\*N19 Federal Assistance for Clean-up and Other Actions to Restore Environmental Resources**.  Federal assistance for clean-up and other actions to restore environmental resources to pre-existing conditions when resource contamination or damage results from a disaster event and when the clean- up and associated actions are not exempt from NEPA. Examples include the clean-up of underground storage tank releases and above ground releases that affect nearby water bodies or wetlands.

A-29

# Appendix B.  List of Environmental Planning Requirements other than NEPA

DHS integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment.  These other environmental planning requirements include, but are not limited to, the following:

A.   Clean Air Act (16 U.S.C. §470 et seq.).

B.   Clean Water Act 33 (U.S.C. §1251 et seq.).

C.   Coastal Barrier Resources Act (16 U.S.C. §3501 et seq.).

D.   Coastal Zone Management Act (16 U.S.C. §1451 et seq.).

E.   Endangered Species Act (16 U.S.C. §1531 et seq.).

F.   Farmland Protection Policy Act (7 U.S.C. §4201 et seq.).

G.   Marine Mammal Protection Act (16 U.S.C. §1361 et seq.).

H.   Migratory Bird Treaty Act (16 U.S.C. §703-712).

I.   National Historic Preservation Act (16 U.S.C. §470 et seq.).

J.   National Marine Sanctuaries Act (16 U.S.C. §1431 et seq.).

K.   Executive Order 11988, Floodplain Management, dated May 24, 1977.

L.   Executive Order 11990, Protection of Wetlands, dated May 24, 1977.

M.   Executive Order 12114, Environmental Effects Abroad of Major Federal Actions, dated January 4, 1979.

N.   Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, dated February 11, 1994.

O.   Executive Order 13423, Strengthening Federal Environmental, Energy, and Transportation Management, dated January 24, 2007.

P.   Executive Order 13514, Federal Leadership in Environmental, Energy, and Economic Performance, dated October 5, 2009.

B-1

# Appendix C.  Record of Environmental Consideration (REC) Template for Categorically Excluded Actions

| INTRODUCTION |
|---|
| The purpose of this Record of Environmental Consideration (REC) is to provide a record that the potential for impacts to the quality of the human environment has been considered in the decision to implement the Proposed Action described below, in accordance with the National Environmental Policy Act of 1969 (NEPA) and DHS Directive 023-01 and Instruction Manual 023-01-001-01 on implementation of NEPA.  DHS integrates the NEPA process with review and compliance requirements under other Federal laws, regulations, Executive Orders, and other requirements for the stewardship and protection of the human environment, as reflected in Section II (8) of this REC.  Signature of the DHS Proponent on this REC demonstrates that they have considered the potential for impacts to the human environment in their decision to implement the Proposed Action as required by NEPA, and are committing to any conditions listed in Section IV of this REC that may be required for implementation of the project. |
| Instructions:  Information to complete this form is needed from both the proponent office and environmental planning specialists.  The environmental impact evaluation documented in this REC must include the full life-cycle of the Proposed Action, to the extent that the stages of that life-cycle are reasonably foreseeable and sufficiently developed to make an environmental analysis possible at this time.  Any connected or related activities that are needed for the Proposed Action to be effective, or that need this Proposed Action to be effective, must also be included in the environmental impact evaluation. Provide quantitative information where appropriate; discuss alternatives, if appropriate; and attach relevant supporting documents (e.g., maps, photographs, correspondence, reports, etc.).  When completed, the form is to be signed by the Preparer, the Environmental Approver, and the Action Proponent.  The completed REC becomes a part of the administrative record for the Proposed Action. |
| SECTION I – Description of Proposed Action |
| 1.  Name of Component and Program/Office Authorizing the Proposed Action: |
| 2.  Title of Proposed Action: |
| 3.  Identifying Number of Proposed Action (if available): |
| 4.  Estimated Start Date and Useful Life of Proposed Action: |
| 5.  Location of Proposed Action (e.g., Nationwide, Regional, Site-Specific. If site-specific, provide City, County, State, and street address and/or latitude-longitude coordinates): |
| 6.  Description of Proposed Action, including its purpose and need and any related or connected actions.  You may include as attachments maps, photographs, diagrams, or other information that may assist with the description. |
| SECTION II – Analysis of Extraordinary Circumstances |
| 7.      ☐      Proposed Action is not a piece of a larger action<br><br>☐      Proposed Action is a piece of a larger action<br><br>Remarks: |

C-1

| | | 8. For A through K, check the appropriate box and provide an explanation when appropriate. Include a summary of any coordination or consultation that occurred with a resource or regulatory agency, if relevant. |
|---|---|---|
| ☐ Yes | ☐ No | A.  Will the Proposed Action have a potentially significant effect on public health or safety? |
| Remarks: | | |
| ☐ Yes | ☐ No | B. Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act? |
| Remarks: | | |
| ☐ Yes | ☐ No | C. Will the Proposed Action have a potentially significant effect on a district, highway, structure, or object that is listed or eligible for listing on the National Register of Historic Places (NRHP)? Will the Proposed Action have a potentially significant effect on a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource? |
| Remarks: | | |
| ☐ Yes | ☐ No | D.  Will the Proposed Action have a potentially significant effect on an environmentally sensitive area? |
| Remarks: | | |
| ☐ Yes | ☐ No | E.  Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment? |
| Remarks: | | |
| ☐ Yes | ☐ No | F.   Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks? |
| Remarks: | | |
| ☐ Yes | ☐ No | G. Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity? |
| Remarks: | | |
| ☐ Yes | ☐ No | H.   Will the Proposed Action establish a precedent for future actions that have significant effects? |
| Remarks: | | |

C-2

| ☐ Yes | ☐ No | I.  Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? |
|---|---|---|
| Remarks: | | |

| ☐ Yes | ☐ No | J.  Does the Proposed Action have the potential to result in significant degradation of existing poor environmental conditions?  Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not significantly modified from their natural condition? |
|---|---|---|
| Remarks: | | |

| ☐ Yes | ☐ No | K.  Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts? |
|---|---|---|
| Remarks: | | |

**SECTION III  –  Categorical Exclusion (CATEX) Determination**

9. If one or more DHS CATEX applies to the proposed action, indicate which DHS CATEX(s) applies (see Appendix A, Table 1, DHS Instruction Manual 023-01-001-01 for the list of DHS CATEXs).  The entire proposed action must clearly fit within one or more DHS CATEX(s).  Note: The presence of an extraordinary circumstance (Section II above) precludes the application of a CATEX when the circumstance would have significant environmental impacts (i.e., Environmental Impact Statement required), or presents the potential for significant environmental impacts (i.e., Environmental Assessment (EA) required), or that potential cannot be readily determined without further analysis (i.e., EA required).

**SECTION IV  –  Conditions**

10.  The following conditions are required to implement the Proposed Action:

- Any change to the Proposed Action requires re-evaluation for compliance with NEPA before the action can proceed.

- This review addresses NEPA and requirements under other environmental planning requirements that are integrated into the NEPA process.  This review may identify the need for additional Federal, State, and/or local permits, approvals, etc. required for the Proposed Action.  However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate Federal, State, and/or local permits, approvals, etc. have been obtained.

- [Add action-specific conditions as necessary, e.g.: If ground disturbing activities occur during action implementation, the Proponent will monitor ground disturbance and if any potential archeological resources or human remains are discovered, will immediately cease work in that area and notify _____.]

C-3

| SECTION V – Signatures | | |
|---|---|---|
| **11a. Preparer of this REC** | | |
| Name, Office, and Title: | Signature: | Date: |
| **11b. Environmental Approver of this REC** | | |
| Name, Office, and Title: | Signature: | Date: |
| **11c. Office of General Counsel Reviewer of this REC (if required by Component)** | | |
| Name, Office, and Title: | Signature: | Date: |
| **11d.  Action Proponent** | | |
| Name, Office, and Title: | Signature: | Date: |

C-4

Instruction Manual # 023-01-001-01

Revision # 01