**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **STATE OF MICHIGAN**<br><br>    Plaintiff,<br><br>v.<br><br>**MARKWAYNE MULLIN**, et al.,<br><br>    Respondents and Defendants. | Case No. 2:26-cv-10968 |

**DECLARATION OF JAMES K. INGALSBE**

I, James K. Ingalsbe, hereby make the following declaration with respect to the above-captioned matter:

1.      I am employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), as the Assistant Director (AD) of the Office of Asset and Facilities management (OAFM). I have held this position since April 2022.

2.      In my current position as AD, I am the Executive responsible for the Occupational Health and Safety, Personal Property, and Real Property Management Programs for ICE. As the AD, I supervise the following four divisions: Asset Management, Safety and Occupational Health, Facilities Management, and Business Operations.

3.      During my tenure as AD of OAFM, I have managed a real property portfolio of over 950 active leases and over 560 government-owned buildings and structures.

4.      Immediately prior to joining ICE, I served as the United States Coast Guard's (USCG) Deputy Chief of the Office of Civil Engineering, and I was responsible for policy, resources, and overall asset management for the USCG's shore facilities, pollution response equipment, and fleet vehicles. During my 25 years of active-duty service at USCG, I served in

1

numerous leadership positions in diverse areas of mission support and program management.  At the conclusion of my time at the USCG, I retired as a Captain.

5.  While in the USCG, I received my Master of Science in National Resource Strategy from the Industrial College of the Armed Forces and Master of Science in Civil Engineering from the University of Illinois.  I am also a licensed Professional Engineer and a certified Level III Program Manager.

6.  Historically, ICE has relied on contractor- or local and state government-owned facilities to house detained aliens. This practice worked until more recent political opposition to the ICE mission in various states led to an increasing number of state, municipal, and local laws, regulations, and ordinances that made it very difficult for state, municipal, and local governments, and private contractors, to reliably provide these detention services to ICE. Contracting and leasing opportunities grew ever more constrained, and ICE determined that buying properties for detention purposes was the most reliable approach going forward to ensure the availability of detention space for its immigration law enforcement mission.

7.  To assist with this new approach to securing detention facilities and to accommodate the agency's increased nationwide immigration enforcement efforts, Congress appropriated $45,000,000,000 to ICE. Public Law 119-21, § 90003 ("One Big Beautiful Bill") (enacted July 4, 2025).  President Trump also directed DHS to "take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens." Exec. Order No. 14,159, 90 Fed. Reg. 8443, § 10 (Jan. 20, 2025).

8. To do so, ICE sought to develop several regional detention arrangements, each consisting of multiple "processing centers" (PCs) that could support a single regional "mega center" (MC).

9. A PC is intended to house up to 1,500 detainees for days or weeks immediately following their arrest. Therefore, as a practical and logistical matter, each PC needed to be located near a well-staffed Enforcement and Removal field office; ideally, within 50 miles.

10. Comparatively, an MC is intended to house larger detainee populations for longer durations following their transfer from a regional PC and who are now awaiting deportation from the country. Given the size and purpose of an MC, these sites need to support larger facilities and be located near larger transportation hubs and airports.

11. If a facility meeting the above criteria for either a PC or an MC was not currently owned by the federal government, ICE would then survey the region for sites to purchase with existing infrastructure that could be remodeled into a detention facility. As part of this survey, ICE also conducted a market research report for each potential site, prepared in accordance with the GSA Site Selection Guide, GSA Guidebook 1 (Acquisition of Real Property), and DHS Directive 023-01. This report evaluated a site's market conditions, pricing support, infrastructure readiness, environmental constraints, and alternatives to inform a defensible federal acquisition decision.

12. Once a site is selected as the best option based on the above criteria and due diligence (¶¶ 8-10), ICE leadership requests Secretary of Homeland Security approval for the purchase (Acquisition Approval). The Acquisition Approval contains a summary of the site's general location, anticipated bed capacity, and government-approved appraised value (established in accordance with the Uniform Appraisal Standards for Land Acquisition).

13.     I am familiar with the recently acquired warehouse located at 7525 Cogswell Street, Romulus, Michigan, 48174 (Cogswell Property).

14.     Before the Cogswell Property or any other warehouse sites were considered for purchase, the agency surveyed the region for existing federal facilities that met the MC criteria described in Paragraph 9 above. No such sites existed within reasonable proximity to larger traffic hubs or airports or with sufficient square footage to reasonably accommodate the anticipated detainee populations.

15.     ICE then surveyed the region for existing sites meeting these criteria that could be purchased and retrofitted. Initially, four Michigan properties were evaluated as potential MC sites, wherein a Highland Park warehouse was selected as the best option. DHS leadership then authorized the purchase in December 2025, only for the property to become unavailable before ICE could engage in negotiations with the property owner.

16.     Based on the remaining sites, ICE then selected the Cogswell Property as the next best option. Specifically, this site included a warehouse with sufficient square footage— approximately 1,295,000—located within the broader Michigan I-81 / I-78 corridor; one of the most active transportation and distribution hubs in the Midwest. The Cogswell Property was also chosen because other alternative sites either became unavailable or imposed unagreeable restrictions.

17.     Following selection, ICE purchased the Cogswell Property on or about February 4, 2026. If ICE were enjoined from using this site, there would be significant operational impacts and costs. At present, we cannot provide accurate estimates of those impacts in dollar amounts, but an injunction would force ICE personnel to transport detainees over greater distances to find detention facilities able to hold additional detainees, resulting in less time spent by ICE personnel actively

4

enforcing immigration laws and increased costs for fuel and maintenance of vehicles. In addition, the property is intended to provide space for administrative offices and a training space for new ICE personnel. Also, ICE intends that the property will also provide space for safely storing vehicles and equipment. Without this space, ICE would be forced to lease other commercial space to meet these needs, thereby incurring additional costs and operational challenges.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: April 21, 2026

JAMES K INGALSBE

Digitally signed by JAMES K INGALSBE
Date: 2026.04.21 14:04:59 -04'00'

_____

James K. Ingalsbe
Assistant Director
Office of Asset and Facilities Management
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security