**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**STATE OF MICHIGAN; CITY OF ROMULUS**

      Plaintiff,

v.

**MARKWAYNE MULLIN**, et al.,

      Defendants.

Case No. 2:26-cv-10968

**DECLARATION OF SHAWN L. BYERS**

    I, Shawn L. Byers, hereby make the following declaration with respect to the above-captioned matter:

1.    I am employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), as the Deputy Field Office Director (DFOD) of the ERO Chicago Field Office. I have held this position since August 2022. Since January 2, 2026, I have also been serving as the National Program Manager for the ICE detention capacity acquisition program.

2.    I have been employed by ICE since November 2, 2003. After numerous positions in local and regional ERO offices, on December 18, 2011, I was promoted to Unit Chief at ERO Headquarters. On June 17, 2012, I was promoted to an Assistant Field Office Director (AFOD) position in the ERO Chicago Field Office. On April 29, 2018, I was promoted to a Deputy Field Office Director position in ICE's ERO St. Paul Field Office. On June 20, 2021, I transferred to the ERO Washington Field Office in Fairfax, Virginia. On August 14, 2022, I transferred to the ERO Chicago Field Office.

1

3.    In my current position as a DFOD, I supervise subordinate managers and mid-level supervisors of ICE law enforcement officers and support staff charged with identifying, locating, and arresting aliens who are present in the United States in violation of law. I also supervise eight subordinate managers (AFODs) and 32 supervisors (Supervisory Detention and Deportation Officers) who are charged with handling the facility-related issues of 13 offices located in the six states that comprise the ERO Chicago office area of operations: Illinois, Indiana, Wisconsin, Missouri, Kansas, and Kentucky. My additional duties include the supervision of the Contracting Officer Representative (COR) for 13 facilities-related and 45 detention-related contracts, with a combined annual value exceeding $72,000,000 in FY 2025. The COR is responsible for the technical monitoring and administration of the contracts. As the first line supervisor for the COR, I am the deciding official for all contracting matters related to facilities projects including design approvals, and when needed, any contract violation notices.

4.    During my tenure as a DFOD, I have managed over 30 facilities-related construction projects to include the relocation of entire multiple offices into both commercially leased and General Services Administration managed spaces.

5.    Prior to my promotion as a DFOD, as a first line manager, supervisor, and headquarters Detention and Deportation Officer, I led ground level construction efforts for multiple facilities construction and relocation projects. I am familiar with the ICE detention standards applicable to facilities that hold aliens present in the United States in violation of law prior to their removal from the United States.

6.    Prior to my government service, I worked in skilled trades and as a business owner installing underground gas lines for residential customers for over 14 years. In my experiences in the skilled trades and as a business owner, I regularly had to inspect and assess real property,

including utility infrastructure, for construction purposes.

7. In my current role as the National Program Manager for the ICE detention capacity acquisition program, my responsibilities include vetting potential properties for operational feasibility, performing or coordinating Certificates of Inspection and Possession (CIP) inspections, and overseeing designs by vendors to ensure they meet operational requirements.

8. ICE maintains detention capacity within each field office's area of jurisdiction to facilitate compliance with the *ICE National Detention Standards (Revised 2025)*. As described in the *ICE National Detention Standards*, ICE uses its immigration detention authority to effectuate its mission of enforcing the nation's immigration laws by securing individuals in custody while they await the resolution of their immigration proceedings and/or removal from the United States.

9. In the past, ICE has relied on state, local, and contractor facilities to house its detainees. Consistent with Section 90003 of Public Law 119-21 ("One Big Beautiful Bill Act"), signed July 4, 2025, which appropriated $45,000,000,000 for ICE's detention capacity, ICE has developed a reimagined detention structure and acquisition strategy to address the rising operational tempo and increasing number of arrests of illegal aliens. This strategy focuses on acquiring existing facilities and retrofitting them to meet ICE detention needs and standards. Additionally, the strategy seeks to implement a new detention model comprised of ICE-owned facilities that would reduce the need to rely on state, local, or contractor owned facilities. In the past few years going back to 2019, multiple state and local governments have attempted to prevent ICE from using contractor-owned or local facilities to detain aliens. As a result, it would be unreasonable for ICE to continue to depend on state, local, or contractor owned facilities to provide reliable and consistent detention capacity commensurate with ICE's operational needs.

3

10. Operating an ICE-owned detention facility protects public safety and national security by equipping the agency with the capacity to detain aliens present in the United States in violation of law, including known or suspected terrorists, foreign fugitives, and those aliens that have failed to appear for their immigration proceedings, and those pending removal who failed to surrender after being ordered removed by an immigration judge.

11. I am familiar with the recently acquired ICE property located at 7525 Cogswell Street, Romulus, Michigan, 48174. The property consists of 27.15 acres, upon which a large vacant warehouse sits. The warehouse has a floor area of approximately 285,600 square feet. On January 3, 2026, I conducted the CIP inspection at the Romulus site in accordance with the *Regulations of the Attorney General Governing the Review and Approval of Title for Federal Land Acquisitions (2016)*, section 4.2. The CIP inspection determined that the building was well maintained and in average condition and did not identify any possible claims to title that would challenge or conflict with the federal government interest in purchasing the property. At the present time, ICE does not have plans to pursue a purchase of another existing facility in the Great Lakes region which includes Michigan, Wisconsin, Indiana, Ohio and Illinois.

12. ICE intends to ultimately use this facility to serve the Detroit ERO field office's needs for detention space in the state of Michigan. Currently, ICE has no for-certain reliable or dedicated detention capacity in the Detroit area and therefore relies on local law enforcement partners in nearby counties to provide space for detainees. The Monroe County facility is approximately 40 minutes away, and the St. Clair County facility is approximately one hour away. However, that space is not guaranteed and ICE typically requests to hold about 100 detainees in Monroe County and 50 detainees in St. Clair County. The ICE-contracted facility in North Lake, Michigan, can accommodate up to 1,810 detainees but is three hours away. Given that prolonged

distance, the North Lake facility is not operationally practicable for daily use to support the Detroit area of operations. As of April 13, 2026, data maintained by the ERO Law Enforcement Systems and Analysis (LESA) Division shows there are 138,966 individuals in Michigan who have final orders of removal, 7,072 of whom have criminal records, and 3,760 of whom have pending criminal charges. In the Detroit area there are 36,702 individuals who have final orders of removal, 2,589 of whom have criminal records, and 1,363 of whom have criminal charges pending. Without sufficient detention capacity in Michigan, ICE personnel may have to make difficult determinations surrounding arrest, including transporting detainees to detention centers in different states to free up detention space in Michigan, or forgoing arrest of some individuals who would otherwise be apprehended. These logistical challenges degrade ICE's ability to enforce the nation's immigration laws and protect public safety.

13. Multiple locations recently acquired for ICE detention purposes have been targets for vandalism, including arson and damage to landscaping. At the Romulus site, signs indicating the property was U.S. government property and stating "no trespassing" were defaced with graffiti. To deter and prevent such actions and protect the property and public safety before construction at the site is completed, ICE plans to erect temporary fencing and security cameras and lighting, install a building alarm system and fiberoptic cable for connectivity, and potentially conduct demolition and installation of drywall for a relatively small amount of office and administrative space in the building. None of these measures would involve disturbing the ground or permanent alteration of the site. Additionally, the building may require repairs to fix leaks in the roof and/or the existing HVAC system.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

5

Date: April 21, 2026

SHAWN L BYERS  Digitally signed by SHAWN L BYERS
DN: cn=SHAWN L BYERS, o=U.S. Government, ou=People, email=Shawn.L.Byers@ice.dhs.gov, c=US
Date: 2026-04-21T13:20:14-0700

Shawn L. Byers
Deputy Field Office Director
National Program Manager, Detention Acquisition Program
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

6